# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT



—————————

August Term, 2009

(Argued: September 17, 2009                    Decided: March 23, 2010)

Docket No.  08-5368-cv

—————————

M. PETER KUCK, individually and on behalf of others similarly situated,

*Plaintiff-Appellant,*

— v.—

JOHN A. DANAHER III, COMMISSIONER, CT STATE DEPT. OF PUBLIC SAFETY,  ALBERT J. MASEK, JR., COMMANDING OFFICER, CT STATE DEPT. OF PUBLIC SAFETY,

*Defendants-Appellees.*

Before:        STRAUB, B.D. PARKER, AND LIVINGSTON, *Circuit Judges.*

—————————

Appellant challenged, on due process grounds, the firearm permit renewal procedures employed by the Connecticut Department of Public Safety and the Board of Firearms Permit Examiners. The United States District Court for the District of Connecticut (Bryant, *J.*) dismissed the complaint. *See* Fed. R. Civ. P. 12(b)(6).  Affirmed in part, vacated and remanded in part.

—————————

Rachel M. Baird, Law Office of Rachel M. Baird, Torrington, CT, *for Plaintiff-Appellant M. Peter Kuck.*

Clare E. Kindall, Assistant Attorney General, *for* Richard Blumenthal, State of Connecticut Attorney General, Hartford, CT, *for Defendants-Appellees John A. Danaher III, et al.*

CERTIFIED COPY ISSUED ON 03/23/2010

1  BARRINGTON D. PARKER, CIRCUIT JUDGE:
2
3          Plaintiff-Appellant M. Peter Kuck appeals from a judgment of the United States District
4  Court for the District of Connecticut (Bryant, *J.*) dismissing his complaint. Kuck's claims arise from
5  his efforts to renew his permit to carry a firearm with the Connecticut Department of Public Safety
6  ("DPS"). His principal claim is a procedural due process challenge alleging that DPS – in tandem
7  with the Board of Firearms Permit Examiners ("the Board") – has a practice of improperly denying
8  permits, unnecessarily prolonging the appeals that follow, and then quietly resolving disputes at the
9  last minute. In addition, Kuck claims that his firearm permit appeal was deliberately delayed by
10  state officials in retaliation for his outspoken criticism of DPS and Board practices, in violation of
11  his First Amendment rights.

12          Based, in part, on this Court's intervening decision in *Spinelli v. City of New York*, 579 F.3d
13  160 (2d Cir. 2009), we conclude that Kuck has stated a procedural due process claim. It remains
14  to be seen, however, whether Kuck has named, or will be able to name, the appropriate defendants
15  for this case to proceed.[1] While he attempted to amend his complaint to add additional defendants,
16  that motion was denied as futile by the district court. We remand so that the district court may
17  consider, in the first instance, whether any relief is available to Kuck or any putative class in light
18  of the proposed amended complaint.
19

_____

[1] Kuck's complaint names as defendants John A. Danaher III, DPS Commissioner, in his official
and individual capacities, and Albert J. Masek, Jr., DPS Commanding Officer, in his official and
individual capacities. The proposed amended complaint and motion to join seek to add: Governor M.
Jodi Rell, in her individual and official capacities; Barbara Mattson, DPS Detective, in her individual
capacity; Thomas Karanda, DPS Detective, in his individual capacity; Ronald A. Bastura, DPS Sergeant,
in his individual capacity; Susan Mazzoccoli, Executive Head, Connecticut State Department of
Administrative Services, in her individual and official capacities; and Christopher R. Adams, Connecticut
State Board of Firearms Permit Examiners, in his individual capacity.

