## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| M. PETER KUCK, individually<br>and on behalf of others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | CASE NO.:  3:07-CV-1390-VLB |
| | : | |
| v. | : | |
| | : | |
| JOHN A. DANAHER III, former Commissioner, | : | |
| Connecticut State Department of Public Safety, | : | |
| In his Individual Capacity, | : | |
| JAMES M. THOMAS, Commissioner, | : | |
| Connecticut State Department of Public Safety, | : | |
| In his Official Capacity, | : | |
| M. JODI RELL, Governor, State of Connecticut, | : | |
| In her Individual and Official Capacities, | : | |
| ALARIC FOX, Captain, | : | |
| Connecticut State Department of Public Safety, | : | |
| In his Individual Capacity, | : | |
| ALBERT J. MASEK, JR., former Commanding Officer, | : | |
| Connecticut State Department of Public Safety, | : | |
| In his Individual Capacity, | : | |
| BARBARA MATTSON, Detective, | : | |
| Connecticut State Department of Public Safety, | : | |
| In her Individual Capacity, | : | |
| THOMAS KARANDA, Detective, | : | |
| Connecticut State Department of Public Safety, | : | |
| In his Individual Capacity, | : | |
| RONALD A. BASTURA, former Sergeant, | : | |
| Connecticut State Department of Public Safety, | : | |
| In his Individual Capacity, | : | |
| SUSAN MAZZOCCOLI, Executive Head, | : | |
| Connecticut State Department of Administrative | : | |
| Services, | : | |
| In her Individual and Official Capacities, | : | |
| CHRISTOPHER R. ADAMS, former Chairman, | : | |
| Connecticut State Board of Firearms Permit | : | |
| Examiners, | : | |
| In his Individual Capacity, | : | TRIAL BY JURY DEMANDED |
| | : | |
| Defendants. | : | SEPTEMBER 3, 2010 |

## AMENDED COMPLAINT

**Preliminary Statement**

1.      This action arises from an attack upon the independence and authority of a civilian review board by a state law enforcement agency intent upon enforcing state firearms laws according to the agency's interpretation of individual rights, regardless of state statutes, regulations, or constitutional principles to the contrary.

2.      In this case, the civilian review board is the Connecticut State Board of Firearms Permit Examiners ("Board") and the state law enforcement agency is the Connecticut State Department of Public Safety (DPS).

3.      The Plaintiff M. Peter Kuck and other individuals similarly situated have been deprived rights secured by the United States Constitution as a direct consequence of the Defendants' conduct, joint and several.

**Jurisdiction**

4.      This Court has jurisdiction of the Amended Complaint pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), (4), and 42 U.S.C. §§ 1983, 1988.

**Parties**

5.      Plaintiff M. Peter Kuck ("Kuck") is an adult citizen of the United States with a residence in West Hartford, Connecticut.

6.      Former Governor John G. Rowland appointed Kuck to the Connecticut State Board of Firearms Permit Examiners ("Board") in 1998 by nomination of Ye Connecticut Gun Guild, Inc. (YCGG) pursuant to Connecticut General Statutes ("General Statutes"), § 29-32b.

7.      Kuck served as the Board's duly elected Secretary from prior to October 2003 until October 11, 2007.

2

8.      Kuck brings Count One, in accordance with Rule 23(b)(1), (2), and (3) of the Federal Rules of Civil Procedure, on his behalf and on behalf of all individuals who, similar to Kuck, have been aggrieved by the denial of their right to lawfully carry a pistol or revolver in the state of Connecticut based exclusively on a DPS determination of "lack of suitability."

9.      Kuck brings Count Two, in accordance with Rule 23(b)(1), (2), and (3) of the Federal Rules of Civil Procedure, on his behalf and on behalf of all individuals who, similar to Kuck:

   a.   have been aggrieved by the refusal to renew a permit to carry a pistol or revolver issued by the state of Connecticut;

   b.   filed timely appeal to the Board in accordance with General Statutes § 29-32b; and

   c.   were denied or are being denied a reasonable and timely opportunity to be heard.

10.     Defendant John A. Danaher III was the Commissioner of the Connecticut State Department of Public Safety ("DPS Commissioner Danaher") at all times relevant to the claims set forth in Counts One through Three, inclusive, and is sued in his individual capacity.

11.     Defendant James A. Thomas is the Commissioner of the Connecticut State Department of Public Safety ("DPS Commissioner Thomas") and is substituted for former DPS Commissioner Danaher as a Defendant in his official capacity.

12.     Governor M. Jodi Rell ("Governor Rell") appointed DPS Commissioner Danaher and DPS Commissioner Thomas to serve as the chief executive officer of the

Department of Public Safety having general jurisdiction over DPS affairs.

13.     Governor Rell is sued in her individual and official capacities.

14.     The DPS is comprised of three principal divisions which include (a) the Division of State Police, (b) the Division of Fire, Emergency and Building Services, and (c) the Division of Scientific Services.

15.     The Division of State Police, the Division of Fire, Emergency and Building Services, and the Division of Scientific Services, and several other DPS sections, report directly to the DPS Commissioner.

16.     The Division of State Police has two distinct operational offices which are the Office of Field Operations and the Office of Administrative Services.

17.     The Office of Administrative Services includes the Special Licensing and Firearms Unit (SLFU).

18.     The DPS Commissioner delegates his responsibility to issue, revoke, and renew state permits to carry a pistol or revolver to the SLFU and its assigned members.

19.     Defendant Alaric Fox ("Lieutenant Fox") is a member of the DPS attached to the SLFU and reporting to DPS Commissioner Danaher at all times relevant to the claims set forth in Counts One through Three, inclusive.

20.     Defendant Albert J. Masek, Jr. ("Captain Masek") supervised the SLFU and was the Commanding Officer of Special Investigations and Support for the Division of State Police at all times relevant to the claims set forth in Counts One through Three, inclusive.

21.     Defendant Barbara Mattson ("Detective Mattson") is a member of the DPS assigned to the SLFU at the rank of detective at all times relevant to the claims set forth

in Counts One through Three, inclusive.

22.    Detective Thomas Karanda ("Detective Karanda") is a member of the DPS formerly assigned to the SLFU at the rank of detective at all times relevant to the claims set forth in Counts One through Three, inclusive.

23.    Sergeant Ronald A. Bastura ("Sergeant Bastura") was a member of the DPS serving as the SLFU's Executive Officer at the rank of sergeant at all times relevant to the claims set forth in Counts One through Three, inclusive.

24.    The State of Connecticut, DPS Commissioner Danaher, Lieutenant Fox, Captain Masek, Detective Mattson, Detective Karanda, and Sergeant Bastura are sued in their individual capacities and are referenced hereinafter as the "DPS Defendants" to include allegations against the State of Connecticut, DPS Commissioner Danaher, Lieutenant Fox, Captain Masek, Detective Mattson, Detective Karanda, and Sergeant Bastura.