## I.   BACKGROUND

In March 2007, Kuck applied to DPS to renew his permit to carry a firearm. He was subsequently contacted by Defendant Albert J. Masek, an employee of DPS, who requested that Kuck provide a U.S. passport, birth certificate, or voter registration card in support of his renewal application.[2] *See* Compl. ¶ 36. In response, Kuck inquired into the basis for the request. He was told that, by statute, the State could not issue a firearm permit to any "alien illegally or unlawfully in the United States," and therefore DPS was required to verify his citizenship. *See* Conn. Gen. Stat. §§ 29-28(b), 29-28(f), 29-29(d); *cf.* Conn. Const. art. I, § 15 (limiting the right to bear arms to "citizens"). Kuck objected to the requirement, arguing that he had submitted proof of citizenship when he first applied for a permit in 1982 and, over the subsequent 25 years, had never before been asked to provide such proof with a renewal application. *See* Am. Compl. ¶¶ 36-37.[3] He claimed then, as he does now, that the DPS requirement was arbitrary, designed to harass, and, in any event, not authorized by state law. Ultimately, he refused to provide the requested documents. As a result, DPS denied his renewal application.

Kuck then filed an appeal with the Board, seeking a hearing on whether his refusal to submit a U.S. passport or birth certificate provided "just and proper cause" for the denial of his application. *See* Conn. Gen. Stat. § 29-32b(b). However, his appeal hearing was not scheduled to occur for eighteen months, during which time he was deprived of a permit to carry a firearm. In October 2008, after this suit was filed, Kuck finally received his hearing. Shortly before the hearing, he

---

[2] The background facts are taken from Kuck's complaint, the allegations of which are assumed to be true for purposes of adjudicating Defendants-Appellees' motion to dismiss. *See Kirschner v. KPMG LLP*, 590 F.3d 186, 188 (2d Cir. 2009).

[3] In fact, Appellant claims that his previous possession of a valid firearm permit itself constituted proof of citizenship sufficient to satisfy the DPS requirement for renewals.

3

1    provided a voter registration roll supporting his citizenship and residency status; as the result, his

2    renewal application was granted.  Despite this resolution, he continues to seek damages from various

3    state officials under 42 U.S.C. § 1983 for alleged violations of his due process and First Amendment

4    rights.

5            Notably, at the time of his renewal application, Kuck was the Secretary of the Board.

6    Members of the Board are appointed by the Governor and include individuals nominated by gun

7    clubs in Connecticut.  *See* Conn. Gen. Stat. § 29-32b(a).   In 1998, Kuck was nominated by Ye

8    Connecticut Gun Guild, Inc. to the seat on the Board reserved for its representative.

9            Kuck alleges that, since his appointment, the estimated waiting-period for a hearing has

10   increased dramatically, and that the Board Chairman, Christopher Adams, opposed his efforts to

11   speed up the appeals process.  *See* Compl. ¶¶ 78-118.  He contends that DPS and the Board have

12   acted to burden gun-owners' ability to obtain carry permits by improperly denying applications in

13   the first instance and then subjecting applicants to unjustified and prolonged appeals.

14           Kuck asserts three constitutional claims: (1) a violation of procedural due process, based on

15   the allegedly arbitrary denial of his firearm permit and excessive delay in obtaining an appeal

16   hearing; (2) a violation of substantive due process on the same grounds; and (3) a First Amendment

17   retaliation claim, alleging that DPS, acting through one of its detectives, threatened and harassed

18   Kuck after he criticized DPS and the appeals process.  *See* Compl. ¶¶ 78-96.  Kuck filed his suit as

19   a putative class action, seeking to represent a class of individuals whose permits have been

20   erroneously denied by DPS and have subsequently been subjected to a long-delayed appeal before

21   the Board.

4

1    Defendants moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint, contending

2    that Kuck had failed to state claims upon which relief could be granted.  The district court agreed

3    and dismissed the suit, holding that the hearing delay was not so long as to make the availability of

4    review "meaningless or nonexistent."  *See Kuck v. Danaher*, No. 3:07-cv-1390, 2008 WL 2902032,

5    at *3 (D. Conn. July 25, 2008).  In light of this determination, the district court denied Kuck's

6    motion to amend his complaint as futile.  This appeal followed.