25.    Christopher R. Adams ("Chairman Adams") served as the Chairman of the Board through July 17, 2008, at all times relevant to the claims set forth in Counts One through Three, inclusive.

26.    The Board was established in 1967 by state statute within the DPS for administrative purposes only to hear appeals from persons aggrieved (a) by any refusal to issue or renew a permit or certificate under the provisions of General Statutes §§ 29-28 and 29-36f, or (b) by any limitation or revocation of a permit or certificate issued under any of said sections, or (c) by a refusal or failure of any issuing authority to furnish an application as provided in General Statutes § 29-28a.

27.    The Board, because it is assigned to the DPS for administrative purposes

only, is required to: (1) Exercise any quasi-judicial, rule-making or regulatory authority, licensing and policy-making functions which it may have independent of the DPS and without approval or control of the department; (2) prepare its budget, if any, and submit its budgetary requests through the department; and (3) hire its own personnel or enter into contracts, if authorized by law, or if the general assembly provides or authorizes the expenditure of funds.

28.     The Governor appoints seven Board members to serve during the Governor's term and until the members' successors are appointed and qualify.

29.     At least one member is appointed from each of the nominations submitted by the DPS Commissioner, the Connecticut State Association of Chiefs of Police, the Commissioner of Environmental Protection, The Connecticut State Rifle and Revolver Association, Inc., and Ye Connecticut Gun Guild, Inc.

30.     At least one member of the Board must be a lawyer licensed to practice in Connecticut to act as Chairman of the Board during the hearing of appeals brought before the Board.

31.     The Governor appointed Chairman Adams to the Board effective August 2005.

32.     The Board maintains an office in Hartford, Connecticut, for conducting its day-to-day business staffed by a manger.

33.     The Board's manager, Susan Mazzoccoli ("Mazzoccoli"), serves as the Board's Executive Head for routine administrative and operational matters.

34.     Chairman Adams is sued in his individual capacity.

35.     Mazzoccoli is sued in her individual and official capacities.

36.     At all times alleged in the Amended Complaint, each of the individual Defendants acted under color of state law.

## Allegations of Fact

The Denial of Kuck's State Permit Renewal Application

37.     A permit to carry a pistol or revolver in the state of Connecticut ("state permit") expires five years after the date such state permit is issued or renewed.

38.     On or about March 19, 2007, Kuck personally submitted his application to the SLFU in Middletown, Connecticut, for the renewal of his state permit prior to its April 16, 2007, expiration date.

39.     The SLFU demanded that Kuck submit a birth certificate or United States passport for renewal.

40.     Kuck  discussed with Sergeant Bastura, the SFLU Executive Officer, the DPS authority to demand the submission of a birth certificate or United States passport as a condition for state permit renewal.

41.     Sergeant Bastura told Kuck that since September 11, 2001, it was SFLU policy to demand a United States passport or birth certificate as a condition for state permit renewal.

42.     The submission of a United States passport or birth certificate is not a requirement under General Statutes §§ 29-28(b), 29-30 for state permit renewal.

43.     When Kuck applied for his first state permit in 1982, the process required that he submit a birth certificate to the DPS as proof of United States citizenship.

44.     The DPS did not require that Kuck provide a birth certificate, United States passport, or voter registration card with any of the ensuing state permit renewals until

his renewal application submitted on or about March 19, 2007.

45. The DPS does not require the submission of a birth certificate or United States passport with every state permit renewal application.

46. In the February 2006 session of the state General Assembly, language in Raised Bill No. 307 that would have imposed a requirement that a birth certificate, naturalization certificate, or valid United States passport be required for citizens of the United States making application for a temporary state permit under General Statutes § 29-28(b), was rejected.

47. In a May 14, 2007, letter to DPS Commissioner Danaher, Chairman Adams told DPS Commissioner Danaher that General Statutes § 29-30 did not require the presentation of any one particular type of identification.

48. In his May 14, 2007, letter to Commissioner Danaher, Chairman Adams asked DPS Commissioner Danaher to reference a federal law or regulation that would require a particular type of identification as a condition for state permit renewal.

49. DPS Commissioner Danaher never responded to Chairman Adams' requests in the May 14, 2007, letter.

50. Sergeant Bastura knew on March 19, 2007, when he informed Kuck of the SFLU policy conditioning state permit renewal upon the submission of a United States passport or birth certificate that the requirement violated the law.

51. Kuck's state permit expired on April 16, 2007.

52. On April 17, 2007, Kuck requested information from Captain Masek about the SFLU's denial of Kuck's state permit renewal.

53. Captain Masek responded to Kuck that DPS sent Kuck a renewal form

and instructions pursuant to General Statutes § 29-30(f) and that Kuck had failed to provide the documentation required for renewal.

54.     Captain Masek instructed Kuck by letter dated April 26, 2007:  "Enclosed please find another copy of the instruction sheet, which states the documentation that DPS will accept for establishing one's United States citizenship or legal residency.  For establishing citizenship, we require the submission of a birth certificate, United States passport or voter registration card."

55.     The DPS Defendants, acting through the DPS Legal Affairs Unit, and Captain Masek, failed to provide Kuck any basis in law for the DPS application demand that Kuck provide a birth certificate, United States passport, or voter registration card as a condition for state permit renewal pursuant to General Statutes § 29-30.

56.     In June 2005, the Board, upon receipt of a letter from YCGG questioning the SFLU's lawful basis for demanding United States passports as a condition for renewal of a state permit, requested that the DPS clarify the basis for the SFLU policy.

57.     The YCGG informed the Board in its June 2005 letter that the demand for United States passports was an arbitrary and possibly illegal change in state permit renewal requirements.

58.     The SLFU informed the Board in 2005 that the SFLU had requested United States passports since September 11, 2001, but that no one would be denied renewal if a United States passport was not produced.

59.     Kuck was entitled to renewal of his state permit in April 2007.

Kuck's Appeal to the Board

60.     Kuck filed a timely appeal to the Board from the DPS refusal to renew his

state permit.

61.     Detective Mattson informed the Board of the SLFU's cause for refusal to renew Kuck's state permit as:  "App refused to produce to Connecticut State Police his birth certificate, United States passport or voters [sic] registration card upon renewal of his permit."

62.     The Board heard Kuck's appeal on October 9, 2008, and found:

    a.   Kuck was "denied renewal of his state pistol permit by the Commissioner of Public Safety … on April 16, 2007 for failure to provide proof that he was not an illegal alien resident of the United States."

    b.   Kuck "provided the issuing authority with a list of registered voters in the town of West Hartford provided by the Registrars of Voters of that town prior to the commencement of the hearing."

    c.   "The issuing authority knew of no other evidence of the appellant's unsuitability other than his failure to furnish proof of citizenship at the time of renewal."

63.     Kuck never provided the DPS Defendants or the Board a United States passport or voter registration card prior to or since the October 9, 2008, Board decision.

64.     With the exception of his initial application for a state permit in 1982, Kuck never provided the DPS Defendants a birth certificate.