7    **II.    DISCUSSION**

8        **A.    Standard of Review**

9        A district court's decision granting a motion to dismiss is subject to *de novo* review.  *See*

10   *Leibowitz v. Cornell Univ.*, 445 F.3d 586, 590 (2d Cir. 2006).  As a matter of substance, "[t]o survive

11   a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state

12   a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)

13   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

14       **B.    Procedural Due Process Claim**

15           1.    Applicable Law

16       Kuck's main contention is that the eighteen-month period he waited to receive an appeal

17   hearing before the Board was, in light of the liberty interest at stake, excessive and unwarranted, and

18   thus violated due process.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985) ("At

19   some point, a delay in the post-termination hearing would become a constitutional violation.").

20   Kuck further alleges that, as a matter of practice, DPS deliberately seeks to prolong the appeals

21   process in order to unlawfully deprive citizens of pistol permits.  *See* Compl. ¶¶ 53-69.

1    Appellees concede that Kuck possesses a liberty interest, created by the Connecticut

2    Constitution, in his right to carry a firearm. *See* Conn. Const. art. I, § 15; *Benjamin v. Bailey*, 662

3    A.2d 1226, 1231-32 (Conn. 1995). They dispute, however, that the time required to resolve Kuck's

4    appeal violated due process. This waiting-period, they argue, is the product of a substantial caseload

5    and the State's acute interest in ensuring that firearms are borne only by those fit to carry them.

6    Our procedural due process analysis is controlled by the three-factor test prescribed in

7    *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). This test requires that we balance: "(1) the private

8    interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used

9    and the probable value (if any) of alternative procedures; (3) the government's interest, including

10   the possible burdens of alternative procedures." *O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir.

11   2005); *see also FDIC v. Mallen*, 486 U.S. 230, 242 (1988). In Kuck's view, his private interest in

12   lawfully possessing a firearm carries the day, at least at the motion to dismiss stage, particularly in

13   light of his allegations that DPS routinely denies permits arbitrarily only to reverse course on the

14   eve of the appeal hearing. *See* Compl. ¶¶ 60-61.

15   Broadly speaking, a delay amounts to a due process violation only where it renders the

16   prescribed procedures meaningless in relation to the private interest at stake. "[T]he mere assertion

17   that state remedies are lengthy . . . will not render state remedies inadequate [under the Due Process

18   Clause] unless they are 'inadequate to the point that [they are] meaningless or nonexistent.'" *Gyadu*

19   *v. Workers' Comp. Comm'n*, 129 F.3d 113 (2d Cir. 1997) (table) (quoting *Easter House v. Felder*,

20   910 F.2d 1387, 1406 (7th Cir. 1990) (en banc)). We, as well as other circuits, have acknowledged

21   that administrative determinations may require a non-trivial amount of time to complete, especially

22   where caseloads are heavy. "Regrettably, delay is a natural concomitant of our administrative

6

1    bureaucracy." *Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir. 1989) (upholding a nineteen-month

2    delay in resolving disputed Medicare Part B claims).  Ultimately, determining the moment at which

3    state procedures become so untimely that they become meaningless is a matter of context, driven

4    by the *Mathews* factors.  *See Mallen*, 486 U.S. at 242 (noting that "the significance of such a delay

5    cannot be evaluated in a vacuum"); *Connecticut v. Doehr*, 501 U.S. 1, 10 (1991) ("[D]ue process,

6    unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place

7    and circumstances." (internal quotation marks omitted)).

8              In precisely this way, we have recently held that deprivations may not be indefinite,

9    particularly where delay cannot be attributed to any clear state interest or the risk of erroneous

10   deprivation is significant.  In *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002), for example, we

11   considered New York City's civil forfeiture procedures for vehicles involved in alleged crimes such

12   as driving while intoxicated.  Under city policy, the City would seize vehicles immediately after an

13   arrest, but forfeiture hearings awaited the completion of the underlying criminal proceedings.  This

14   practice frequently meant that owners were deprived of their vehicles for a year or more before they

15   had any opportunity to challenge the seizure.  *See id.* at 44-46.  We concluded that this interval was

16   simply too long in light of the private interests at stake.  "[T]o say that the forfeiture proceeding,

17   which often occurs more than a year after a vehicle's seizure, represents a meaningful opportunity

18   to be heard at a meaningful time on the issue of continued impoundment is to stretch the sense of

19   that venerable phrase to the breaking point."  *Id.* at 53.  The seizure of real property, especially a

20   vehicle used for daily transportation, called for a more timely opportunity to challenge the

21   deprivation.  *See id.* at 50, 60-62.