65.     The Board did not receive the list of registered voters into evidence at the October 9, 2008, hearing.

66.     The DPS Defendants, in renewing Kuck's state permit following the October 9, 2008, Board hearing, recorded into the official DPS SLFU database that

Kuck's citizenship had been verified by the Board when in fact it was the Board's finding that the DPS had verified Kuck's citizenship through a voter registration list submitted to the DPS, not the Board.

67.     The DPS Defendants, in renewing Kuck's state permit following the October 9, 2008, Board hearing, recorded into the official DPS SLFU database that Kuck's citizenship had been verified by his birth certificate on December 11, 2008.

68.     Kuck never provided the DPS Defendants his birth certificate after the initial issuance of his state permit in 1982.

69.     Kuck moved for a rehearing before the Board to correct the Board's findings of fact.

70.     Despite Detective Mattson's representation to the Board in stating the cause for the DPS Defendants' refusal to renew Kuck's state permit, the DPS Defendants did possess Kuck's birth certificate as indicated in the SLFU's database.

71.     For this reason, Kuck could not have been denied renewal of his state permit by the DPS Defendants on April 16, 2007, for failure to provide his birth certificate, United States passport, or voter registration card.

72.     The Board, finding that Kuck was not an aggrieved party after its October 8, 2008, decision reversing the DPS Defendants' refusal to renew Kuck's state permit, declined to rule on Kuck's motion to correct the finding of the Board.

The Delay of Kuck's Appeal to the Board

73.     In a May 14, 2007, letter to DPS Commissioner Danaher, the Board, through Chairman Adams and at Kuck's insistence, in his capacity as the Board's Secretary, expressed concern about the backlog of appeals scheduled to be heard by

11

the Board and the waiting period for appellants.

74.     The May 14, 2007, letter to DPS Commissioner Danaher cited an audit performed by the Auditors of Public Accounts ("Auditors") which found that the backlog had been a concern for at least two years and during this time had increased from an estimated wait time for hearing from fourteen to sixteen months.

75.     For fiscal years ending June 30, 2001, and 2002, the Auditors determined that the estimated wait time for a hearing before the Board had increased from three months to fourteen months as of January 23, 2003.

76.     For fiscal years ending June 30, 2003, and 2004, the Auditors noted that the backlog as of May 30, 2005, was fourteen months.

77.     In May, 2007, the estimated wait time for hearing before the Board was seventeen months.

78.     The Board, in its May 14, 2007, letter to DPS Commissioner Danaher, invited DPS to work with the Board to expedite the appeals process.

79.     The Auditors audit the books and accounts of each officer, department, commission, board and court of the State government to examine the performance in order to determine effectiveness in achieving expressed legislative purpose.

80.     The Auditors' findings are reported to the Governor, the State Comptroller, the joint standing committee of the General Assembly having cognizance of matters relating to appropriations and the budgets of State agencies, and the Legislative Program Review and Investigations Committee.

81.     Governor Rell received the auditors' reports indicating that the DPS contributed to the backlog of the appeals waiting for hearing before the Board by not

reviewing and then settling the majority of the cases until the month of the scheduled hearing.

82.     The Auditors told Governor Rell that state permits could have been returned sooner if the DPS has reviewed the cases prior to the scheduled hearing.

The DPS Unilateral Decisions to Return State Permits Prior to Hearing

83.     DPS Commissioner Danaher and his designated agents, including, but not limited to, Lieutenant Fox, Captain Masek, Detective Mattson, Detective Karanda, and Sergeant Bastura, maintained an unlawful practice and procedure of returning revoked state permits to their holders prior to hearing before the Board.

84.     The Board, in deciding whether to order the restoration of a state permit, inquires into and determines the facts, *de novo*, and unless the Board finds that revocation would be for just and proper cause, the Board orders the state permit restored to its holder in accordance with General Statutes § 29-32b(b).

85.     DPS Commissioner Danaher and his designated agents, including, but not limited to, Lieutenant Fox, Captain Masek, Detective Mattson, Detective Karanda, and Sergeant Bastura, by engaging in the unlawful practice and procedure of returning revoked state permits to their owners prior to hearing before the Board, have circumvented the scrutiny of the Board to determine whether the facts support a finding that revocation was for just and proper cause.

86.     DPS Commissioner Danaher and his designated agents, including, but not limited to, Lieutenant Fox, Captain Masek, Detective Mattson, Detective Karanda, and Sergeant Bastura, by engaging in the unlawful practice and procedure of returning

revoked state permits to their owners prior to hearing before the Board, have concealed and secreted revocations from the civilian scrutiny and review of the Board.

87.     DPS Commissioner Danaher and his designated agents, including, but not limited to, Lieutenant Fox , Captain Masek, Detective Mattson, Detective Karanda, and Sergeant Bastura, by engaging in the unlawful practice and procedure of returning revoked state permits to their owners prior to hearing before the Board, have condoned and promoted the revocation of state permits having no basis in fact and without any just and proper cause.

88.     DPS Commissioner Danaher and his designated agents, including, but not limited to, Lieutenant Fox , Captain Masek, Detective Mattson, Detective Karanda, and Sergeant Bastura, by engaging in the unlawful practice and procedure of returning revoked state permits to their owners prior to hearing before the Board, have used discretion not granted them under state law and opened the state permit revocation process to partiality, inconsistency, appearance of impropriety, and problems associated with the lack of oversight attendant to the unauthorized and unregulated discretion practiced by the SLFU in determining whether revoked state permits should be returned to their holders prior to the civilian scrutiny of the Board.

<u>The Secretary, the Chairman, and the Executive Head of the Board</u>

89.     The Governor of the State of Connecticut appointed Kuck to serve on the Board of Firearms Permit Examiners in 1998 by nomination of Ye Connecticut Gun Guild, Inc. (YCGG) pursuant to General Statutes § 29-32b.

90.     The stated purposes of YCGG are (a) to establish and maintain in Connecticut a permanent organization for the promotion of friendship among, and for

the mutual benefit of, persons interested in the collection, preservation, and use of arms and accessories and (2) to take a united stand in opposing legislation or regulation at any level of government which may be injurious to the collection, preservation, possession, or use of firearms by responsible collectors, shooters, sportsmen, and other firearm owners.

91.    Kuck served as the Board Secretary, by election of the Board, from prior to October 2003 until October 11, 2007.

92.    The Board Secretary is responsible for all secretarial duties defined in sections 29-32b-5 through 29-32b-15 of the Regulations of Connecticut State Agencies ("Regulations"), including:

     a.    Accepting appeals to the Board.

     b.    Conducting a thorough inquiry of the facts of the appeal.

     c.    Determining the manner in which a verbatim transcript of each hearing held before the Board is maintained.

     d.    Compelling attendance at hearings by subpoena.

     e.    Postponing, recessing, or rescheduling hearings at the Secretary's discretion when the Board is not in session.

93.    In May 2006, Kuck, in his capacity as Board Secretary, began to question the reason for the backlog of appeals waiting for hearing before the Board.