7

1      Even more recently, we concluded that a gun shop owner's due process rights were violated

2      when New York City suspended her license without a prompt post-deprivation hearing. *See Spinelli*

3      *v. City of New York*, 579 F.3d 160, 174-76 (2d Cir. 2009). The city conceded that the investigation

4      and hearing process for suspended gun dealer licenses often took "months or years" to complete.

5      *Id.* at 171. Aware of the likely delay, Spinelli hired a lawyer whose successful negotiations with city

6      officials resulted in reinstatement of the suspended license after only 58 days. But given that

7      Spinelli's business and livelihood were at stake, we held that even this delay "exceeded the bounds

8      of due process." *Id.* at 174. These decisions inform our application of the *Mathews* factors in this

9      case.

10                    2.     ***Mathews* Analysis**

11                           a.     First factor: The private interest at stake

12      With respect to the first *Mathews* factor, Kuck's stake in the firearm license is a liberty

13      interest tied to the right to bear arms recognized by state law. *See* Conn. Const. art. I, § 15. As

14      noted, the defendants concede that Kuck possesses such an interest. Unlike in *Spinelli*, however,

15      this interest is not directly tied to Kuck's economic livelihood, and thus lacks some of the same

16      urgency identified by our opinion in that case and others. *See Spinelli*, 579 F.3d at 171 ("The

17      Supreme Court has 'repeatedly recognized the severity of depriving someone of his or her

18      livelihood.'") (quoting *Mallen*, 486 U.S. at 243); *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970).

19      Nonetheless, the interest here remains substantial, protected as it is by the Connecticut Constitution

20      and decisions of that state's highest court. *See Benjamin*, 662 A.2d at 1231-32 (identifying state

21      constitutional right to bear arms for self-defense, but declining to invalidate assault weapons ban).

8

1        While this right is clearly subject to state regulation – including licensing provisions such

2    as those here – these procedures must comport with due process. *See id.*; *State v. Bailey*, 551 A.2d

3    1206, 1218 (Conn. 1988) ("It is beyond serious dispute that the legislature has the authority to place

4    reasonable restrictions on a citizen's right to bear arms."); *Valdivieso Ortiz v. Burgos*, 807 F.2d 6,

5    8 (1st Cir. 1986) (where "a fourteenth amendment liberty interest is implicated . . . the state therefore

6    must adhere to rigorous procedural safeguards").  Contrary to defendants' suggestion, the state's

7    ability to regulate firearms does not extinguish the liberty interest at stake or eliminate the need to

8    afford due process.  In Connecticut, a permit to carry a firearm may only be revoked by the

9    Commissioner of DPS "for cause," or under certain statutorily enumerated circumstances requiring

10    revocation.  Conn. Gen. Stat. § 29-32(b), (c).  Much the same, denial or revocation must be

11    supported on appeal by "just and proper cause." Conn. Gen. Stat. § 29-32b(b).  By contrast to other

12    states' regulatory schemes, the Commissioner does not have unfettered discretion to revoke permits

13    under state law.  *See Bach v. Pataki*, 408 F.3d 75, 80-81 (2d Cir. 2005) (describing the "wide

14    discretion" possessed by licensing officers under New York law); *Gross v. Norton*, 120 F.3d 877,

15    878 (8th Cir. 1997) (finding no constitutionally protected interest in gun permit under Minnesota

16    law).  As a result, permit renewal applicants are entitled to basic due process protections, including

17    a meaningful opportunity to be heard after a denial or revocation. *See Spinelli*, 579 F.3d at 169.