94.    In anticipation of the June 2006 Board meeting and in response to Kuck's insistence that the Board address the backlog, Chairman Adams asked Mazzoccoli for an estimate of the number of appeals scheduled for hearing at the June 2006 Board meeting.

95.     Mazzoccoli informed Chairman Adams that she had discussed the schedule with Detective Mattson and learned that of the twenty appeals scheduled the SLFU had resolved twelve appeals with the possibility that two more appeals would be resolved prior to hearing.

96.     Chairman Adams condoned the SLFU's unlawful circumvention of the hearing process and informed Mazzoccoli that her report sounded good.

The Board Secretary's Regulatory Functions

97.     General Statutes § 29-32b(c) provides that a person aggrieved by a DPS revocation action may file with the Board a "clear and concise statement of the facts on which he relies for relief, and shall state the relief sought by the appellant."

98.     The Board's receipt of the statement by a person seeking the restoration of a state permit ("appellant") begins the appeals process and no appeal may be rejected for informality.

99.     The Board must set a time and place for the appellant to be heard within ten days of its receipt of the appeal.

100.    The Board, while such appeal is pending, may request such additional information from the appellant and from the DPS as it deems reasonably necessary to conduct a fair and impartial hearing, and shall require of the DPS from whose decision or action the appeal is being sought a statement in writing setting forth the reasons for such failure, refusal, revocation or limitation.

101.    State statutes and regulations provide flexibility and discretion to the Board Secretary so that state permits revoked without apparent just and proper cause may be scheduled forthwith for hearing.

102.    As Board Secretary, Kuck was denied the authority to review facts appeals and schedule appeals for hearing.

103.    Without this oversight by the Board Secretary, the DPS has been allowed to delay the return of state permits by up to twenty-two months in cases in which the DPS knows that a hearing before the Board will result in the restoration of a state permit.

104.    The DPS Defendants' abuse of its ability to ignore state permit issuance, revocation, and renewal statutes is apparent in the number of state permits returned without hearing before the Board after a sixteen to twenty-two month hearing delay.

105.    The DPS Defendants, knowing that they revoke state permits without evidence or basis in law, withhold case statements and positions from the Board until just prior to the scheduled hearing and then settle cases on the day of hearing because the DPS Defendants know that the cases are without evidence or basis in law.

106.    By the time the DPS Defendants settle cases on the day of hearing before the Board, the aggrieved person has been denied the state permit without evidence or basis in law for a fourteen to twenty-two month time period.

107.    The Board Secretary's authority to review the facts and schedule appeals operates as a check and balance on the DPS Defendants' revocation authority.

108.    The ability of the DPS Defendants to revoke state permits and then return them to their holders without review by the Board of the facts has resulted in a pattern and practice of allowing law enforcement agencies and the DPS Defendants to revoke state permits without concern for the law or the intent of the legislative bodies that represent the people.

109.    The SLFU has operated as a rogue unit within the DPS without oversight or regard for the law or the individual rights of state permit holders.

110.    On March 10, 1998, Inspector Michael Beal ("Beal"), a retired state trooper rehired to work in the SLFU, drafted a letter of resignation to his supervisor, Captain Manfred Brideau, informing the DPS of unlawful practices condoned by the DPS that Beal, despite his best efforts, had been unable to quell.

111.    Inspector Beal wrote that it was his responsibility to address the common practice among local police officers of confiscating state permits from individuals when the law gave local law enforcement officers no right to do so if a state permit was validly held.

112.    Beal termed this practice "constructive revocation" which was not authorized under the law.

113.    On January 3, 2008, Beal met with DPS Commissioner Danaher, Lieutenant Fox, and a former DPS law enforcement officer to discuss the delay in appeals filed with the Board for hearing.

114.    At the meeting, Lieutenant Fox told DPS Commissioner Danaher and Beal that a state permit was a privilege and that he [Lieutenant Fox] had adopted the "conservative" side and a "take the permit" preference in carrying out the delegation of the DPS Commissioner's authority to issue, revoke, and renew state permits.

115.    DPS Commissioner Danaher did not correct or oppose Lieutenant Fox's statements of position.

116.    During the meeting, DPS Commissioner Danaher asked Beal for his [Beal's] definition of suitability.

117.   Lieutenant Fox defined suitability as the standard set by law enforcement authorities.

118.   In a subsequent written communication with DPS Commissioner Danaher, Beal warned DPS Commissioner Danaher that taking guidance from Lieutenant Fox on state permit issues had misdirected the DPS.

Chairman Adams and Mazzoccoli's Collaboration with DPS

*Part I – Manipulation of the Number of Cases Heard By the Board*

119.   Kuck attempted in March 2007 to identify the reasons for the backlog in appeals to the Board and asked Chairman Adams whether Chairman Adams had scheduled a meeting with the recently appointed DPS Commissioner Danaher to discuss the backlog of appeals.

120.   Chairman Adams informed Kuck that DPS Commissioner Danaher was confirmed just on the Tuesday preceding March 22, 2007, and that the Board was doing as much as possible to reduce the backlog of appeals.

121.   Chairman Adams informed Kuck that the backlog was "trending down" over time and that, although the backlog was important, Chairman Adams was busy through the current legislative session.

122.   In April 2007, Mazzoccoli informed Chairman Adams that the number of hearings scheduled for the upcoming April 2007 Board meeting numbered six.

123.   Chairman Adams told Mazzoccoli that Kuck would "flip" when he learned that only six appeals were scheduled for hearing and asked Mazzoccoli if DPS would add more appeals to the schedule.

124.   Although it was too late for Mazzoccoli to send timely notices to appellants

for April 2007 hearings, she told Chairman Adams:  "Too late to send hearing notices, but I can adjust the agenda to show cases resolved at the meeting instead of prior to the meeting. I can easily adjust 3 cases, 040-06, 073-06 and 278-05, that were just issued permits last week.  Let me know and I will change the agenda and call Det. Mattson. I'm positive she won't mind."

125.    Chairman Adams approved Mazzoccoli's plan by responding:  "Yes, please do that since it'll be a more accurate reflection of what we've accomplished."

126.    Chairman Adams then asked Mazzoccoli how the number of cases scheduled for hearing in April 2007 had decreased from forty to six over the course of the prior few weeks.

127.    One of the reasons for the decrease in the number of appeals scheduled for hearing in April 2007 was that Mazzoccoli faxed the list of forty appellants to Detective Mattson for review on March 8, 2007.

128.    Detective Mattson left phone messages for Mazzoccoli on March 9, 2007, updating Mazzoccoli with DPS plans to resolve certain appeals by reinstatement, issuance, or barring the state permits.

129.    Following a conversation with Detective Mattson, Mazzoccoli told Chairman Adams that Detective Mattson was refusing to add three more cases to the April 2007agenda.

130.    Detective Mattson was concerned that Kuck would sense that she was not being truthful if she did as Mazzoccoli and Chairman Adams asked.