18        All in all, deprivation of a firearm permit may not represent the same day-to-day hardship

19    occasioned by the seizure of a vehicle used for daily transportation, as in *Krimstock*, 306 F.3d at 44-

20    46, or interference with a business-person's livelihood, as in *Spinelli*, 579 F.3d at 174-76.  Yet the

21    Connecticut Constitution establishes a clear liberty interest in a permit to carry a firearm – an

22    interest that is highly valued by many of the state's citizens. *See* Conn. Const. art. I, § 15 ("Every

9

1    citizen has a right to bear arms in defense of himself and the state.").  Though not overwhelming or

2    absolute, we conclude that the private interest at stake remains significant.

3                    b.        Second factor: The risk of erroneous deprivation

4            The second *Mathews* factor – the risk of erroneous deprivation and the probable value of

5    alternative procedures – requires a close analysis of Kuck's complaint. *See Mathews*, 424 U.S. at

6    335.  Kuck, as we have seen, alleges that DPS frequently denies permit applications for bogus or

7    frivolous reasons, thereby subjecting qualified applicants to a lengthy appeals process, only to grant

8    the permit months or years later, just before the appeal hearing. *See Compl.* ¶¶ 2-3, 53-69.  In his

9    case, Kuck claimed that DPS was not entitled under state law to require proof of citizenship with

10   his 2007 renewal application, and that his permit should not have been denied for lack of such

11   documentation.  While this requirement appears eminently reasonable to us, it is not our province

12   here to resolve the specific issue of state law on which Kuck based his appeal to the Board.  The

13   viability of Kuck's due process claim does not turn on the merits of his initial challenge; rather, it

14   concerns whether he received the process he was due. *See Post v. Harper*, 980 F.2d 491, 494 (8th

15   Cir. 1992) ("We review the process afforded to the plaintiff; we do not review the merits of the

16   decision rendered."); *Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 10 (1st Cir. 2003) ("We do not

17   review the substance of decisionmaking under the rubric of procedural due process analysis.").

18   Thus, the focus of this second prong remains on (1) the overall risk of erroneous deprivation for

19   permit applicants, and (2) the time-period required to correct such deprivations.

20           In support of his allegations, Kuck offers figures suggesting that the number of appeals

21   "resolved" without a hearing is indeed far greater than those actually heard by the Board. *See Am.*

22   *Compl.* ¶¶ 195-197 (alleging, for example, that 249 appeals were "resolved" in fiscal year 2006-07,

10

while only 40 appeals came before the Board for a hearing).[4]  This data is consistent with his

allegation that many permits are granted or reinstated shortly before the Board is due to hear the

applicant's appeal.  At the motion to dismiss stage, we credit the inference that this large disparity

represents a significant number of unfounded permit decisions by DPS.  *See Spagnola v. Chubb*

*Corp.*, 574 F.3d 64, 67 (2d Cir.2009) (When reviewing a motion to dismiss, we accept "all well-pled

factual allegations as true and draw all reasonable inferences in the plaintiff's favor").[5]  In addition,

Kuck alleges that the resulting delay is far from trivial.  According to the complaint, unsuccessful

applicants must regularly wait fourteen to twenty months to receive an appeal hearing.  *See* Compl.

¶¶ 47-48, 61.  Together, these allegations plausibly allege a state practice of delaying appeals, only

to moot them at the very last minute, after the applicant has waited more than one year for a hearing.

*See Iqbal*, 129 S. Ct. at 1949-50.  Because this practice appears to have affected a significant number

of applicants, and the delay is considerable, the second *Mathews* factor weighs in favor of Kuck at

this stage of the proceedings.[6]

---

[4] Comparable figures for the preceding years are as follows:

| Fiscal year | Appeals resolved | Appeals heard |
| --- | --- | --- |
| 2005-06 | 281 | 72 |
| 2004-05 | 265 | 76 |
| 2003-04 | 166 | 52 |
| 2002-03 | 150 | 43 |
| 2001-02 | 109 | 39 |

[5] Kuck, we also recognize, is in an unusual position to describe the process by which appeals are resolved.  Because he sits on the Board itself, his allegations have some additional plausibility at this early stage of the proceedings.  *See Iqbal*, 129 S. Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task").