131.    Chairman Adams and Mazzoccoli failed to convince Detective Mattson to falsify records and lie to the Board.

132.    If Detective Mattson had agreed to Chairman Adams' and Mazzoccoli's request, then Detective Mattson would have made a representation to the Board that the three cases referenced by Mazzoccoli had just resolved and should be taken off the agenda when in fact the cases had resolved prior to the Board meeting and been placed back on the agenda by Mazzoccoli and Chairman Adams to make it appear that the Board was doing more work at Board meetings.

133.    In their continued effort to make it appear as though the Board was hearing numerous appeals, when in fact the Board had abdicated its authority to DPS, Mazzoccoli misrepresented the number of appeals reviewed and heard by the Board to be included in The Digest of Administrative Reports when she reported to DAS employee Cindy Rusczyk that the Board had held eleven meetings for fiscal year 2006-07 and that during this period two-hundred and forty-nine cases were reviewed and heard by the Board.

134.    The actual number of cases presented to the Board for review or hearing during fiscal year 2006-07 was forty.

135.    In previous fiscal years, the number of new appeals, the number of appeals resolved, and the number of appeals resolved at hearings before the Board included for:

a.    FY 2005-06:  281 New Appeals; 281 Appeals Resolved; 72 Appeals presented to Board.
b.    FY 2004-05:  295 New Appeals; 265 Appeals Resolved; 76 Appeals presented to Board.
c.    FY 2003-04:  300 New Appeals; 166 Appeals Resolved; 52 Appeals presented to Board.
d.    FY 2002-03:  299 New Appeals; 150 Appeals Resolved; 43 Appeals presented to Board.
e.    FY 2001-02:  313 New Appeals; 109 Appeals Resolved; 39 Appeals presented to Board.

136. In preparation for questions from the media in June 2007, Mazzoccoli and Chairman Adams agreed to present the number of new appeals and the number of appeals resolved without providing the far less number of cases actually presented to the Board.

137. Chairman Adams was irritated with the attention brought by Kuck to the backlog issue.

138. In addition to the information about the number of cases "resolved" before the Board, Chairman Adams asked Mazzoccoli for information about the degree of the backlog when he become Board Chairman in August of 2005, about the length of Board members' services, and anything else that Mazzoccoli believed a reporter might ask.

139. Chairman Adams commented to Mazzoccoli in this same email concerning the media: "He [Kuck] has no business pushing anybody to do anything. A reminder of what the role of secretary includes might be in order - and it ain't much."

140. If the DPS Defendants, Chairman Adams, and Mazzoccoli had not denied Kuck the opportunity to review the facts of each appeal and schedule the cases for hearing while he was Secretary, then the majority of the cases of revocation lacking just or proper cause as demonstrated by the DPS resolution of the cases just prior to Board meetings would have been resolved some twenty-two months prior leaving only the cases not subject to resolution to be scheduled before the Board.

*Part II – The Secretary's Functions*

141. Chairman Adams did not know that the Board was guided by fifteen regulations until April 23, 2007, almost two years subsequent to his appointment as the Chairman.

22

142.    The revelation that the Board had regulations was initiated by a brief email on April 13, 2007, from Chairman Adams to Mazzoccoli asking if the Board had "Bylaws."

143.    In Spring 2007, Kuck, having no legal background or training, without the support of the Board Chairman and its Executive Head, and still attempting to discover what authority he had, if any to address the backlog, learned that regulations to guide the Board existed.

144.    Kuck then learned that Mazzoccoli maintained an outdated compilation of Board regulations consisting of only the first four or five of the fifteen regulations contained at section 29-32b-1 through 29-32b-15 of the Regulations.

145.    On April 23, 2007, at 1:30 p.m., Kuck, upon learning that Mazzoccoli did not have the complete set of Regulations and in fact did not have the Regulations referencing the duties of the Board Secretary, emailed the complete set of Regulations contained in section 29-32b-1 through 29-32b-15 to Mazzoccoli.

146.    Mazzoccoli then emailed Chairman Adams on April 23, 2007, at 2:25 p.m. to inform him, first, that the Board did not have Bylaws, and second, the Board had Regulations numbered 29-32b-5 through 29-32b-15 in addition to the outdated sections 29-32b-1 through 29-32b-4 on file in the Board's office.

147.    Chairman Adams became aware, for the first time, on April 23, 2007, that the Board had Regulations it was mandated to follow.

148.    When Kuck learned about the Regulations and began to exercise his authority as Secretary to decrease the backlog and preserve the rights afforded appellants under state statutes and regulation, Mazzoccoli and Adams increased their

discussions about removing Kuck as Secretary and preventing his reappointment to the Board.

*Part III – The Backlog of Appeals*

149.    As part of his efforts to decrease the backlog, Kuck continued to ask Chairman Adams and Mazzoccoli if either had received any response from DPS Commissioner Danaher to the Board's May 14, 2007, letter requesting a dialogue to decrease the backlog of appeals.

150.    Kuck asked Mazzoccoli to make inquiry of DPS to determine the status of any response to the Board's May 14, 2007, letter, and to indicate to DPS that the Board Secretary was making the request.

151.    Kuck indicated to Mazzoccoli that he believed the DPS was deliberately delaying a response.

152.    Chairman Adams, despite the fact that DPS Commissioner Danaher had been confirmed as DPS Commissioner more than two months prior, still had not met with DPS Commissioner Danaher to work toward resolving the backlog issue.

153.    In response to Mazzoccoli and in direct sabotage of the Secretary's regulatory functions, Chairman Adams told Mazzoccoli on June 25, 2007, not to contact DPS, stating furthermore:  "I spoke to them [DPS] a couple of weeks ago and the commissioner's office is drafting a response.  No offense to secretaries, but the fact that 'the Secretary wants to know' is irrelevant.  He [Kuck] needs to be reminded that ALL he gets to do is keep track of minutes."

154.    When Chairman Adams told Mazzoccoli that Kuck needed to be reminded that all he [Kuck] was authorized to do was to keep track of minutes, Chairman Adams,

knowing that Board regulations existed and knowing that section 29-32b-3 of the Regulations placed responsibility on the Secretary for all secretarial duties defined in sections 29-32b-5 through 29-32b-15, sabotaged Kuck's efforts to decrease the backlog and exert civilian oversight on the revocation activities of the SLFU.

155.   Mazzoccoli continued to report and block each effort by Kuck to resolve the backlog and exert civilian oversight on the SLFU's revocation activities.

156.   Chairman Adams repeatedly told Mazzoccoli to ignore Kuck.

157.   When Mazzoccoli apologized to Chairman Adams for reporting to him about each attempt by Kuck to do his job as secretary, Chairman Adams responded on April 24, 2007:  "And PLEASE - no need to apologize. YOU are not the one 'bothering me with this during session' - Peter is.  He's either clueless about my schedule right now, so self-centered he's unaware, or explicitly attempting to manipulate the fact that I'm in session and taking this opportunity to push his agenda. I sincerely hope it's not the 3rd thing, but fear it may be."