[6] This prong generally requires that we also consider the probable value of alternative procedures.  *See Mathews*, 424 U.S. at 335.  Because it is clear that reducing the time to obtain an appeal hearing would considerably diminish the impact of these allegedly erroneous denials, we need not explore this factor in depth.

1                 c.       Third factor: The governmental interest at stake

2         The third *Mathews* factor requires us to examine the strength of the state's interest in the

3 challenged procedures. Connecticut clearly has a strong and compelling interest in ensuring that

4 firearm permits are not issued to those "lacking the essential character or temperament necessary

5 to be entrusted with a weapon." *Dwyer v. Farrell*, 475 A.2d 257, 260 (Conn. 1984) (internal

6 quotation marks omitted). Yet the state's legitimate interest in public safety does little to explain

7 why it requires up to twenty months to address appeals. For the purposes of a due process analysis,

8 the state must articulate some reason, tied to this interest, that justifies the lengthy period necessary

9 to resolve these appeals. *See Mallen*, 486 U.S. at 242 (directing courts to examine "the justification

10 offered by the Government for delay and its relation to the underlying governmental interest").

11         Here, the state's account is far from overwhelming: the defendants argue that the prolonged

12 wait is simply a function of the Board's caseload and backlog. Yet, on the pleadings, there is no

13 indication that this time is required to gather evidence, perform additional investigation, or formally

14 consider the appeal. Instead, the complaint suggests that the appeal sits gathering dust for nearly

15 all of the interim period, awaiting the scheduled hearing date. Moreover, the amended complaint

16 states that the Board held only 40 appeal hearings in fiscal year 2006-07 – or less than four appeals

17 per month. *See* Am. Compl. ¶¶ 195-197. Thus, the pleadings themselves do not support a clear case

18 of routine administrative delay or overburdened bureaucracy. *See Isaacs v. Bowen*, 865 F.2d 468,

19 477 (2d Cir. 1989). All in all, the State's argument boils down to an assertion that public safety is

20 important and appeals have gotten backed up. But the delay has little apparent connection to the

21 public interest invoked by defendants. The State gives no account of how or why public safety

22 requires unsuccessful applicants to wait a year-and-a-half for an appeal hearing.

1    While we are often solicitous of governmental interests, particularly those related to the

2    public's safety, we cannot accept, at least without additional factual support, the months-long delay

3    that Connecticut attempts to justify in this case. *See Spinelli*, 579 F.3d at 173. This interest is not

4    a license for indefinitely denying permit applicants a post-deprivation opportunity to contest an

5    adverse finding by DPS. *See also Storace v. Mariano*, 391 A.2d 1347, 1348 (Conn. C.P. 1978)

6    (construing the statute governing permit appeals, Conn. Gen. Stat. § 29-32b(c), and stating "[i]t is

7    clear from a reading of the statute that time is of the essence"). For the purposes of the present

8    motion to dismiss, we find that Kuck has stated a procedural due process claim. Whether discovery

9    will bear out his claim is a matter for the district court to determine on remand.

10       C.    Substantive Due Process Claim

11   Kuck also asserts a substantive due process claim based on the DPS practices described

12   above. He claims that DPS has imposed arbitrary requirements contrary to state law which, when

13   combined with the lengthy appeals process, denied him substantive due process. *See* Compl. ¶¶ 14,

14   84-88. The district court dismissed the claim, holding that DPS's alleged misconduct was not so

15   "egregious, outrageous, or shocking to the contemporary conscience" that it violated substantive due

16   process. *See Kuck v. Danaher*, No. 3:07-cv-1390, 2008 WL 2902032, at *3 (D. Conn. July 25,

17   2008). We conclude the district court was correct.