*Part IV – Efforts to Remove Kuck as Secretary and Prevent his Reappointment*

158.   In April 2007, Chairman Adams and Mazzoccoli initiated contacts with Maryann Boord, the Director of Boards and Commissions within the Office of the Governor.

159.   Previously, by letter dated January 25, 2007, Kuck, in response to an inquiry from Director Boord, indicated to Director Boord that he wished to continue his service on the Board.

160.   Together Chairman Adams and Mazzoccoli worked on drafting a letter to the Office of the Governor to oppose and sabotage Kuck's reappointment to the Board.

161.    Chairman Adams and Mazzoccoli tried to find out personal information about Kuck to present to the Governor's office as cause not to reappoint him.

162.    Mazzoccoli and Chairman Adams investigated Kuck's YCGG participation which led Chairman Adams to congratulate Mazzoccoli for her "great sleuthing."

163.    The draft letter to the Governor's office represented that Chairman Adams had previously met with the DPS staff and a compromise was reached to review double the amount of cases every other month, which as a result has reduced the backlog six months.

164.    The backlog was not reduced by six months at any time during the year 2007.

165.    Mazzoccoli defended the DPS against Kuck's efforts to reduce the backlog, writing to the Governor's office that the review of appeal cases is just small part of DPS duties and the DPS did not have the time or manpower to better address the issue.

166.    Chairman Adams reviewed Mazzoccoli's draft letter to the Governor with approval and indicated he would look at it more closely and meet with Mazzoccoli.

*Part V – Chairman Adams and Mazzoccoli Prevent Kuck from Performing His Duties*

167.    On May 4, 2007, Kuck requested that Mazzoccoli forward a copy of the Board Regulations to all the Board members, which Mazzoccoli denied.

168.    On May 8, 2007, in direct violation of the Board Regulations, Mazzoccoli refused to provide Kuck a transcript of the previous Board meeting and Chairman Adams, agreeing that he and Mazzoccoli would use the budget as an excuse, approved Mazzoccoli's unlawful refusal.

169.    As the May 2007, Board meeting approached, Mazzoccoli and Chairman Adams discussed whether the letter to the DPS Commissioner Danaher regarding the backlog had been drafted by the DPS nominated Board member Joseph T. Corradino ("Corradino").

170.    When Mazzoccoli informed Chairman Adams that Corradino intended to bring the letter to the May 2007, Board meeting, Chairman Adams responded:  "WTF? I left a message for him and he hasn't called me back. Maybe I should be paranoid[]" to which Mazzoccoli responded:  "Session paranoia,….lack of sleep? Did you call the phone number [number redacted]? He has your back because the letter needs your signature."

*Part VI – The DPS Joins Chairman Adams and Mazzoccoli in seeking the Assistance of the Governor's Office*

171.    Chairman Adams did not attend the May 10, 2007, Board meeting.

172.    Mazzoccoli informed Chairman Adams on May 11, 2007, that officers were incensed at Kuck for refusing to accept evidence of alcohol intoxication based on certain horizontal gaze nystagmus (HGN) tests without corroborating blood alcohol content (BAC) tests.

173.    Kuck based his refusal on the December 6, 2006, report by the Connecticut State Office of the Attorney General documenting efforts by law enforcement to misrepresent HGN tests and manipulate motor vehicle operators into refusing the BAC tests.

174.    Mazzoccoli told Chairman Adams:  "Our relationship with DPS has been further damaged and there are at least 3 local officers who are very angry with a remark made by Peter [Kuck].  Every officer in the room made an audible groan and one officer

27

asked if he could have a copy of the transcript.  I received a call from Maryann Boord at home and spoke with her this morning I told her about some of what Peter [Kuck] did yesterday."

175.   Trooper Seth Mancini, an attorney employed by DPS, told Kuck that Kuck would be sorry he that said he was unwilling to accept the HGN test as evidence and wanted BAC tests to corroborate intoxication.

176.   On May 14, 2007, Mazzoccoli again discussed Kuck's removal from the Board with Director Boord.

177.   Mazzoccoli sought Chairman Adams' permission prior to releasing information about Board business to Kuck.

178.   Mazzoccoli, with the agreement of Chairman Adams, ignored Kuck's requests for transcripts.

179.   Chairman Adams told Mazzoccoli on May 16, 2007, that Kuck did not have the authority as Secretary that Kuck thought he had despite Chairman Adams' recently acquired knowledge that Board Regulations existed and that section 29-32b-3 of the Regulations provided:  "The Secretary of the Board of Firearms Permit Examiners shall be responsible for all secretarial duties defined in sections 29-32b-5 through 29-32b-15."

180.   Mazzoccoli requested permission from Chairman Adams prior to providing Kuck a letter sent to DPS Commissioner Danaher dated May 14, 2007, addressing the backlog and the DPS imposed requirement that state permit holders present a voter registration card, passport, or birth certificate prior to renewal of a state permit.

181.   On May 24, 2007, Chairman Adams asked Mazzoccoli if Kuck had a day

job because Kuck needed to spend more time at his day job.

182.    Chairman Adams commented to Mazzoccoli that Kuck needed to take a valium.

183.    In July 2007, Chairman Adams and Mazzoccoli engaged in a conversation using their state email addresses about Chairman Adams' purchase of a new house causing Chairman Adams to comment:  "Looks like Deb and I may be closing on our new house on the 12th! YAY! But that means I won't be able to make it to the BFPE - BOO!  What's the backup date?  Happy Friday!"

184.    On June 15, 2007, Mazzoccoli reported to Adams that "Det. Karanda said he believes Peter is no longer objective and should be removed from the Board. He also told me that Sgt. Rosado had spoken with you yesterday. I feel like a school kid passing rumors, and it bothers me that it has become so unprofessional, but I want to keep you informed."

185.    In July 2007, Mazzoccoli and Chairman Adams continued to discuss preventing Kuck's reappointment to the Board with Director Boord's cooperation.

186.    Chairman Adams told Mazzoccoli to remind Director Boord that time was of the essence because Kuck's appeal of the nonrenewal of his own state permit was coming up before the Board even though it was not scheduled for hearing until November 13, 2008.

187.    On July 17, 2007, Mazzoccoli wrote to Chairman Adams that Kuck would never be removed because Director Boord was leaving her position in the Governor's office.

188.    In July 2007, Mazzoccoli reported to Chairman Adams that Detective

29

Mattson and Detective Karanda attempted to meet with Director Boord at the Governor's office but Director Boord convinced the detectives that she had enough information and would send a letter to the YCGG requesting a list of three names in nomination for Kuck's position on the Board as the YCGG representative.

189.   Detective Mattson holds and expresses the opinion while acting under color of state law that guns should not be possessed by persons not affiliated with law enforcement.

190.   Detective Karanda threatened Kuck at a November 8, 2006, Board meeting.

191.   The discussion preceding the threat occurred when Detective Karanda approached Kuck at a Board meeting on November 11, 2006, to inform Kuck that Detective Karanda was aware that Kuck and/or the YCGG had a scheduled gun show the upcoming weekend.

192.   Detective Karanda then asked Kuck if he [Kuck] had heard about a previous antiques arms show in Hartford and when Kuck indicated that he had, Detective Karanda said, "well we went too easy on those guys, and next time we will drag them out in handcuffs."

193.   Detective Karanda concluded the discussion with a threat by stating in a loud voice that he [Detective Karanda] had better not see anyone at the Guild show with price tags on any pistols or he [Detective Karanda], if the individuals did not have a local permit to sell, notwithstanding any posted sign limiting sales to Federal Firearms License holders only, would drag them out in cuffs.

194.   Following Detective Mattson's and Detective Karanda's aborted meeting

with Director Boord, Mazzoccoli told Chairman Adams that she wished "Maryann" [Director Boord] was not leaving her position in the Governor's office because Mazzoccoli did not believe that anything would "be done about Peter [Kuck] now that Maryann [Director Boord] is leaving."

195.    On August 27, 2007, Kuck asked Mazzoccoli to schedule a separate session as follows:  "Please schedule a separate session after our regular hearing. The agenda for this special session will consist of; a frank discussion regarding the SLFU's failure to respond to our request of May 14th in regards to the backlog and other issues as well as our setting a date for the consideration of a declaratory ruling. I intend to schedule a meeting to go forward with the request for a declaratory ruling that is before us. I intend to do so under the authority granted the board secretary under Section 29-32b(7) of our regulations."

196.    Chairman Adams and Mazzoccoli ignored Kuck's August 27, 2007, request and together decided not to respond to Kuck's request for information concerning the September 13, 2007, Board meeting and scheduled appeals.

197.    When Kuck contacted Mazzoccoli for information about Board business, Mazzoccoli hung up the phone on Kuck and told security to bar Kuck from the Board's offices.

198.    Chairman Adams told Mazzoccoli not to give Kuck any information.

*Part VII – Kuck's Removal as Secretary*

199.    On September 10, 2007, Mazzoccoli told Chairman Adams that if a new Secretary was elected all their problems would go away.

200.    At the September 2007 Board meeting, during an "executive session" convened by Chairman Adams, Mazzoccoli read from a multiple-page document detailing her dissatisfaction with Kuck.

201.    At the October 2007 Board meeting, with Mazzoccoli present, Kuck demanded that the document relied upon by Mazzoccoli at the September 2007 meeting be included in the September 2007 minutes, and the approval of the September 2007 minutes was tabled.

202.    At the November 2007 Board meeting, with Mazzoccoli present, Kuck moved that the document relied upon by Mazzoccoli at the September 2007 meeting be included in the September 2007 minutes.

203.    Kuck's motion passed and the September 13, 2007, minutes were adopted with Mazzoccoli's multiple-page document attached.

204.    The Board conducted a vote at its Board meeting on October 11, 2007, and Kuck was replaced as Secretary by Board member Corradino.

### VIOLATIONS AND CLAIMS

<u>Count One</u>
DENIAL OF RIGHT TO KEEP AND BEAR ARMS
Second and Fourteenth Amendments to the United States Constitution
(42 U.S.C. § 1983)
Against DPS Defendants

205.    Plaintiff hereby incorporates by reference under Count One each and every paragraph numbered 1 through 204, above.

206.    The DPS Defendants' refusal to renew Plaintiff's state permit based on a lack of suitability violated the Second Amendment to the United States Constitution.

207.    General Statutes § 29-28(b) lists ten factors reviewed by state and local agencies for determination of a person's eligibility to obtain or hold a temporary or state permit to carry pistols or revolvers.

208.    The statute also requires "suitability."  Conn. Gen. Stat. § 29-28(b).

209.    A person is denied a state permit even if he or she meets all ten of the eligibility factors but is not deemed suitable.

210.    A person is disqualified from holding a state permit if he or she is suitable but does not meet one or more of the eligibility factors.

211.    Only a suitable person who meets all ten eligibility factors may hold a state permit.

212.    Plaintiff met all ten eligibility factors.

213.    Plaintiff's fundamental constitutional right to keep and bear arms in self-defense was contingent upon holding a state permit that requires he be found "suitable" by the DPS Defendants.

214.    In determining suitability, the DPS Defendants exercised discretion absent any parameters set forth under state law.

215.    The "right to keep and bear arms" is "among those fundamental rights necessary to our system of ordered liberty."  McDonald v. City of Chicago, Illinois, __ U.S. __, 130 S.Ct. 3020, 3042 (2010).

216.    A fundamental right, such as the right to keep and bear arms, is "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment."  McDonald, 130 S.Ct. at 3111.

217.    While "'longstanding regulatory measures'" such as "'prohibitions on the possession of firearms by felons and the mentally ill,'" "'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms'" are not imperiled by incorporation, limitations on the legislative freedom and policy choices of the States and restrictions on "'experimentation and local variations'" are necessary consequences of the "'enshrinement of constitutional rights.'" Id. at 3050, 3047 (quoting District of Columbia v. Heller, 554 U.S. __, 128 S.Ct. 2783, 2816-17, 171 L.Ed.2d 637 (2008)).

218.    The April 2007 refusal by the DPS Defendants to renew Plaintiff's state permit was based upon the DPS Defendants' determination that Plaintiff was not suitable to hold a state permit.

219.    The vague principle of suitability in General Statutes § 29-28(b), which has no statutory definition and is subject to a myriad of interpretations among reasonable individuals, is the essence of the freedoms exercised by the state legislature and the policy choices of the DPS Defendants' now subject to limitations necessitated by an individual's fundamental right to keep and bear arms.

220.    The discretion exercised by the DPS Defendants in refusing to renew Plaintiff's state permit violated the Second Amendment.

221.    Wherefore, Plaintiff and other individuals similarly situated have suffered damages and demand judgment against the DPS Defendants for compensatory damages, and further demand judgment against each of the DPS Defendants, jointly

and severally, for punitive damages, plus the costs of this action, and such other relief as this Court deems just, proper, and equitable.

Count Two
DENIAL OF PROCEDURAL DUE PROCESS
Second, Fifth, and Fourteenth Amendments to the United States Constitution
(42 U.S.C. § 1983)
Against All Defendants

222.    Plaintiff hereby incorporates by reference under Count Two each and every paragraph numbered 1 through 204, above.

223.    General Statutes § 29-32b(d) provides that the Board shall hold hearings at such places and times as its discretion reasonably determines.

224.    The DPS Defendants, in creating a backlog of cases which requires aggrieved individuals to wait between fourteen and twenty-two months for a hearing, have denied aggrieved individuals the opportunity to be heard at a meaningful time and in a meaningful manner.

225.    DPS Commissioner Danaher failed to respond to the Board's efforts to decrease the backlog despite the recommendation of the Auditors that the DPS take specific action or risk denying appellants their right to a hearing.

226.    In acquiescing to the DPS Defendants' method of delaying appeals for as long as possible then resolving appeals just prior to hearing, so that the process itself becomes the punishment, even under facts and circumstances where no punishment was ever warranted, Chairman Adams and Mazzoccoli deprived Plaintiff and others similarly situated the Fifth and Fourteenth Amendments due process right to be heard at a meaningful time and in a reasonable manner.

35

227.    The denial of the due process right to be heard at a meaningful time and in a reasonable manner deprived Plaintiff the Second Amendment right to keep and bear arms.

228.    The nearly eighteen month imposition of a *de facto* suspension of Plaintiff's state permit by the DPS Defendants, made possible by the delay between the expiration date of his state permit and his opportunity to be heard by the Board, violates due process.

229.    The delay between the DPS Defendants' refusal to renew state permits held by individuals similarly situated to Plaintiff and their opportunity to be heard violates due process.

230.    In failing to implement the Board Regulations that were adopted to guide the Board's hearings and in preventing Plaintiff from fulfilling his duties as Board Secretary, Chairman Adams and Mazzoccoli allowed the DPS Defendants to accrue a backlog and thereby violated Plaintiff's due process rights and the due process rights of others similarly situated awaiting hearing on their appeal.

231.    In failing to exercise independence and authority over the DPS Defendants' revocation decisions, Chairman Adams and Mazzoccoli violated Plaintiff's due process rights and the due process rights of others similarly situated awaiting hearing on their appeal.

232.    In disregarding the Auditors' reports of the DPS Defendants' backlog of cases and failing to exercise independence and authority over the DPS Defendants to correct the backlog, Governor Rell violated Plaintiff's due process rights and the due process rights of others similarly situated awaiting hearing on their appeal.

233.   The practice and procedure of delaying appeals to punish state permit holders by *de facto* suspensions, pending the return of their state permits just prior to hearing before the Board, is an outrageous and knowing violation of clearly established law.

234.   In addition to the violation of his Fifth and Fourteenth Amendment rights, the Defendants deprived Plaintiff of property and liberty interests guaranteed under Article First, § 15, of the Connecticut Constitution and the Second Amendment to the United States Constitution.

235.   Wherefore, Plaintiff and other individuals similarly situated have suffered damages and demand judgment against the DPS Defendants, Chairman Adams, and Mazzoccoli, jointly and severally, and Governor Rell, for compensatory damages, and further demand judgment against each of the Defendants, jointly and severally, for punitive damages, plus the costs of this action, and such other relief as this Court deems just, proper, and equitable.

<u>Count Three</u>
DENIAL OF SUBSTANTIVE DUE PROCESS
Second, Fifth, and Fourteenth Amendments to the United States Constitution
(42 U.S.C. § 1983)
Against All Defendants

236.   Plaintiff hereby incorporates by reference under Count Three each and every paragraph numbered 1 through 204, above.

237.   The DPS Defendants' imposition of barriers to gun possession in contravention of representative legislation is so outrageously arbitrary as to constitute a gross abuse of governmental authority.

238.   The right to appeal to the Board from the DPS Defendants' imposition of

arbitrary requirements for a state permit renewal is rendered meaningless by the unreasonable wait period for such a hearing.

239.   The right to appeal to the Board is rendered meaningless when the Board cannot or will not take action on matters brought to its attention demonstrating that the DPS Defendants refused to renew Plaintiff's state permit on the grounds that Plaintiff was not suitable because he would not produce a birth certificate when the DPS Defendants had the Plaintiff's birth certificate in their possession during the entirety of Plaintiff's state permit *de facto* suspension from April 2007 through October 8, 2008.

240.   By creating arbitrary requirements and then creating a delay in the process for appeal from the imposition of the arbitrary requirements, DPS Commissioner Danaher, Lieutenant Fox, Captain Masek, Detective Mattson, Detective Karanda, and Sergeant Bastura have substantially infringed upon state law based upon their animus toward gun possession by persons not affiliated with law enforcement.

241.   The right to appeal to the Board from DPS Commissioner Danaher's, Lieutenant Fox's, Captain Masek's, Detective Mattson's, Detective Karanda's, and Sergeant Bastura's imposition of arbitrary requirements for state permit renewal is rendered meaningless by the unreasonable wait period for such a hearing.

242.   In failing to implement the Board Regulations that were adopted to guide the Board's hearings and in preventing Plaintiff from fulfilling his duties as Board Secretary, Governor Rell, Chairman Adams, and Mazzoccoli allowed DPS Commissioner Danaher, Lieutenant Fox, Captain Masek, Detective Mattson, Detective Karanda, Sergeant Bastura to violate Plaintiff's right to due process.

243.    In addition to the violation of his Fifth and Fourteenth Amendment rights, Governor Rell, Chairman Adams, Mazzoccoli, DPS Commissioner Danaher, Lieutenant Fox, Captain Masek, Detective Mattson, Detective Karanda, and Sergeant Bastura deprived Plaintiff of property and liberty interests guaranteed under Article First, § 15, of the Connecticut Constitution and the Second Amendment to the United States Constitution.

244.    The acts and omissions of the DPS Defendants were intentional and were inspired by malice.

245.    Wherefore, Plaintiff has suffered damages and demands judgment against Governor Rell, DPS Commissioner Danaher, Lieutenant Fox, Captain Masek, Detective Mattson, Detective Karanda, Sergeant Bastura, Chairman Adams, and Mazzoccoli jointly and severally, for compensatory damages, and further demands judgment against each of the Defendants, jointly and severally, for punitive damages, plus the costs of this action, and such other relief as this Court deems just, proper, and equitable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs claim judgment against the Defendants as stated in

Counts One through Three, inclusive, and as follows:

1. Compensatory damages;

2. Punitive damages;

3. Attorney's fees and costs;

4. Prospective injunctive relief against the Connecticut State

   Department of Public Safety, including, but not limited to, Court

   oversight to protect the right of Connecticut citizens to keep and

   bear arms; and

5. Such other relief in law or equity as the Court may deem

   appropriate.

Dated this 3rd day of September, 2010, at Torrington, Connecticut.

PLAINTIFFS
M. PETER KUCK, individually
and on behalf of others similarly
situated


BY:   /s/ Rachel M. Baird
      Rachel M. Baird (ct12131)
      Law Offices of Rachel M. Baird
      379 Prospect Street
      Torrington CT 06790-5238
      Tel:  (860) 626-9991
      Fax:  (860) 626-9992
      Email:  rbaird@rachelbairdlaw.com

## CERTIFICATION OF SERVICE

I HEREBY CERTIFY THAT on September 3, 2010, a copy of the foregoing

Amended Complaint was filed electronically.  Notice of this filing will be sent by email to

all parties by operation of the Court's electronic filing system.  Parties may access this

filing through the Court's system.

/s/ Rachel M. Baird
Rachel M. Baird
Commissioner of the Superior Court