18   Generally speaking, "[f]or state action to be taken in violation of the requirements of

19   substantive due process, the denial must have occurred under circumstances warranting the labels

20   'arbitrary' and 'outrageous.'" *Natale v. Town of Ridgefield*, 170 F.3d 258, 262 (2d Cir. 1999). Yet

21   nothing in the complaint "shocks the conscience" or suggests a "gross abuse of governmental

22   authority." *Rochin v. California*, 342 U.S. 165, 172 (1952), *overruled on other grounds by Mapp*

13

1      *v. Ohio*, 367 U.S. 643 (1961); *Natale*, 170 F.3d at 263 (2d Cir. 1999).  Whether authorized or not,

2      the fact that state officials required Kuck to produce proof of citizenship or legal residency in

3      connection with his permit renewal application is hardly outrageous or shocking.  Even more,

4      substantive due process does not entitle federal courts to examine every alleged violation of state

5      law, especially ones that, while perhaps vexatious, are more routine than egregious.  That is

6      especially so because, under Connecticut law, Kuck and other class members have recourse to state

7      forums to challenge the merits of DPS decisions.  *See* Conn. Gen. Stat. § 29-32b(b), (f).  The district

8      court's dismissal of Kuck's substantive due process claim is consequently affirmed.

9          D.      First Amendment Retaliation Claim

10      Finally, Kuck claims that his First Amendment rights were violated when he was threatened

11      and harassed by a DPS officer, allegedly on account of his outspoken criticism of the agency and

12      the appeals board.  *See* Compl. ¶¶ 76-77.  The district court dismissed this claim, reasoning that

13      Kuck had not adequately alleged that his speech caused any adverse action by DPS.  *See Kuck,* 2008

14      WL 2902032, at *3.  Again, we agree that dismissal was proper.

15      In order to state a retaliation claim, we require a private citizen to show: "(1) he has an

16      interest protected by the First Amendment; (2) defendants' actions were motivated or substantially

17      caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of

18      his First Amendment right." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

19      While Kuck has adequately alleged that he engaged in protected speech, he has not pleaded

20      facts that suggest he was actually threatened by any of the defendants.  At most, the allegations

21      suggest that the DPS officer intended to strictly enforce laws limiting the sale of firearms at

22      upcoming gun shows.  *See* Compl. ¶¶ 73-77.  It goes without saying that retaliation cannot be

1    established where no adverse action has been alleged.  *See Dillon v. Morano*, 497 F.3d 247, 251 (2d

2    Cir. 2007); *Gill v. Pidlypchak*, 389 F.3d 379, 382-84 (2d Cir. 2004) (requiring an adverse action by

3    defendants and a causal connection between the adverse action and the protected speech).  Even

4    more, nothing in the complaint suggests that Kuck's speech was "actually chilled" as a result of the

5    DPS officer's statements.  *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76, 78 (2d Cir. 2008);

6    *Curley*, 268 F.3d at 73.  Consequently, Kuck's First Amendment retaliation claim fails on the

7    pleadings and was properly dismissed by the district court.

8    **III.    CONCLUSION**

9            We remand to the district court for further consideration of Kuck's procedural due process

10   claim.  While Kuck has received his renewal permit in the interim, which moots any personal

11   injunctive relief, he has also sued for damages and on behalf of a putative class of plaintiffs who

12   may still be awaiting hearings before the Board.  *See Comer v. Cisneros*, 37 F.3d 775, 799 (2d Cir.

13   1994) ("Where the claims of the named plaintiffs become moot prior to class certification, there are

14   several ways in which mootness is not had.").  It remains to be seen, however, whether Kuck has

15   named an appropriate defendant for this case to proceed as an individual damages suit or a putative

16   class-action.  Because the district court previously found that the eighteen-month hearing delay

17   could not support a procedural due process claim, it denied both Kuck's motion to join and his

18   motion to amend as futile.  We do not reach these issues or the state's various defenses at present;

19   on remand, the district court should consider the merit, vel non, of these motions.  We affirm the

20   dismissal of Claim Two (substantive due process) and Claim Three (First Amendment retaliation).
21

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit