UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

M. PETER KUCK,                          :
         PLAINTIFF,                     :
                                        :  CIVIL ACTION NO. 3:07cv1390(VLB)
                                        :
         v.                             :  SEPTEMBER 29, 2011
                                        :
JOHN A. DANAHER ET AL,                  :
         DEFENDANTS.                    :

MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' [Doc. #70] and [Doc. #86] MOTIONS TO DISMISS

         The Plaintiffs, M. Peter Kuck ("Kuck") and James F. Goldberg ("Goldberg")

bring this action individually and on behalf of others similarly situated alleging

that (i) they were denied the right to keep and bear arms in violation of the

Second and Fourteenth Amendments in count one; (ii) that they were denied

procedural due process in connection with the revocation of a gun permit and the

denial of a gun permit renewal in counts two, three and four; (iii) that they were

denied substantive due process in connection with the revocation of a gun permit

and the denial of a gun permit renewal in count five; (iv) that Goldberg's right to

free speech under the First Amendment was violated when his gun permit was

revoked in retaliation for the exercise of his First Amendment rights in count six;

and (v) that the seizure of Goldberg's gun permit was an illegal seizure of

property in violation of the Fourth Amendment in count seven.  Defendants have

moved to dismiss Plaintiffs' complaint for failure to state a claim upon which

relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) as well as based on

sovereign immunity under the Eleventh Amendment pursuant  to Fed. R. Civ. P.

12(b)(1).  In addition, Defendants assert that they are entitled to qualified and

1

quasi-judicial immunity in connection with Plaintiffs' allegations.  For the reasons set forth below, Defendants' motions to dismiss are granted in part and denied in part.

**Background**

*i.        Procedural History and Background*

The Court recently granted Defendants' motion to consolidate two separate actions that were pending before the Court which were *Goldberg v. Danaher et al.*, 3:07-cv-1911 and *Kuck v. Danaher et al.*, 3:07-cv-1390.  The allegations and claims between the two actions were substantially similar, both Goldberg and Kuck have sued the same Defendants and were represented by the same counsel. Goldberg filed his original complaint on December 12, 2007 which the Court dismissed on July 22, 2008 based on Plaintiff's failure to submit a memorandum in opposition to the motion to dismiss under Local Rule 7(a)(1).  Goldberg appealed the dismissal on November 3, 2001.  On April 30, 2010, the Second Circuit vacated the Court's judgment and remanded the case back to the Court. On September 3, 2010, Goldberg filed an amended complaint which Defendants have moved to dismiss.

Kuck filed his original complaint on September 17, 2007 which the Court dismissed on July 25, 2008.   Kuck then appealed the dismissal to the Second Circuit.  The Second Circuit vacated and remanded the Court's ruling on the motion to dismiss and held that at the motion to dismiss stage the plaintiff had plausibly pled that procedural due process was violated when his appeal hearing

2

regarding the denial of his gun permit renewal before the Connecticut Board of Permit Examiners (the "Board") was scheduled eighteen months after the denial. *Kuck v. Danaher*, 600 F.3d 159 (2d Cir. 2010).

On September 3, 2010, Kuck filed an amended complaint, which Defendants have moved to dismiss.  On August 17, 2011, the Court consolidated both actions.  Since the allegations and claims in the amended complaints filed in Kuck and Goldberg's separate actions are substantially identical, the Court will consider both amended complaints in its opinion.

Plaintiffs have sued the following five Connecticut State Department of Public Safety ("DPS") officers in their individual capacities: Alaric Fox, Albert Masek, Barbara Mattson, Thomas Karanda, and Ronald Bastura.  Plaintiffs have also sued the Commissioner of DPS James Thomas in his official capacity (collectively referred to as the "DPS Defendants").  In addition, former Connecticut Governor Jodi Rell is sued in her individual and official capacities. Lastly, Plaintiffs have sued two individuals associated with the Board.  They have brought suit against the sole employee of the Board, Susan Mazzoccoli, in her individual and official capacities as well as the former chairman, Christopher Adams, in his individual capacity (collectively referred to as the "Board Defendants").

ii.   *Statutory Framework*

In order to obtain a permit to carry a pistol or revolver in Connecticut, a person must apply to a local authority, either the chief of police, warden or

3

selectman, in the jurisdiction in which he resides or maintains a place of business.  Conn. Gen. Stat. §§ 29-28(a)-(b).  No permit may be issued if the applicant falls under one of ten statutory exclusions.  Conn. Gen. Stat. § 29-28(b).  The exclusions are and in 2007 were as follows:  (1) the applicant has failed to successfully complete a pistol and revolve safety or training course; (2) the applicant has been convicted of a felony or of certain enumerated misdemeanors;[1] (3) the applicant has been convicted as a delinquent for the commission of a serious juvenile offense; (4) the applicant has been discharged from custody within the preceding twenty years after having been found not guilty by reason of mental disease or defect; (5) the applicant has been confined in a hospital for persons with psychiatric disabilities within the preceding twelve months by order of a probate court; (6) the applicant is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical forth against another person; (7) the applicant is subject to a firearms seizure order issue; (8) the applicant is prohibited by federal law from shipping, transporting, possessing or receiving a firearm; (9) the applicant is an illegal alien; and (10) the applicant is less than twenty-one years of

---

[1]  **The enumerated misdemeanors are illegal possession of narcotics in violation of Conn. Gen. Stat. § 21a-279(c), criminally negligent homicide in violation of Conn. Gen. Stat. § 53a-58, third degree assault in violation of Conn. Gen. Stat. § 53a-61, assault of an elderly, blind, disabled, pregnant or mentally retarded person in violation of Conn. Gen. Stat. § 53a-61a, second degree threatening in violation of Conn. Gen. Stat. § 53a-62, first degree reckless endangerment in violation of Conn. Gen. Stat. § 53a-63, second degree unlawful restraint in violation of Conn. Gen. Stat. § 53a-96, first degree riot in violation of Conn. Gen. Stat. § 53a-175, second degree riot in violation of Conn. Gen. Stat. § 53a-176, inciting to riot in violation of Conn. Gen. Stat. § 53a-178, and second degree stalking in violation of Conn. Gen. Stat. § 53a-181d.**

age.  Conn. Gen. Stat. § 29-28(b).  In addition, before a temporary permit is issued, the local authority must find that the applicant intends to use the pistol or revolver for a lawful purpose and that the applicant is a "suitable person" to receive such a permit.  *Id.*  The statute does not define the term "suitable."

Within eight weeks after an application for a temporary permit has been made, the local authority must inform the applicant whether the temporary permit has been approved or denied.  Conn. Gen. Stat. § 29-28a(b).  The local authority then sends the application indicating approval or denial to the Commissioner of DPS (the "Commissioner").  *Id.*  If the local authority has denied the application for a temporary state permit, no state permit may be issued.  *Id.*  Within eight weeks after receiving an application indicating approval from the local authority, the Commissioner must inform the applicant in writing whether his application for a state permit has been approved or denied.  Conn. Gen. Stat. § 29-28a(b).[2]  When an application is denied, the applicant has the right to appeal the denial to the Board of Firearm Permit Examiners (the "Board").  Conn. Gen. Stat. § 29-32b(b).

State permits to carry a pistol or revolver expire after five years.  Conn. Gen. Stat. § 29-30(c).  Within ninety days before expiration, the issuing authority must send a notice and renewal form to the holder of the permit.  Conn. Gen. Stat. § 29-30(f).  Unless a permit has been revoked or revocation is pending, the permit remains valid for a period of ninety days after the expiration date.  *Id.*  The Commissioner must "investigate each applicant for renewal for a state permit to

---

[2]  If a local authority issued a temporary permit and the Commissioner denies the permit, the temporary permit is immediately revoked.  Conn. Gen. Stat. § 29-28a(b).

ensure that such applicant is eligible under state law." Conn. Gen. Stat. § 29-29(d).

The Commissioner may revoke a state permit or temporary state permit "for cause," and "shall" revoke a permit

> upon conviction of the holder of such permit of a felony or of any misdemeanor specified in subsection (b) of section 29-28 or upon the occurrence of any event which would have disqualified the holder from being issued the state permit or temporary state permit pursuant to subsection (b) of section 29-28.

Conn. Gen. Stat. § 29-32(b).  In addition, the Commissioner "may revoke the state permit or temporary permit based on the Commissioner's own investigation or upon the request of any law enforcement agency." *Id.*  Any person aggrieved by the revocation of a pistol permit may bring an administrative appeal to the Board. Conn. Gen. Stat. § 29-32b(b).

Conn. Gen. Stat. § 29-32b provides the statutory framework for the appeals process and the Board.  The Connecticut Legislature recently amended Conn. Gen. Stat. §29-32b which became effective July 1, 2011.   Before the statute provided that "[t]here shall be established a Board of Firearms Permit Examiners, within the Department of Public Safety for administrative purposes only."  *See* 2011 Conn. Legis. Serv. P.A. 11-48 (H.B. 6651).   Now the statute provides that "[t]here shall be established a Board of Firearms Permit Examiners, within Office of Governmental Accountablity established under Section 58 of this act."  Conn. Gen. Stat. § 29-32b(a).

The Board is "comprised of seven members appointed by the Governor to serve during his term and until their successors are appointed and qualify.  With

the exception of public members, the members shall be appointed from nominees of the Commissioner of Public Safety, the Connecticut State Association of Chiefs of Police, the Commissioner of Environmental Protection, The Connecticut State Rifle and Revolver Association, Inc., and Ye Connecticut Gun Guild, Inc., and each of said organizations shall be entitled to representation on the board. At least one member of the board shall be a lawyer licensed to practice in this state, who shall act as chairman of the board during the hearing of appeals brought under this section." *Id.* The only powers which the Governor has with respect to the Board is the appointment of Board members.

The statute further provides that any person aggrieved by any refusal to issue, renew, or the revocation of a permit may within ninety days after receipt of notice and "without prejudice to any other course of action open to such person in law or in equity, appeal to the board.  On such appeal the board shall inquire into and determine the facts, de novo, and unless it finds that such a refusal, limitation or revocation, or such refusal or failure to supply an application, as the case may be, would be for just and proper cause, it shall order such permit or certificate to be issued, renewed or restored, or the limitation removed or modified, as the case may be." Conn. Gen. Stat. § 29-32b(b).

The statute also provides that the Board shall schedule a hearing or an appeal within ten days of receipt of the appeal.  It further provides that "[t]he board shall hold hearings at such times and places as it in its discretion reasonably determines to be required, but not less than once every ninety days, and shall give reasonable notice of the time and place of the hearing to the

appellant and to the issuing authority.  The board shall have the power to compel

attendance at its sessions."  Conn. Gen. Stat. § 29-32b(d).  In addition,

> [a]ll appeals hearings shall be conducted in an informal manner, but
> otherwise according to the rules of evidence, and all witnesses shall be
> sworn by the chairman.  The board shall cause a verbatim transcript of the
> hearing to be kept in such manner as it may determine, and shall furnish
> such transcript to any party appealing its decision as hereinafter set forth.
> The statements of witnesses made under oath shall be privileged.
> Decisions of the board shall be by majority vote and shall be
> communicated in writing to the appellant and to the issuing authority
> within twenty days after the rendering of the decision.  If any issuing
> authority neglects or refuses to comply with a decision of the board within
> ten days after notice of the board's decision has been given to such
> issuing authority, the board shall apply to the superior court for a writ of
> mandamus to enforce the board's decision.

Conn. Gen. Stat. § 29-32b(e).  Lastly, any person who has been aggrieved by the

decision of the Board may appeal that decision in state superior court.  Conn.

Gen. Stat. § 29-32b(f).

The Board maintains an office for conducting its day-to-day business and

Conn. Agencies. Regs. § 29-32b-4 provides that "[t]he office shall be staffed by a

manager and other personnel as needed.  Such manager shall serve as its

executive head for routine administrative and operational matters."

### iii.    Facts as Alleged in the Amended Complaints

The following relevant facts are taken from Goldberg and Kuck's amended

complaints.  [Doc. # 67, 3:07-cv-1911, Goldberg Compl. and Doc. #60, 3:07-cv-

1390, Kuck Compl.].  Goldberg applied in April 2007 for a temporary state permit

to carry a pistol or revolver with the local authority which was shortly approved.

[Doc. #67, Goldberg Compl. at ¶37].  DPS then approved and issued a non-

temporary permit to Goldberg on May 17, 2007.  [*Id.* at ¶¶37-40].  One month later on June 21, 2007, Goldberg was arrested by the Glastonbury Police Department ("GPD") for breach of the peace in the second degree.  [*Id.* at ¶¶41-40].  Goldberg had entered a Chili's restaurant while wearing his firearm in a holster which was visible.  *See James F. Goldberg v. Town of Glastonbury, et al.*, Docket No. 3:07-cv-01733 (SRU).  The manager at Chili's called 911 to report that a man with a firearm had entered the restaurant which resulted in the Glastonbury Police Officers arriving on the scene and arresting Goldberg for breach of the peace in the second degree.  During the arrest, the GPD seized Goldberg's pistol and his gun permit.   Goldberg has sued the GPD in a separate action alleging that his Fourth Amendment rights were violated when he was arrested and his property seized.  *See James F. Goldberg v. Town of Glastonbury, et al.*, Docket No. 3:07-cv-01733 (SRU).

On June 25, 2007, GPD Lieutenant Dennis Woessner forwarded a letter to Defendant DPS Officer Detective Mattson consisting of one-sentence "[e]nclosed is the case we spoke about on the phone.  Thanks for all your help." [Doc. # 67, Goldberg Compl. at ¶48].  Defendant Mattson then sent Goldberg a letter dated June 27, 2007 notifying him that his permit had been revoked as a "result of your involvement in an incident investigated by: Glastonbury Police Department, Case Number: 07-009576, date 6/27/2001."  [*Id.* at ¶¶49-50].  Goldberg alleges that this letter did not reference whether DPS's revocation was based on either an investigation by DPS or upon the request of any law enforcement agency as is required under Conn. Gen. Stat. § 29-32(b).  [*Id.* at ¶¶51-52].  Goldberg timely

appealed DPS's revocation of his permit and was scheduled for a hearing before the Board on May 14, 2009 which was twenty-two months after the revocation of his permit. [*Id.* at ¶62].

On July 30, 2007, the charges for breach of the peace against Goldberg were nolled.  [*Id.* at ¶¶57-61].  On January 29, 2008, Goldberg then re-applied for a temporary state permit with the local authority to carry a pistol before his earlier permit was reinstated and where his appeal on his prior permit was still pending. [*Id.* at ¶¶64-71].  The temporary permit was approved on February 4, 2008.  On February 21, 2008, Goldberg received notice from DPS that his temporary permit was also revoked for cause.  The notice informed Goldberg that this second revocation was also based on his breach of peace arrest and the fact that his prior permit had been revoked and was currently under appeal with the Board. [*Id.*].  Goldberg alleges that DPS violated Conn. Gen. Stat. §29-32(b) as it did not conduct an investigation prior to revoking either of his permits nor did it receive requests for revocation from any law enforcement agency.  [*Id.* at ¶¶87-89].

Prior to Goldberg's hearing before the Board,  DPS reinstated Goldberg's permit on September 22, 2008 stating "a review of the facts and circumstances of the incident involving your Connecticut Permit to Carry Pistols and Revolvers has been completed.  Effective upon your receipt of this notice, your permit is reinstated."  [*Id.* at ¶86].

On March 19, 2007, Kuck submitted an application for renewal of his state gun permit prior to its expiration.  [Doc. # 60, Kuck Compl. at ¶37].  DPS

demanded that Kuck submit a birth certificate or United States Passport for renewal.  [*Id.* at ¶38].  Kuck was informed that since September 11, 2001 it was DPS policy to require a birth certificate or passport for renewal.  [*Id.* at ¶41].  When Kuck had originally applied for his gun permit, he was not required to provide such identification.  [*Id.* at ¶44].  Kuck alleges that the submission of a United States passport or birth certificate is not a requirement under Conn. Gen. Stat. ¶¶29-28(b), 29-30 for state permit renewal.  On April 16, 2007, Kuck's state permit expired.  [*Id.* at ¶51].  Kuck filed a timely appeal to the Board and the Board heard the appeal on October 9, 2008.  [*Id.* at ¶¶60-61].  DPS renewed Kuck's permit following the October 9, 2008 hearing.  [*Id.* at ¶¶66-67].

As the Second Circuit noted in *Kuck*, both Goldberg and Kuck allege that "DPS frequently denies permit applications for bogus or frivolous reasons, thereby subjecting qualified applicants to a lengthy appeals process, only to grant the permit months or years later, just before the appeal hearing."  *Kuck v. Danaher*, 600 F.3d 159, 165 (2d Cir. 2010).  In addition, both Goldberg and Kuck's amended complaints contain allegations regarding the experience of Kuck as secretary of the Board.  [Doc. #67, Goldberg Compl. at ¶¶116-229].  Kuck served as Board secretary "from prior to October 2003 until October 11, 2007."  [*Id.*].  In particular, Plaintiffs allege that Kuck's attempts as Secretary to "address the [appeals] backlog" were thwarted by the actions of the DPS Defendants and the Board Defendants Adams and Mazzoccoli.  Plaintiffs allege that Board Defendants Adams and Mazzoccoli collaborated with DPS to "deny Kuck the opportunity to review the facts of each appeal and schedule the cases for hearing

while he was Secretary." [*Id.*].   In particular, Plaintiffs allege that  Mazzoccoli and Adams in responding to Kuck's concerns about the backlog by reached out to DPS to discern whether DPS planned to resolve certain appeals by reinstating the permits prior to the scheduled appeals hearing.  However, the Court notes that Mazzoccoli and Adam's conduct that the Plaintiffs complain of had the effect of reducing the number of appeals before the Board and did not result in the alleged denial of the opportunity to review the facts of each appeal.  [Doc. # 67, Goldberg Compl. at ¶¶144-165].

Plaintiffs also allege that the Board's appeals process was audited sometime prior to May, 2007 by the Auditors of Public Accounts which found that the backlog of appeals "had been a concern for at least two years and during this time had increased from an estimated wait time for hearing from fourteen to sixteen months."  [Doc. #67, Goldberg Compl. at ¶¶100-109].  Plaintiffs further allege that the Auditors' findings were reported to the Governor and therefore Governor Rell was notified that "DPS contributed to the backlog of the appeals waiting for hearing before the Board by not reviewing and then settling the majority of the cases until the month of the scheduled hearing."  [*Id.*].

<u>Legal Standard</u>

The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are "substantively identical."  ***Lerner v. Fleet Bank, N.A.***, 318 F.3d 113, 128 (2d. Cir. 2003).  However, on a motion to dismiss under Rule 12(b)(1), the party invoking

the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6).  *Id.*  In deciding both types of motions, the Court "must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff."  *In re AIG Advisor Group Sec. Litig.*, 309 Fed. App'x. 495, 497 (2d Cir. 2009).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

The Court's review on a motion to dismiss pursuant to Rule 12(b)(6) is generally limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  In addition, the Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  In deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), however, the Court "may resolve disputed factual issues by reference to

evidence outside the pleadings, including affidavits." *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir. 2007).

<u>Analysis of Plaintiffs' Count One Claim that his Second Amendment Rights were Violated</u>

**i.** **Analysis of whether the Connecticut Statute violated Plaintiffs' Second Amendment Rights**

In count one of Kuck's amended complaint, he alleges that DPS denied him a permit renewal based on a finding of unsuitability.  DPS denied his permit renewal because Kuck had failed to demonstrate that he was not an illegal alien when he refused to provide a passport or birth certificate pursuant to one of the ten specific "eligibility" factors enumerated in Section 29-28(b).  Therefore, DPS's decision was based on their determination that Kuck was unsuitable based on one of the specific eligibility categories enumerated in the statute.  The Supreme Court in *Heller* held that reasonable prohibitions on the possession of firearms are permissible under the Second Amendment.  *District of Columbia v. Heller*, 554 U.S. 570, at 626-27 & n.26 (2008).  In *Heller*, Justice Scalia stated a person must be allowed to register gun if not disqualified implying withholding of a permit to one who does not establish their qualification is permissible.  *Id.* (holding that the decision should not call into question "longstanding prohibitions on the possession of firearms" by certain classes of persons).

In count one of Goldberg's Amended Complaints, Goldberg claims that the DPS Defendants violated his right to bear arms under the Second Amendment by revoking his pistol permit based upon a determination that he was not "suitable" to hold a permit under Section 29-28(b) of the Connecticut General Statutes based on his arrest for breach of the peace in the second degree.

14

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.  U.S. Const. amend II.  In *Heller*, the Supreme Court held that the Second Amendment protects the individual right to keep and bear arms for self-defense.  *Heller*,  554 U.S. at 595.  Two years later, in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment "incorporates the Second Amendment right recognized in *Heller*" to the states.  *Id.* at 3026.

In *Heller*, the Supreme Court addressed whether several District of Columbia statutes, which generally prohibited the possession of handguns and required any other lawful firearms in the home to be kept inoperable, violated the Second Amendment.  *Heller*, 554 U.S. at 592.  The Supreme Court found that the District of Columbia's prohibition on operable handguns in the home was unconstitutional because the right to self-defense is central to the Second Amendment and the regulation extended to the home, "where the need for defense of self, family, and property is most acute."  *Id.* at 628.  The Court recognized, however, that the right to bear arms is not unlimited, noting that "the majority of 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  *Id.* at 626 (citations omitted).  The Court further stated that its decision should not call into question "longstanding prohibitions on the possession of firearms" by certain classes of persons, such as the mentally ill and convicted felons, and in certain places constituting security concerns.  *Id.* at

626-27 & n.26.  Thus, the Supreme Court suggested that the core purpose of the right conferred by the Second Amendment was to permit "law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id.* at 635.

The Supreme Court in *Heller* did not decide the appropriate level of constitutional scrutiny to be used in reviewing restrictions upon a person's right to bear arms.  *Id.* at 624.  Instead, the Court found that, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutionals rights," the ban at issue "would fail constitutional muster."  *Id.* at 628-29 (internal citation omitted).  The Court did rule out two types of scrutiny as inappropriate for Second Amendment analysis.  First, the Court held that rational basis review was improper, explaining that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."  *Id.* at 629 n.27.  Second, the Court rejected the "interest-balancing approach" advocated by Justice Breyer in dissent, noting that "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest balancing' approach."  *Id.* at 634.

The Second Circuit has not yet weighed in on the appropriate level of scrutiny to apply to firearms restrictions.  The Circuit Courts of Appeal that have addressed the issue have generally concluded that intermediate scrutiny should be applied to the firearms restrictions they considered.  For example, in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), the Third Circuit applied intermediate scrutiny to a statute making it unlawful to possess a handgun with

an obliterated serial number.  *Id.* at 97.  The Third Circuit formulated the applicable test as whether the asserted governmental interest was "significant," "substantial," or "important," and whether the fit between the challenged regulation and the asserted objective is "reasonable, not perfect."  *Id.* at 97-98.  In *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010), the Tenth Circuit adopted the Third Circuit's approach in *Mazzarella* and applied intermediate scrutiny to a statute prohibiting the possession of a firearm by a person subject to a domestic protection order.  *Id.* at 801-02.  The Tenth Circuit formulated the intermediate scrutiny test as follows:  "To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means reasonably related to that objective."  *Id.* at 802 (quoting *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (applying intermediate scrutiny to statute criminalizing possession of a firearm by a convicted felon)).

Similarly, in *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), the Fourth Circuit applied intermediate scrutiny to a regulation prohibiting the carrying or possession of a loaded handgun in a motor vehicle inside a national park.  *Id.* at 469-70.  The Fourth Circuit contemplated that courts "will employ different types of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the Second Amendment question presented."  *Id.* at 470.  The Fourth Circuit explained that, under such an approach, "we would take into account the nature of a person's Second Amendment interest, the extent to which those interests are burdened by government regulation, and the

strength of the government's justifications for the regulation." *Id.* Based upon these considerations, the Fourth Circuit employed intermediate scrutiny to the challenged regulation because it burdened the right to bear arms outside of the home, and thus did not implicate the "core right of self-defense of a law-abiding citizen in his home" recognized by *Heller*. *Id.* at 471. The Court explained, that "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *Id.* at 470. Therefore, the Fourth Circuit applied intermediate scrutiny to the regulation at issue, which required the government to demonstrate that the challenged regulation "is reasonably adapted to a substantial government interest." *Id.* at 471.

The Ninth Circuit, by comparison, has adopted a "substantial burden" framework for the analysis of firearm regulations, under which "heightened scrutiny does not apply unless a regulation substantially burdens the right to keep and to bear arms for self-defense." *Nordyke v. King*, 644 F.3d 776, 784-85 (9th Cir. 2011). The Ninth Circuit in *Nordyke* remanded to the district court to allow the plaintiffs an opportunity to amend their complaint and, if they did so, to have the district court apply the substantial burden test to the regulation at issue, a county ordinance prohibiting the possession of firearms on county property.

Most district courts to have addressed the issue have also applied intermediate scrutiny to challenged firearms regulations. *See, e.g.*, *Osterweil v. Bartlett*, No. 1:09-cv-825, 2011 WL 1983340, at *10 (N.D.N.Y. May 20, 2011) (applying intermediate scrutiny to statute prohibiting nonresidents who are not

employed in New York State from obtaining a firearms license); *United States v. Smith*, 742 F. Supp. 2d 855, 864-65 (S.D.W.Va. 2010) (applying intermediate scrutiny to statute criminalizing the possession of a firearm by a person convicted of a misdemeanor crime of domestic violence).

This Court follows the approach taken by the majority of other courts to have confronted the issue and applies intermediate scrutiny to Section 29-28(b). The Court is persuaded by the reasoning of other courts that strict scrutiny should not apply to firearm regulations that restrict the right to bear arms outside the home. *See, e.g., Masciandaro*, 638 F.3d at 471 ("While we find the application of strict scrutiny important to protect the core right of self-defense of a law-abiding citizen in his home . . . , we conclude that a lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside the home.") (internal quotation marks and citation omitted); *Osterweil*, 2011 WL 1983340, at *10 (applying intermediate scrutiny because the challenged law "falls at least one level outside the core right recognized in *Heller, i.e.*, the right of a law abiding individual to keep and carry a firearm for the purpose of self defense in the home"). Section 29-28(b) governs the issuance of permits to carry a pistol or revolver in public, and does not implicate the right to possess a firearm for self-defense in the home. Under Connecticut law, persons may carry a pistol or revolver in their own dwelling without a permit. *See* Conn. Gen. Stat. § 29-35(a) ("No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28.");

19

*State v. Bailey*, 209 Conn. 322, 346 (1988) ("[T]he statute allows persons to carry a pistol in their own dwelling without a permit.").  Therefore, Goldberg's "core right" of self-defense within his home was not violated when his pistol permit was revoked after his arrest for breach of peace at Chili's.

In addition, this Court is mindful of the *Heller* Court's warning that lower courts should not interpret its decision so broadly as to invalidate all existing firearm regulations.  *Heller*, 554 U.S. at 626-27.  As the Fourth Circuit stated in *Masciandaro*, requiring strict scrutiny in the circumstances presented here "would likely foreclose an extraordinary number of regulatory measures, thus handcuffing lawmakers' ability to prevent armed mayhem in public places, and depriving them of a variety of tools for combatting the problem."  638 F.3d at 471 (citations and internal quotation marks omitted).

Accordingly, the Court must consider whether the state has an important interest in regulating the carrying of firearms in public and whether Section 29-28(b) is substantially related to that interest.  As the Second Circuit has recognized, "Connecticut clearly has a strong and compelling interest in ensuring that firearm permits are not issued to those 'lacking the essential character or temperament necessary to be entrusted with a weapon.'"  *Kuck v. Danaher*, 600 F.3d 159, 166 (2d Cir. 2010) (quoting *Dwyer v. Farell*, 193 Conn. 7, 12 (1984)).  Goldberg argues, in essence, that Sections 29-28(b) and 29-32(b) are unconstitutional because they grant DPS unfettered discretion to deny and revoke permits to carry a pistol or revolver based upon a finding that a person is not "suitable" to hold a permit.  According to Goldberg, the ten specific

"eligibility" factors enumerated in Section 29-28(b) ensure that only law-abiding citizens competent to carry a pistol or revolver will be issued a firearm permit. [Doc. #84, Goldberg Mem. in Opp. at 7-8]. If there remain categories of individuals who should not be eligible to hold a permit, Goldberg claims, the statute can be amended by the legislature to add additional specific, defined eligibility factors. *Id.* Thus, in Goldberg's view, the suitability requirement of Section 29-28(b) is not reasonably related to the State's interest in protecting the public from individuals who would pose a danger if entrusted with a firearm.

The Connecticut Supreme Court recognized the unworkability of the approach advocated by Goldberg more than a century ago in *Smith's Appeal from County Commissioners*, 65 Conn. 135, 138 (1894). In that case, the Court considered an appeal by Smith, a state citizen who contested the granting of a liquor license under a licensing statute to another citizen, Kirby, on the basis that Kirby was not a "suitable" person to receive a license. *Id.* Like the statute at issue in the case at bar, the statute governing liquor licensing expressly prohibited the granting of licenses to certain classes of persons, and also required a suitability determination to be made with respect to an applicant not falling within the enumerated classes to determine whether such applicant was unfit to receive a license. *Id.* In discussing the meaning of the term "suitable," the Court stated:

> The word "suitable" as descriptive of an applicant for license under the statute, is insusceptible of any legal definition that wholly excludes the personal views of the tribunal authorized to determine the suitability of the applicant. A person is "suitable" who by reason of his character - his reputation in the community, his previous conduct as a licensee - is shown to be suited or adapted to the

orderly conduct of [an activity] which the law regards as so dangerous to public welfare that its transaction by any other than a carefully selected person duly licensed is made a criminal offense. It is patent that the adaptability of any person to such [an activity] depends upon facts and circumstances that may be indicated but cannot be fully defined by law, whose probative force will differ in different cases, and must in each case depend largely upon the sound judgment of the selecting tribunal.

*Id.*

Later, in *Dwyer v. Farell*, the Connecticut Supreme Court observed that the legislative intent underlying the scheme for issuance of firearm permits set forth in Sections 29-28 through 29-38 was "to protect the safety of the general public from individuals whose conduct has shown them to be lacking the essential character or temperament necessary to be entrusted with a weapon." 193 Conn. at 12-13 (quoting *Rabbitt v. Leonard*, 36 Conn. Sup. 108, 115-16 (1979)); *see also Commissioner of Public Safety v. Board of Firearms Permit Examiners*, 12 Conn. App. 414, 423 (2011). Thus, although the term "suitable" as used in Section 29-28(b) is not statutorily defined, Connecticut courts have made clear that the purpose of imposing a suitability requirement is to ensure that persons who potentially would pose a danger to the public if entrusted with a handgun do not receive a permit. *See Nicholson v. Board of Firearms Permit Examiners*, No. CV 94 054 10 48, 1995 WL 584377, at *3 (Conn. Super. Ct. Sept. 28, 1995) ("[A]n 'unsuitable person' under [Section 29-28(b)] is one whose conduct indicates that he or she is potentially a danger to the public if entrusted with a handgun.").

Contrary to Plaintiffs' contention, this Court does not believe it to be possible for Connecticut to discharge its duty to protect the public unless DPS and also the Board on appeal is afforded circumscribed discretion to determine

22

whether a particular applicant seeking a pistol permit would pose a danger to the public if entrusted with a firearm.  The suitability requirement is the statutory mechanism which provides DPS and also the Board with the necessary discretion.  The statute enumerates certain categories of individuals who because of their conduct or characteristics are automatically ineligible to hold a pistol permit.  However, whether any particular person who does not fall within those enumerated categories is suited to carry a firearm is heavily dependent upon facts and circumstances that "cannot be fully defined by law, whose probative force will differ in different cases," and which require the exercise of sound judgment by a state authority.  *Smith's Appeal*, 65 Conn. at 138.  As a review of Connecticut cases in which pistol permits have been revoked reveals, it is impossible for the legislature to conceive in advance each and every circumstance in which a person could pose an unacceptable danger to the public if entrusted with a firearm.  *See, e.g. Lepri v. Board of Firearms Permit Examiners*, No. CV 960055714, 1998 WL 707810, at *2 (Conn. Super. Ct. Sept. 29, 1998) (affirming revocation of plaintiff's pistol permit where plaintiff was arrested for breach of peace after he pointed a bazooka in the direction of a neighbor and others who were on or near the neighbor's property); *Dillon v. Board of Firearms Permit Examiners*, No. CV 960053199, 1997 WL 625436, at *2 (Conn. Super. Ct. Oct. 2, 1997) (affirming revocation of pistol permit where plaintiff accidently shot himself on two occasions as a result of his gross violation of gun safety rules); *Hall v. Board of Firearm Permit Examiners*, No. CV 950069036, 1996 WL 88511, at *4 (Conn. Super. Ct. Feb. 8, 1996) (affirming revocation of pistol permit where

plaintiff shot his gun at a friend's house and then brought the loaded gun into a bar and drove home with it after drinking for one hour and later while drinking threatened to commit suicide by shooting himself; noting that "[t]he Board is not required to wait until [plaintiff] actually shoots himself or someone else in a fit of intoxicated rage before revoking his pistol permit").

Furthermore, DPS does not exercise unbridled discretion to deny or revoke a person's firearm permit.  The principle of "ejusdem generis" mandates that where a general term follows an enumeration of terms with specific meaning, the general term is expected to apply to matters similar to the specifically enumerated terms.   diLeo v. Greenfield, 541 F.2d 949, 954 (2d Cir. 1976).  In addition, denial or revocation decisions are subject to de novo review by the Board to determine whether, based upon all of the facts, there was "just and proper cause" for the denial or revocation.  Conn. Gen. Stat. § 29-32b(b).  In addition, decisions of the Board may be appealed to Connecticut Superior Court. Conn. Gen. Stat. § 29-32b(f).

For these reasons, the Court holds that the statute at issue is substantially related to Connecticut's compelling interest in protecting the public from persons who could potentially pose a dangerous if entrusted with a firearm.  Section 29-28(b) enumerates categories of individuals who are ineligible to hold a firearm permit, and affords DPS discretion to determine whether denial or revocation of a permit in particular circumstances not covered by the express statutory grounds is warranted, subject to review by the Board as well as the Superior Court.  In this case, Goldberg's permit was revoked by DPS based upon his arrest for breach of

peace in connection with an incident that occurred at Chili's restaurant.  This
arrest provided DPS with a reasonable basis to revoke Goldberg's permit pending
a determination of whether, based upon all of the facts and circumstances, he
was suitable to hold a permit, *i.e.*, that he would not pose a danger to the public if
entrusted with a weapon.  Goldberg appealed the revocation, and his permit was
ultimately returned to him after his criminal case was nolled.  While the Court is
troubled by the time which elapsed from the date the permit was revoked to the
date it was reinstated, particularly in light of the time frames prescribed by the
appeal statute, the record is not sufficiently developed for the Court to draw any
reasoned conclusions.  In these circumstances, the Court holds that the DPS
Defendants did not violate Goldberg's Second Amendment right to bear arms.

> ii.     *Analysis of Whether the Connecticut Statute is Unconstitutionally*
> *Void for Vagueness*

As the Defendants acknowledge, count one of the Amended Complaints
may also be construed to assert a void for vagueness challenge to Section 29-
28(b) under the Second and Fourteenth Amendments.  *See* [Doc. # 67, Goldberg
Compl. at ¶243] (alleging that the policy choices exercised by the state legislature
and the DPS Defendants in interpreting Section 29-28(b)'s "vague principle of
suitability" are "now subject to limitations necessitated by an individual's
fundamental right to keep and bear arms").  Plaintiffs do not specify whether they
challenge Section 29-28(b) facially or as applied.  Therefore, the Court will analyze
both types of challenges.

### A. Facial Challenge

"Facial challenges are generally disfavored." *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010). There are several reasons for this. First, limiting such "third party" standing "serves institutional interests by ensuring that the issues before the court are concrete and sharply presented." *Id.* (quoting *Thibodeau v. Portuondo*, 486 F.3d 61, 71 (2d Cir. 2007)). Second, "[c]laims of invalidity often rest on speculation." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Third, facial challenges "run contrary to the fundamental principles of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* Fourth, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 742.

Nevertheless, facial challenges have been permitted in certain rare circumstances when the claims were based on the assertion of a First Amendment right. *Id.* In such cases, a plaintiff was "allowed to challenge a law that may be legitimately applied to his or her own expressive conduct if the law has the potential to infringe unconstitutionally on the expressive conduct of others." *Id.*

Neither the Supreme Court nor the Second Circuit has definitively decided whether a facial void for vagueness challenge can be maintained where, as here, the challenge is not properly based on the First Amendment. *Id.* at 743. In

*Dickerson*, the Second Circuit identified two possible standards that may govern non-First Amendment vagueness challenges.  *Id.*  The *Dickerson* Court did not, however, resolve which standard should apply, or indeed whether such challenges are even cognizable at all.  *Id.*

The first possible standard is that such challenges are permitted only when "no set of circumstances exists under which the [law] would be valid."  *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *accord Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982) ("To succeed [in a vagueness challenge], the complainant must demonstrate that the law is impermissibly vague in all of its applications.").  The Second Circuit explained that this standard "effectively eliminates facial challenges outside of the First Amendment context that could not also be brought as an as-applied challenge, since any law that is unconstitutional in every set of circumstances is also necessarily unconstitutional when applied to any plaintiff."  *Dickerson*, 604 F.3d at 743-44; *see also United States v. Rybicki*, 354 F.3d 124, 129-30 (2d Cir. 2003) (discussing decisions that have "held that when . . . the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied'"); *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993) ("[V]agueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the statute's facial validity.").

The second possible standard is derived from the Supreme Court's plurality opinion in *City of Chicago v. Morales*, 527 U.S. 41 (1999), where the

plurality expressed some skepticism about the "no set of circumstances" standard enunciated in *Salerno* and *Hoffman* and upheld a facial vagueness challenge to an anti-loitering statute. *Morales*, 527 U.S. at 55 n.22. Courts have interpreted the *Morales* decision as applying a facial vagueness challenge to a statute with no First Amendment implications since the Morales court found that the freedom to loiter was a part of the liberty interest protected by the Due Process Clause. *See Dickerson*, 604 F.3d at 743; *Morales* , 527 U.S. at 53. The statute at issue in *Morales* was a Chicago ordinance that required a police officer, upon observing a person "whom he reasonably believes to be a criminal street gang member loitering in any public place with one or more persons," to order all such persons to disperse, and made any person's failure to obey such an order a violation. *Id.* at 47 n.2. The statute defined "loiter" as "to remain in any one place with no apparent purpose." *Id.* Justice Stevens, writing for the plurality, explained:

> This is not an ordinance that simply regulates business behavior and contains a scienter requirement. It is a criminal law that contains no *mens rea* requirement, and infringes on constitutionally protected rights. When vagueness permeates the text of such a law, it is subject to facial attack.

*Id.* at 55 (internal citations and quotation marks omitted). The plurality found the statute to be impermissibly vague because it failed to give citizens adequate notice of what conduct is forbidden and what is permitted and afforded too much discretion to the police to determine what activities constituted loitering. *Id.* at 64. The statute at issue in *Morales* also in fact has First Amendment implications since the anti-loitering statute can be seen to impermissibly restrict a citizen's

right to assemble which would infringe upon the First Amendment.  *See McDonald*, 130 S. Ct. at 3031 ("[T]he Court held that the general 'right of the people peaceably to assemble for lawful purposes,' is protected by the First Amendment") (quoting *U.S. v. Cruikshank*, 92 U.S. 542, 551-552 (1875)).   If the *Morales* decision does implicate the First Amendment then the appropriate standard for review should be the *Salerno* and *Hoffman* standard as that standard has been held to apply to vagueness challenges outside the First Amendment context.

However assuming that *Morales* does not involve any First Amendment implications and that the *Morales* plurality's decision suggests that a facial vagueness challenge can apply outside the First Amendment context, the approach of the *Morales* plurality has not been adopted by a majority of the Supreme Court as a whole.  Therefore, the Second Circuit has recognized that it is not required to apply the *Morales* plurality's approach.  *Rybicki*, 354 F.3d at 131.  Nonetheless, in *Rybicki* the Second Circuit observed that under that approach, "to invalidate as unconstitutionally vague on its face a statute that does not implicate First Amendment rights and might be valid under some set of circumstances, a court would have to conclude that the law is 'permeated' with vagueness, and, perhaps, that it infringes on a constitutional right and has no mens rea requirement[.]"  *Id.* (citation omitted).  At least one other Circuit has expressly declined to adopt the *Morales* plurality's approach, instead applying the standard enunciated in *Salerno* and *Hoffman Estates*.  *See Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 972 (9th Cir. 2003) ("Until a

majority of the Supreme Court directs otherwise, a party challenging the validity of an ordinance on vagueness grounds outside the domain of the First Amendment must demonstrate that 'the enactment is impermissibly vague in all of its applications.'") (quoting *Hoffman Estates*, 455 U.S. at 495).

Applying the *Salerno/Hoffman Estates* standard, Section 29-28(b) clearly survives Goldberg's facial void for vagueness challenge.  There are innumerable factual circumstances in which invocation of the suitability standard to revoke a person's pistol permit on the basis that he poses a danger to the public, even though he does not fall within one of the express statutory grounds for revocation, would be constitutionally valid.  For instance, it could not possibly be unconstitutional for the state to revoke a person's pistol permit after he develops incurable dementia, is diagnosed with paranoid schizophrenia and makes threats to harm others, repeatedly shoots himself, or has an alcohol or drug addiction and repeatedly engages in reckless activity with his firearm while intoxicated.[3]

As the Second Circuit has acknowledged, the standard applied in *Morales* is not binding because it was not endorsed by a majority of the Supreme Court. *Rybicki*, 354 F.3d at 131.  The Parties have not cited and this Court has not found any decision that has applied the *Morales* plurality's standard in the context of a facial vagueness challenge under the Second Amendment.  In the absence of express guidance from the Supreme Court and the Second Circuit's pronouncement in *Rybicki*, this Court concludes that the *Morales* plurality's approach is not applicable to the present circumstances.

---

[3]  These examples are intended for illustrative purposes only and are not meant to provide an exhaustive list.

Were the *Morales* plurality's approach applicable however, the statute would not be vague because the statute's enumerated basis for denial of a permit in light of the fundamental principle of statutory construction "ejusdem generis" circumscribes the discretion of DPS and the Board and gives citizens adequate notice of who is and who is not eligible to receive a gun permit.  In *Morales*, the plurality focused on the fact that the ordinance was vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." 527 U.S. at 61 (internal quotation marks and citation omitted). Here, since the Connecticut statute provides enumerated categories which qualify and limit the discretionary category regarding suitability it does provide an "imprecise but comprehensible normative standard" unlike the standard at issue in *Morales*.   In addition, the *Morales* plurality also suggested that the statute was unconstitutional because it gave too much discretion to a police officer to determine what conduct constituted loitering and thereby encouraged arbitrary and discriminatory enforcement.  527 U.S. at 71 ("The ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in *every* case.") (emphasis in the original).   As discussed above, the principle of "ejusdem generis" places limits on the discretion of DPS and the Board in the permit process and therefore protects against the potential for the arbitrary and discriminatory enforcement that was found in *Morales*.

Moreover, in *Rybicki* the Second Circuit suggested that the *Morales* standard might apply only in the limited circumstances where the "law is 'permeated' with vagueness, and, perhaps, that it infringes on a constitutional right and has no mens rea requirement[.]" *Rybicki*, 354 F.3d at 131. (citation omitted). The statute at issue in this case is not a criminal statute without a mens rea requirement, like the anti-loitering statute at issue in *Morales*. The Second Circuit has observed that "[l]aws with civil consequences receive less exacting vagueness scrutiny." *Arriaga v. Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008); *see also Village of Hoffman*, 455 U.S. at 498-99 (expressing "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe"). While the statute at issue implicates a constitutional right, the Court does not believe the consequence complained of, namely revocation of a permit to carry a weapon outside of the home, is as severe as the deprivation of liberty occasioned by an arrest and incarceration. Furthermore, the Court does not find Section 29-28(b) to be "permeated" with vagueness. The term "suitable" has a clear definition under Connecticut law. It has long been established that a person is not "suitable" to carry a firearm if he lacks "the essential character or temperament necessary to be entrusted with a [lethal] weapon," *Dwyer*, 129 Conn. at 12, and thus is potentially dangerous to the public. Therefore, Plaintiffs' facial vagueness challenge fails.

### B. As Applied Challenge

In order to survive an as applied vagueness challenge under the Due Process Clause, a law must be "crafted with sufficient clarity to give the person

of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply [it]." *Perez v. Hoblock*, 368 F.3d 166, 174-75 (2d Cir. 2004) (citations and internal quotation marks omitted).  "The first way that a law may be unconstitutionally vague as applied to the conduct of certain individuals is 'if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'" *VIP of Berlin LLC v. Town of Berlin*, 593 F.3d 179, 186-87 (2d Cir. 2010) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  The relevant inquiry is "whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."  *Id.*

    "Even if a person of ordinary intelligence has notice of what a statute prohibits, the statute nonetheless may be unconstitutionally vague 'if it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Dickerson*, 604 F.3d at 747 (quoting *Hill*, 530 U.S. at 747).  Nevertheless, a law need not "achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth."  *Id.* (citation and internal quotation marks omitted).  "Moreover, a statute that provides what may be unconstitutionally broad discretion if subjected to a facial challenge may still be upheld as constitutional on an as-applied challenge if the particular enforcement at issue [is] consistent with the core concerns underlying the [statute] such that the enforcement did not represent an abuse of discretion under the statute."  *Id.* (citation and internal quotation marks omitted); *see also VIP of Berlin*, 593 F.3d at 191 ("[A] court may determine that a statute provides adequate guidance if either:

33

(1) the statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement; or (2) even in the absence of such standards the conduct at issue falls within the core of the statute's prohibition[.]").

Thus, the Court must decide whether Section 29-28(b) as a general matter provides sufficiently clear standards to provide persons of ordinary intelligence notice of what conduct it prohibits and to eliminate the risk of arbitrary enforcement, and if not, whether the conduct at issue in this case falls within the core of the statute's prohibition.

Applying these standards, the Court holds that Goldberg's as applied vagueness challenge cannot succeed.  As previously discussed, Section 29-28(b) enumerates certain categories of individuals who are automatically ineligible to hold a pistol permit.  However, the legislature cannot possibly be expected to anticipate in advance every circumstance in which a person could potentially pose a danger to the public if entrusted with a firearm.  Thus, the statute requires a discretionary "suitability" determination to be made by DPS before issuing a pistol permit in order to determine whether the applicant possesses the "essential character and temperament necessary to be entrusted with a weapon." *Dwyer*, 193 Conn. at 12.  A person of ordinary intelligence would understand what type of conduct could result in the revocation of his pistol permit.  Specifically, a person of ordinary intelligence would understand that his permit will be subject to revocation if he develops a condition or engages in conduct which indicates

that he may pose a danger to the public if he is allowed to carry a firearm in public.

In addition, the statute provides sufficient guidance to DPS in the circumstances of this case to eliminate the risk of arbitrary enforcement in its enumerated qualifications.  The nature of the state interest at issue requires that DPS have the flexibility to determine on a case-by-case basis whether a particular applicant would pose a danger to the public if entrusted with a firearm.  The factors which would make a person unsuitable are many and evanescent.  However, the Board's discretion is adequately circumscribed by the enumerated factors for determination of an applicant's qualifications.  Further, the statute has built-in procedural mechanisms to ensure that pistol permits are not revoked absent just cause.  A person aggrieved by the denial or revocation of a permit may appeal the denial to the Board, which must conduct a de novo review and determine based upon all of the facts whether the denial or revocation was supported by just and proper cause.  The Board's decision may be appealed to Connecticut Superior Court.

Finally, the conduct at issue in this case falls within the "core" of the statute's prohibition.  Goldberg was arrested for breach of the peace after an incident at Chili's involving his carrying of a pistol.  An arrest for conduct involving one's firearm could certainly be indicative of that person's potential danger to the public, and preventing danger to the public is the core purpose of the statute.  The Court's analysis assumes that Goldberg's arrest for breach of the peace in the second degree was supported by probable cause.

Goldberg appears to be alleging in count seven that his arrest and the seizure of his gun permit were not supported by probable cause and has initiated a separate lawsuit challenging the alleged violations of his Fourth Amendment rights against GPD which has yet to be resolved in his favor.

However, Plaintiff's void for vagueness challenge should not be affected by the allegation that Goldberg was arrested without probable cause as the heart of the void for vagueness as-applied challenge is whether the statute provides sufficient notice that a person of ordinary intelligence would understand that his permit would be revoked had he engaged in conduct which would have supported an arrest for breach of the peace in the second degree.   In Connecticut, a person is guilty of breach of the peace in the second degree when:

> with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do.

Conn. Gen. Stat. § 53a-181.  If an individual had engaged in such conduct while carrying a firearm, particularly an unconcealed firearm, a person of ordinary intelligence would understand that his gun permit would be subject to revocation based upon the enumerated bases for disqualification for the issuance of a permit set forth in the subject statute.  Conn. Gen. Stat. §29-28(b).  Consequently, Goldberg would have notice that if he committed an offense involving a firearm

such as breach of peace in the second degree that his gun permit would be subject to revocation.

To the extent that Kuck is also alleging that the statute is void for vagueness as applied to him, the Courts finds that the statute would not be void for vagueness as applied to him as the requirement that the applicant not be an illegal alien is expressly enumerated in the statute.  Conn. Gen. Stat. § 29-28(b). Therefore, a person of ordinary intelligence would understand that his or her permit would be denied if he or she did not produce documentation demonstrating United States citizenship.

For the foregoing reasons, count one of Goldberg's Amended Complaint and count one of Kuck's Amended Complaint are dismissed.

### iii.  Analysis of Whether Defendants are Entitled to Qualified Immunity in connection with Plaintiffs' Count One Claim

Defendants argue that they are entitled to qualified immunity in connection with Plaintiffs' count one claim.  The Court notes that "claims asserted against a government official in his official capacity is essentially a claim against the governmental entity itself, the defense of qualified immunity, which may be available to individual defendants as they are sued in their individual capacities, is not applicable to claims against them in their official capacity."  *Jackler v. Byrne*, No.10-0859-cv, 2011 WL 2937279, at *17 (2d Cir. 2011).  Therefore the doctrine of qualified immunity only protects Defendants as to Plaintiffs' claims for damages against them in their individual capacities.  A government official "sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where the conduct was

so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (internal quotation marks and citations omitted).  In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated that first, a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right, and then second, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* at 201.  Subsequently, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court ruled that courts are permitted to exercise their discretion in determining which of the two prongs should be addressed first.

Here, it was not clearly established in 2007 that the Connecticut statutory regime would be subject to the Second Amendment.  It was not until the following year that the Supreme Court held that the Second Amendment protects the individual right to keep and bear arms for self-defense. *Heller*, 554 U.S. at 595. Further, it was two years later, in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) that the Supreme Court held that the Due Process Clause of the Fourteenth Amendment "incorporates the Second Amendment right recognized in *Heller*" to the states.  *Id.* at 3026.  Therefore prior to 2010, it was not clearly established that the Second Amendment right of an individual applied to the States and therefore Defendants are entitled to qualified immunity in connection with both Goldberg and Kuck's count one claims.

<u>Analysis of Plaintiffs' Count Two Claim that Procedural Due Process was
Violated by the Delay in Appeals</u>

In both Amended Complaints in count two, Plaintiffs' allege that DPS
Defendants created a backlog of cases which required "aggrieved individuals to
wait between fourteen and twenty-two months for a hearing, have denied
aggrieved individuals the opportunity to be heard at a meaningful time and in a
meaningful manner."  [Doc. #67, Goldberg Compl. at ¶ 248 and Doc. #60, Kuck
Compl. at ¶106].  Plaintiffs also allege that "in failing to exercise independence
and authority over the DPS Defendants' revocation decision, Chairman Adams
and Mazzoccoli violated Plaintiff's due process rights."  [Doc. #67, Goldberg
Compl. at ¶ 256 and Doc. #60, Kuck Compl. at ¶106].  Plaintiffs' count two claims
are asserted against all of the Defendants.  As discussed below, the Plaintiffs
have named various Defendants and sued them in different capacities. [4]

The Defendants concede that Plaintiffs have plausibly pled at the motion to
dismiss stage that the twenty-two month delay between the revocation of his
permit and his appeals hearing violated procedural due process based on the
Second Circuit's analysis in *Kuck*.  In *Kuck*, the Second Circuit applied the three-
factor test prescribed in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).   The
Second Circuit concluded that Kuck's stake in the firearm license was a liberty

---

[4] As noted above, Plaintiffs have sued the following five DPS officers in their
individual capacities: Alaric Fox, Albert Masek, Barbara Mattson, Thomas
Karanda, and Ronald Bastura.  Plaintiffs have also sued the Commissioner of
DPS James Thomas in his official capacity only.  In addition, former Connecticut
Governor Jodi Rell is sued in her individual and official capacities.  Lastly,
Plaintiffs have sued the sole employee of the Board, Susan Mazzoccoli, in her
individual and official capacities as well as the former chairman, Christopher
Adams, in his individual capacity.

interest tied to the right to bear arms recognized by state law.  *Kuck*, 600 F.3d 159, at 164.  In addition, the Second Circuit concluded that there was a risk of erroneous deprivation based on the fact (i) that the number of appeals that were resolved without a hearing was far greater than the number of appeals actually heard by the Board and (ii) that a reduction in the time to obtain an appeal would considerably diminish the impact of such allegedly erroneous denials.  *Id.* at 165-166.

Lastly, the Second Circuit concluded that while "Connecticut clearly has a strong and compelling interest in ensuring that firearm permits are not issued to those 'lacking the essential character or temperament necessary to be entrusted with a weapon,'" the State had failed to explain "why it requires up to twenty months to address appeals.  For the purposes of a due process analysis, the state must articulate some reason, tied to this interest, that justifies the lengthy period necessary to resolve these appeals."  *Id.* at 166 (*quoting Dwyer*, 193 Conn. At 7).  The Second Circuit noted that "[w]hile we are often solicitous of governmental interests, particularly those related to the public's safety, we cannot accept, at least without additional factual support, the months-long delay that Connecticut attempts to justify in this case.  This interest is not a license for indefinitely denying permit applicants a post-deprivation opportunity to contest an adverse finding by DPS."  *Id.* at 167 (internal citation omitted).   Accordingly, the Second Circuit concluded that "[f]or the purposes of the present motion to dismiss, we find that Kuck has stated a procedural due process claim.  Whether discovery will bear out his claim is a matter for the district court to determine on

remand." *Id.*   As Defendants concede, it is therefore appropriate for discovery to be taken in connection with Plaintiffs' count two claims and for such claims to be adjudicated on summary judgment or trial.  However, Defendants argue that Plaintiffs cannot maintain this cause of action since Defendants are protected under the doctrines of sovereign immunity under the Eleventh Amendment as well as qualified and quasi-judicial immunity and that Plaintiffs have failed to name an appropriate defendant for this claim to proceed.

> i.   *Analysis of Whether Plaintiff Alleged Sufficient Personal Involvement and Standing of DPS Defendants, Governor Rell and Mazzoccoli*

Defendants argue that Plaintiffs have failed to adequately allege that the DPS Defendants, Governor Rell and Mazzoccoli were personally involved in the alleged constitutional deprivation.  To state a claim under § 1983, a plaintiff must allege the personal involvement of a defendant.  *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Platt v. Incorporated Village of Southhampton*, 391 Fed. Appx. 62, 65 (2d Cir. 2010) ("Under Section 1983, liability can only be imposed against defendants in their individual capacities for personal involvement in alleged constitutional deprivation") (internal quotation marks and citation omitted).

First, Defendants argue that the DPS Defendants could not have been personally involved in a due process violation in connection with the appeals hearing backlog as the Board is vested with total discretion and authority to schedule and address appeals and DPS has no control or authority over the Board during the appeals process under Conn. Gen. Stat. § 29-32b.  While Plaintiffs stylize the allegations in this count as premised on DPS's conduct and allege that DPS created the backlog by denying and revoking permits for

essentially frivolous reasons, the Court agrees that the statutory framework establishes that the Board has the sole authority and discretion to address any backlog not DPS.  In particular, the statutory framework provides that "[t]he board shall hold hearings at such times and places as it in its discretion reasonably determines to be required, but not less than once every ninety days." Conn. Gen. Stat. §29-32b(d).   Moreover, as the Second Circuit stated the "viability of Kuck's due process claim does not turn on the merits of his initial challenge; rather, it concerns whether he received the process he was due." *Kuck*, 600 F.2d at 165.  Plaintiffs' allegations that DPS created the backlog by denying and revoking permits for essentially frivolous reasons is really a challenge to the merits of the revocation decision and not to that which is at issue here namely the process Plaintiffs were due; a process which is statutorily vested to the control and authority of the Board not DPS.

Further, to the extent that Plaintiffs are moving for prospective injunctive relief with regard to the backlog the only party in a position to execute a grant of such relief is the Board since the Board is the only authority vested with power to schedule more hearings more frequently.  Under the statutory framework, DPS does not have the power to direct the Board to schedule hearings.  *See Saar v. United States Dep't of Justice*, 705 F. Supp. 999, 1006 (S.D.N.Y. 1989) (where supervisor was informed of plaintiff's complaint, but "had no control over plaintiff's segregation, he cannot be held personally liable for any due process violations arising out of that segregation.").   Considering the statutory framework, Plaintiffs have failed to plausibly allege that the DPS Defendants were

personally involved in the alleged deprivation of their due process rights. *Ashcroft*, 129 S. Ct. at 1949.  Plaintiffs have therefore failed to plead particular facts demonstrating that the DPS Defendants' personal involvement in the creation of the appeals delay.

Defendants also characterize this argument in terms of standing and argue that Plaintiffs' injuries are likewise not fairly traceable to the challenged action of the DPS Defendants citing F*riends of the Earth v. Laidlaw Environmental Services*, Inc., 528 U.S. 167, 180-81 (2000).  The Court agrees that since the delay in the scheduling of Plaintiffs' hearings was occasioned by the Board and not DPS, their injury is arguably not fairly traceable to the DPS Defendants' conduct and thus the Plaintiffs have failed to establish standing to sue DPS.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (establishing Article III standing requirement).

Second, Defendants argue that Plaintiffs have failed to allege the personal involvement of former Governor Rell in the alleged due process violation. [5]  "An individual cannot be held liable for damages under § 1983  merely because he held a high position of authority, but can be held liable if he was personally involved in the alleged deprivation."  *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (internal quotation marks and

---

[5] **The Court notes that Governor Rell is the former Governor.  However in an official capacity action in federal court "death or replacement of the named official will result in automatic substitution of the official's successor in office." *See generally Kentucky v. Graham*, 473 U.S. 159, 166 n.11 (1985) (citing Fed. R. Civ. P. 25(d)(1)).  Therefore the Court acknowledges that the official capacities claims alleged against Governor Rell will now be brought against the current Governor Daniel Malloy.**

citations omitted).  In the Second Circuit, personal involvement has traditionally

been shown by the following factors articulated in *Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995):

> (1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong, (3) the defendant created a
> policy or custom under which unconstitutional practices occurred,
> or allowed the continuance of such a policy or custom, (4) the defendant was
> grossly negligent in supervising subordinates who committed the wrongful
> acts, or (5) the defendant exhibited deliberate indifference ... by failing to
> act on information indicating that unconstitutional acts were occurring.

*Id.*

The Court notes that the recent Supreme Court decision in *Ashcroft v. Iqbal*

129 S. Ct. 1937 (2009) has recently called into question whether all of the *Colon*

factors remain a basis for establishing supervisory liability and "no clear

consensus has emerged among the district courts within this circuit."  *Aguilar v.*

*Immigration and Customs Enforcement Div. of the United States*, No.07CIV8224,

2011 WL 3273160, at *10 (S.D.N.Y. August 1, 2011) (collecting cases).  However,

for purposes of deciding the present motion, it is not necessary for the Court to

determine the standard for supervisory liability for violations of procedural due

process as Plaintiffs have failed to plead facts that would satisfy any of the *Colon*

factors.

Plaintiffs have alleged that the Governor appoints the members of the

Board from the nominees of several organizations.  In addition, Plaintiffs have

alleged that an audit was prepared by the Auditors of Public Account which

"found that the backlog had been a concern for at least two years and during this

time had increased from an estimated wait time for hearing from fourteen to

sixteen month" and that the Auditors' findings are reported to the Governor. [Doc. # 67, Goldberg Compl. at ¶¶101-109].  While at first blush, it would seem that Plaintiffs' allegations could satisfy Colon factors 2, 4, or 5.   However, Plaintiffs have failed to allege that the audit report put the Governor on notice that constitutional violations were occurring.  If the Governor had no reason to believe that the delays resulted in unconstitutional conduct, the Governor could not have been deliberately indifferent or grossly negligent with respect to such constitutional violations.  *See Bordas v. Payant*, No.9:08-cv-0458, 2009 WL 35292, at *5 (N.D.N.Y. Jan. 5, 2009) (finding that defendant supervisor was not given notice that subordinates has engaged in conduct which violated the plaintiff's constitutional rights); *Burns v. Trombly*, 624 F.Supp.2d 185, 204 (N.D.N.Y. 2008) ("Plaintiff's letter was too brief and conclusory to place the two Defendants on notice that any constitutional violation had actually occurred.").  To say that the audit report put Governor Rell on notice of constitutional violations is particularly difficult considering that the Second Circuit's decision in *Kuck* acknowledged that the state might have a compelling reason tied to its interest which justified the length of the delay at issue here.  In addition, the Governor would not have known that the Board's backlog implicated constitutional rights until the 2008 Supreme Court decision in *Heller, supra*.

Moreover, even assuming the Governor was on notice of unconstitutional conduct, Plaintiffs have not alleged that the Governor has any power over the Board's decisions and activities.  Beyond the power to appoint Board members, the statutory framework does not reference the Governor anywhere else nor does

it suggest that the Governor has any supervisory duties with respect to the Board.  *See Suarez v. Keiser*, No.04-cv-6362, 2006 WL 543725, at *6 (W.D.N.Y. March 3, 2006) ("a letter alleging constitutional violations sent to a supervisor who had the authority and duty to remedy the situation might trigger personal involvement, while a letter to a supervisory official with no authority to remedy the situation probably would not.");  *Johnson v. Wright*, 234 F. Supp. 352, 363 (S.D.N.Y. 2002)("[T]o allow a mere letter to an official to impose supervisory liability would permit an inmate to place liability on individuals who had no authority over the situation complained of merely by sending letters."). Accordingly, the Court finds that Plaintiffs have not plausibly alleged that Governor Rell was personally involved in the alleged due process deprivation.

Defendants also argue that the Plaintiffs have failed to plausibly allege that Mazzoccoli as the Board's sole employee was personally involved in the alleged constitutional violation.   Mazzoccoli is the Board's sole employee and Conn. Agencies. Regs. § 29-32b-4 provides that the Board "shall be staffed by a manager and other personnel as needed.  Such manager shall serve as its executive head for routine administrative and operational matters."  After reviewing the specific allegations regarding Mazzoccoli's conduct in both Kuck and Goldberg's complaints, the Court finds that Plaintiffs have not plausibly alleged that Mazzoccoli had any discretion regarding scheduling decisions or that she was performing anything other than purely ministerial and administrative duties.  *Ashcroft*, 129 S. Ct. at 1949.  In fact, the specific allegations regarding Mazzoccoli's conduct indicate that Mazzoccoli was following Chairman Adam's

orders and directives.  *See* [Doc. #67, Goldberg Compl. at ¶¶174-182 and Doc. #60, Kuck Compl. at ¶¶149-157].   The Plaintiffs do allege that on one occasion Mazzoccolli independently reached out to DPS regarding whether DPS would reinstate permits prior to the appeals process in an effort to reduce the backlog. [Doc. #60, Kuck Compl. at ¶¶119-140 and Doc. #67, Goldberg Compl. at ¶¶144-165].   However, these allegations do not suggest that Mazzoccoli contributed to the backlog and the delay but was rather responding to Kuck's concern to reduce the ultimate backlog.   Accordingly, Plaintiffs have failed to plausibly allege that Mazzoccoli as the Board's sole employee was personally involved in the alleged due process violation.

> ii.   *Analysis of Defendants Assertion of Sovereign Immunity under the Eleventh Amendment in connection with Plaintiffs' Count Two Claim*

Defendants argue that the Eleventh Amendment bars Plaintiffs' § 1983 claims insofar as it seeks damages against certain Defendants in their official capacities.   By virtue of sovereign immunity state employees are immune from suits against them in their official capacities.  *Respass v. Murphy*, No.3:10-cv-318, 2010 WL 2232674, at *2 (D. Conn. June 2, 2010) (finding that §1983 claims for damages against defendants in their official capacities barred by the Eleventh Amendment which protects state from suits for monetary relief and also protects state officials sued in their official capacity) (citations omitted); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather against the official's office"); *Pinkston v. Connecticut*, No.3:09-cv-633, 2010 WL 174866, at *3 n.7 (D. Conn. Jan. 14, 2010) ("it is well established that section 1983 does not

abrogate the Eleventh Amendment immunity").  Here, Goldberg has only sued three Defendants in their official capacities, DPS Defendant Thomas, Defendant former Governor Rell, and Defendant Mazzoccoli.  Accordingly, Plaintiffs' claim against these Defendants for monetary damages are barred by the Eleventh Amendment.

However the Eleventh Amendment does not preclude suits against state officials acting in their official capacity that seek prospective injunctive relief. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908).  Here, Plaintiffs have moved for prospective injunctive relief and the Court notes that if Plaintiffs are able to demonstrate that their procedural due process rights were violated by the length of the delays in the appeals process, prospective injunctive relief would be particularly appropriate.  However, this exception under *Ex parte Young* only applies where the official sued has "some connection with the enforcement of the [allegedly unconstitutional act]."  *Id.* at 157; *see also Marshall v. Switzer*, 900 F. Supp. 604, 615 (N.D.N.Y. 1995) (explaining that the state official must have "a direct connection to, or responsibility for, the alleged illegal action") (citation omitted).

First, Plaintiffs have failed to demonstrate that DPS Defendant Commissioner Thomas has a special connection to the enforcement of or any authority over the appeals process before the Board.   As discussed above, statutorily the Board and not DPS is vested with total discretion, authority and control over the appeals process.  Notably, the Connecticut Legislature recently amended Conn. Gen. Stat. § 29-32b to place the Board under the Office of

Governmental Accountability.  *See* 2011 Conn. Legis. Serv. P.A. 11-48 (H.B. 6651).

Before the Board was placed within DPS for administrative purposes only.  [*Id.*].

Moreover as discussed above, DPS Defendant Thomas would not have the

authority to require the Board to schedule more frequent appeal hearings.  *See*

*Hall v. Marshall*, 479 F.Supp.2d 304, 318 (S.D.N.Y. 2000) (dismissing claims

against state officials in absence of allegation that they had authority to perform

the injunctive relief sought); *see also Loren v. Levy,* No. 00 CIV.7687, 2003 WL

1702004, at *11 (S.D.N.Y. Mar. 31, 2003) ("An injunction may issue only in

circumstances where the state official has the authority to perform the required

act.") (citation and internal quotation marks omitted).  Accordingly, the exception

under *Ex parte Young* would not apply to DPS Defendant Thomas.

Second, Plaintiffs have also failed to demonstrate that Defendant

Mazzoccoli has any authority over the enforcement of the appeals process.  As

discussed above, Mazzoccoli is the Board's sole employee and Conn. Agencies.

Regs. § 29-32b-4 provides that the Board "shall be staffed by a manager and

other personnel as needed.  Such manager shall serve as its executive head for

routine administrative and operational matters."  While Mazzoccoli might

administratively calendar appeals on behalf of the Board, the statutory framework

establishes that as an employee Mazzoccoli has no authority or discretion over

the activities of the Board.  In fact, the statutory framework provides that it is the

Board's Secretary, not Mazzoccoli, who is responsible for scheduling appeals:

> After receipt of the appeal the Secretary reserves the right to make a
> thorough inquiry of the facts of the appeal. When the Secretary
> determines that the information obtained relative to the appeal is
> sufficient to permit the conduct of a fair and impartial hearing, he

> **shall set a date for a hearing and give reasonable notice of the time and place of the hearing to the appellant and to the issuing authority.**

**Conn. Agencies Regs. § 29-32b(7).  Accordingly, Mazzoccoli would not have the authority to enforce an injunction against the Board based on her position as the employee in charge of routine administrative and operational matters.  *See Duncan v. Nighbert*, No.3:06-34, 2007 WL 2571649, at \*4 (E.D.Ky. Aug. 31, 2007) (holding that the plaintiff's "official capacity claims" against two defendants "for the injunctive relief of reinstatement must fail" because "[p]ursuant to" Kansas statutory law, these two defendants "do not have the authority to reinstate Plaintiff to his previous position" and thus these two defendants "cannot provide the relief requested.").  Accordingly, the exception under *Ex parte Young* would also not apply to Defendant Mazzoccoli.**

**Lastly, Plaintiffs have failed to demonstrate that the Governor has a special connection to the enforcement of the appeals process before the Board as required under *Ex parte Young*.  First, courts in the Second Circuit have not extended the exception under *Ex parte Young* on the basis that a state official has a general duty to execute and enforce state laws.  *See Connecticut Ass'n of Health Care Facilities, Inc. v. Rell*, 2010 WL 2232693, at \*5 (D. Conn. June 3, 2010) (concluding that general authority to enforce the laws of the state is insufficient to make government officials the proper parties to litigation challenging the law and noting that a "'[h]olding that a state official's obligation to execute the laws is a sufficient connection to the enforcement of a challenged statute would extend *Young* beyond what the Supreme Court has intended and held'") (quoting *Children's Healthcare is a Legal Duty v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996)).**

In addition, Plaintiffs have not alleged that the Governor had any control, authority or discretion over the appeals process or the day to day functioning of the Board.  The only connection that Plaintiffs have alleged between the Governor and the Board is the fact that the Governor appoints the seven members of the Board from the nominees of the Commissioner of Public Safety, the Connecticut State Association of Chiefs of Police, the Commissioner of Environmental Protection, The Connecticut State Rifle and Revolver Association, Inc., and Ye Connecticut Gun Guild, Inc.  Conn. Gen. Stat. §29-32b(a).   While courts in the Second Circuit have not yet addressed the question of whether a sufficient connection exists under *Ex parte Young* where the only nexus alleged between the state official and the challenged action is the power to appoint, other district courts have considered the issue and concluded that the "power to make appointments to the entity that acted unconstitutionally is insufficient to demonstrate that a state official falls with the exception recognized in Ex parte Young."  *Kelly v. Burks*, 414 F. Supp. 2d 681, 686 (E.D.Ky. Feb. 7, 2006); *see e.g., D.G. ex rel. Stricklin v. Henry*, 591 F.Supp.2d 1186, 1189 (N.D. Okla. 2008) (even though "Governor has the power to appoint members of the OCHS and to name its chairman.  However, the Governor is in no sense responsible for actually administering the foster care system."); *Peter v. Sanford*, No.6:10-767, 2010 WL 5684397, at *3-4 (D.S.C. Dec. 6, 2010) (concluding that "the Governor's appointment duties related to that agency and its advisory boards do not make him specially accountable.") (collecting cases).  The Court agrees that the power to appoint members of the Board from nominees does not demonstrate that the

Governor has a "particular duty to enforce the statute in question" or a "demonstrated willingness to exercise that duty" as is required under *Ex parte Young*.  209 U.S. at 161.  Accordingly, the exception under *Ex parte Young* would also not apply to the Governor.

Plaintiffs cannot obtain prospective injunctive relief from the Defendants sued in their individual capacities as such Defendants would not have the authority to provide such relief in their individual capacities.  *See DeLoreto v. Ment*, 944 F.Supp. 1023, 1031 (D. Conn. 1996) (finding that "injunctive relief of reinstatement could only be awarded against Defendants in their official capacities.  Clearly, in their individual capacities they have no authority to reinstate Plaintiffs."); *see also Smith v. Plati*, 56 F. Supp. 2d 1195, 1203 (D. Colo. 1999) (dismissing claims against state official in his individual capacity because the relief plaintiff requested could only be obtained against the defendant in his official capacity).

### iii.    Analysis of Defendants Assertion of Qualified Immunity in connection with Plaintiffs' Count Two Claim

Defendants argue that they are entitled to qualified immunity in connection with Plaintiffs' count two claims.  Defendants argue that at the time it was not clearly established that an 18-20 month delay in the scheduling of appeals before the Board was a violation of procedural due process as the caselaw that the Second Circuit relied upon in its decision in *Kuck* would not lead an objectively reasonable public official to believe his conduct was in violation of a plaintiff's federal rights.  At the onset, the Court notes that the Second Circuit's opinion in

*Kuck* did not hold that the delay was a violation of procedural due process, but rather that "for the purpose of the present motion to dismiss, we find that Kuck has stated a procedural due process claim.  Whether discovery will bear out his claim is a matter for the district court to determine on remand."  *Kuck*, 600 F.3d at 166-167.  The Second Circuit suggested that if the state is able to articulate some reason, tied to compelling government interest at stake, that justifies the lengthy period necessary to resolve these appeal, then procedural due process may not be violated under the *Mathews* framework.  Therefore in 2010 when the Second Circuit issued its decision in *Kuck* it did not definitively hold that the delay at issue denied Kuck procedural due process.  Further, in 2007 prior to the *Heller, supra*, decision the right of an individual to bear arms was not clearly established.

In *Kuck*, the Second Circuit based its reasoning on two prior cases which held that delays in post-deprivation hearings resulted in a procedural due process violations.  The first case the Second Circuit relied upon was *Spinelli v. City of New York*, 579 F.3d 160 (2d Cir. 2009) in which the Court of Appeals concluded that a "gun shop owner's due process rights were violated when New York City suspended her license without a prompt post-deprivation hearing."  *Kuck*, 600 F.3d at 164.   As Defendants point out, the *Spinelli* decision was issued in 2009 years after the conduct complained of by Plaintiffs.   Therefore, the *Spinelli* decision could not have put the Defendants on notice that their conduct could be unconstitutional.

However, the second case that the Second Circuit relied upon should have put the Defendants on notice that their conduct could be unconstitutional. This second case was *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) in which the Court of Appeals considered "New York City's civil forfeiture procedures for vehicles involved in alleged crimes such as driving while intoxicated. Under city policy, the city would seize vehicles immediately after an arrest, but forfeiture hearings awaited the completion of the underlying criminal proceedings. This practice frequently meant that owners were deprived of their vehicles for a year or more before they had any opportunity to challenge the seizure. [The Court of Appeals] concluded that this interval was simply too long in light of the private interests at stake." *Kuck*, 600 F.3d at 164. This decision, which was issued five years prior to conduct that Plaintiffs complain of, would put an objectively reasonable officer on notice that a deprivation of a fundamental right such as the Second Amendment right to bear arms without an opportunity to challenge it for a year was unconstitutional even though as the Defendants point out, the *Krimstock* opinion is not squarely on point to the present case as the decision considered the seizure of a vehicle used for daily transportation in connection with criminal proceedings and not the revocation of a gun permit pursuant to a statutory scheme that regulates the ability of individuals to lawfully carry a firearm in public.

Moreover, the statutory regime clearly contemplated that hearings would occur promptly as it requires that the Board within ten days of receipt of the appeal schedule a hearing and mandates that the Board hold hearings as it

reasonably determines to be required but not less than once every ninety days. Conn. Gen. Stat. § 29-32b(b)-(c).   In addition, the statutory regime requires that DPS submit information justifying its revocation and failure to do so within 10 days of the scheduled hearing "shall be cause for the Board to grant the relief sought without further hearing."  Conn. Gen. Stat. § 29-32b(c).  The statute does not grant the Board discretion to extend the time to file.  Taken together, the decision in *Krimstock* and the statutory regime itself provided the Board with sufficient notice that the delay violated gun permit holders constitutional right to procedural due process.  Accordingly, the individual capacity defendants are not protected by the doctrine of qualified immunity in connection with Goldberg and Kuck's count two claims.

### iv.    Analysis of Defendants Assertion of Quasi-judicial Immunity in connection with Plaintiffs' Count Two Claim

Lastly, Defendants argue that they are entitled to quasi-judicial or absolute immunity since the Board is a performing an essentially judicial function.   In deciding whether an actor is entitled to quasi-judicial immunity on the basis that his role is analogous to that of a judge or prosecutor, the court must evaluate the challenged proceedings in light of the "characteristics of the judicial process" set forth in *Butz v. Economou*, 438 U.S. 478 (1978). These factors include:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner,* 474 U.S. 193, 202 (1985) (*citing Butz*, 438 U.S. at 511-12).

"Absolute immunity is less likely to attach when the official function involved is less adjudicative, such as when the officer acts under his own initiative rather than that of the court." *Trueluck v. New York State Bd. of Parole*, No.9:08-cv-1205, 2010 WL 1268028, at *11 (N.D.N.Y. Feb. 23, 2010) (citation omitted). In determining the applicability of absolute immunity, "there must be a specific inquiry into the facts of the situation at hand to determine whether the particular acts or responsibilities of the officers fall within the confines of the absolute immunity doctrine. If the officer's function was administrative rather than adjudicative or prosecutorial and not integrally related to the judicial process, qualified, not absolute, immunity would attach. If a judicial function was performed, even if it was done in an erroneous manner the function does not become any less judicial in nature." *Id.* (internal quotation marks and citations omitted). Further, the Second Circuit has emphasized that courts "must conduct some factual inquiry" in its determination regarding absolute immunity. *King v. Simpson*, 189 F.3d 284, 288 (2d Cir. 1999) (internal quotation marks and citations omitted). The Court also notes that the Supreme Court has been "quite sparing" in recognizing claims of absolute immunity. *Forrester v. White*, 484 U.S. 219, 224 (1988). In addition, "[a] court should find absolute immunity only in circumstances where the official can demonstrate that absolute, rather than qualified, immunity is required by public policy." *Krebs v. New York State Div. of Parole*, No.9:08-cv-255, 2009 WL 2567779, at *6 (N.D.N.Y. Aug. 17, 2009) (*citing Scotto v. Almenas*, 143 F.3d 105, 110 (2d Cir. 1998)).

Here, Defendants have argued that the Board is required to exercise discretionary judgment that is not purely ministerial or administrative in nature and therefore should be extended protection under the doctrine of absolute or quasi-judicial immunity.  From a review of the statutory scheme in Conn. Gen. Stat. § 29-32b, the Board's function in the appeals process appears to satisfy many of the *Butz* factors.  For example, there is a need to assure that the Board members can perform their functions in appeals hearing without harassment or intimidation as well as the need to insulate the Board members from political influence to ensure that the Board is making appropriate determinations on who should be allowed to carry a firearm in light of the compelling state interest in ensuring the public safety.   Further, precedence is of critical importance in ensuring consistency in the standards used to determine who should obtain a firearm permit.   In addition, precedence is particularly important in light of the fact that the Board is vested with the discretion to make a fact specific determination of suitability under the statute.  In fact, the statute provides that the Board "shall cause a verbatim transcript of the hearing to be kept in such manner as it may determine, and shall furnish such transcript to any party appealing its decision as hereinafter set forth" thereby highlighting the importance of precedence to the entire statutory framework.  Conn. Gen. Stat. § 29-32b(e).  Lastly, the statutory framework provides for correctability of error on appeal.  Under Conn. Gen. Stat. § 29-32b(f), any person aggrieved by the decision of the Board may appeal the decision in Connecticut Superior Court.

Moreover, the adjudicative nature of the Board's role is underscored by the fact that the statute provides for some of the same hallmarks found in the judicial process.  For example, "appeals hearings shall be conducted in an informal manner, but otherwise according to the rules of evidence, and all witnesses shall be sworn by the chairman" and the "statements of witnesses made under oath shall be privileged."  Conn. Gen. Stat. § 29-32b(e).   In addition, the statute provides "that at least one member of the board shall be a lawyer licensed to practice in this state, who shall act as chairman of the board during the hearing of appeals brought under this section." Conn. Gen. Stat. § 29-32b(a).

In addition, other courts have found quasi-judicial immunity to be appropriate in connection with the revocation decisions of medical and other state licensing board regimes.  *See, e.g., O'Neal v. Mississippi Board of Nursing*, 113 F.3d 62, 66 (5th Cir. 1997) (absolute immunity protected members of state licensing board who conducted adjudicatory nursing license revocation hearings); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) (state personnel review board members were absolutely immune from monetary relief with respect to their adjudicatory functions); *Wang v. New Hampshire Bd. of Registration in Medicine*, 55 F.3d 698, 701 (1st Cir. 1995) (state medicine board members involved in license revocation proceedings were entitled to absolute quasi-judicial and quasi-prosecutorial immunity).

However, the heart of Plaintiffs' due process claim is that the Board failed to schedule appeals hearings in a timely fashion.   It is arguable that the scheduling of appeals is more of an administrative rather than a judicial function.

However, it is well established that scheduling is recognized as an integral part of the adjudicative process in connection with a court's function. *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997) (The "court's inherent power to control its docket is part of its function of resolving disputes between parties.  This is a function for which judges and their supporting staff are absolutely immune."). The ability of the Board to control its own appeals schedule can therefore be seen as functionally equivalent to the decision of a judge concerning the scheduling of a trial which is undoubtedly subject to absolute immunity which suggests that the Board should be entitled to quasi-judicial immunity.  *See e.g., Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 623 (7th Cir. 2002) ("Employing this functional approach, we have determined that the scheduling of parole hearings constituted a judicial function subject to absolute immunity"); *Walrath v. United States*, 35 F.3d 277, 283 (7th Cir. 1994) ("scheduling of a parole revocation proceeding[ ] is an integral part of the revocation decision itself").

However, as discussed above the statutory regime governing the Board and the appeals process unquestionably instructs that gun permit holders be provided with a timely appeal.  Considering that the statute mandates the Board to schedule timely appeals, the Court questions whether it is appropriate to extend quasi-judicial immunity to the Board in connection with such an obligation.   The Court also notes that the Second Circuit has contemplated that quasi-judicial immunity may be overcome in certain circumstances.  Gross v. Rell, 585 F.3d 72, 82-83 (2d Cir. 2009) ("It may be the case that *quasi-judicial* immunity may similarly be overcome: for example, if the plaintiff alleges that the

actions a defendant took were discretionary (as opposed to in strict compliance with court orders), undertaken in bad faith, intentional torts, etc.  No case in our Circuit spells out the circumstances under which quasi-judicial immunity may be surmounted.").   In light of the statute's mandate regarding timely appeals the Court finds that the issue of whether the Board should be entitled to quasi-judicial immunity is more appropriately determined on summary judgment after additional briefing on the matter.

Quasi-judicial immunity should only extend to claims against defendants sued in their individual and not official capacities.  *See Tomlins v. Village of Wappinger Falls Zoning Bd. of Appeals*, No.08-cv-9813, 2011 WL 2714213, at *5 (S.D.N.Y. July 8, 2011) (noting that the "Second Circuit has recently observed that "no court case that we have found extends judicial immunity to an *institution* (as opposed to an individual)" and that "various other circuit courts have noted that quasi-judicial immunity only extends to an *individual* sued in his or her *personal* capacity") (citing *Gross v. Rell*, 585 F.3d 72, 93 (2d Cir. 2009)).  Further, the Supreme Court has suggested that "[w]hen it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses.... In an official-capacity action, these defenses are unavailable.  The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."  *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985) (citations omitted).  Therefore quasi-judicial immunity if applicable

would only protect Defendants Adams and Mazzoccoli from Plaintiffs' individual capacity claims against them.

Since Plaintiffs have sued nine defendants each in different capacities and the fact that Defendants have raised various immunities and defenses which impact the ability to bring suit based on these different capacities, the Court will address each Defendant separately to clarify whether Plaintiffs' claims in count two may proceed against that particular Defendant.

The count two claim against the five DPS officers, Fox, Masek, Mattson, Karanda, and Batsura in their individual capacities is hereby dismissed.  Plaintiffs have failed to plausibly allege these Defendants were personally involved in the alleged due process violation as DPS had no authority or control over when and how the Board scheduled appeals hearings.  *Ashcroft*, 129 S. Ct. at 1949.  For the same reasons, Plaintiffs' injuries cannot be fairly traceable to these Defendants' conduct.

The count two claim against Defendant DPS Commissioner James Thomas in his official capacity is also dismissed.  The Eleventh Amendment bars the claims against Defendant Thomas in his official capacity for monetary and prospective injunctive relief as Plaintiffs have not demonstrated that the exception under *Ex parte Young* should apply to Defendant Thomas.

The count two claim against Former Governor Rell in her individual and official capacities to which the current Governor Malloy succeeds is likewise dismissed.   First, Plaintiffs have failed to allege that Governor Rell was personally involved in the alleged constitutional deprivation or that their injuries

were fairly traceable to her actions.  In addition, Plaintiffs would not be entitled to obtain prospective injunctive relief from the Governor in her individual capacity. The Eleventh Amendment would also bar the claims against the current Governor in his official capacity for monetary and prospective injunctive relief as Plaintiffs have not demonstrated that the exception under *Ex parte Young* should apply to the Governor.

The count two claim against Defendant Former Board Chairman Christopher Adams in his individual capacity remains as Defendants has not demonstrated that Defendant Adams is entitled to qualified immunity.  In addition, for purposes of the motion to dismiss, the Court has not yet determined whether Defendant Adams is entitled to quasi-judicial immunity.  The Plaintiffs would not be able to obtain prospective injunctive relief from the former chairman in his individual capacity.   Even if Plaintiffs had sued the former Board chairman in his official capacity, Plaintiffs would not be able to obtain prospective injunctive relief as Adams is no longer the acting Chairman of the Board and would have no authority to provide such relief.

The count two claim against Defendant Mazzoccoli in her official capacity is hereby dismissed on the basis of the Eleventh Amendment.  The Court notes that Plaintiffs could not obtain prospective injunctive relief from Mazzoccoli as they have not demonstrated that the exception under *Ex parte Young* should apply to her.  The count two claim against Mazzoccoli in her individual capacity is also dismissed as Plaintiffs have not plausibly alleged that Mazzoccoli was personally involved in the alleged constitutional violation.

For the reasons set forth above, Plaintiffs have failed to name a proper defendant who would be able to provide prospective injunctive relief in connection with the appeals backlog since Plaintiffs cannot obtain prospective injunctive relief from individual capacity defendants.  Plaintiffs could only obtain prospective injunction relief if they sued an official capacity defendant who could meet the requirements under *Ex-parte Young*.  For example, if Plaintiffs sued any of the current Board members in their official capacities and in particular the Board Secretary who is statutorily vested with scheduling appeals for prospective injunctive relief, the exception in *Ex parte Young* exception would apply as the Board members would have a connection to the enforcement of the appeals process and would have the authority to provide such injunctive relief.  Plaintiffs may therefore amend their complaint to bring this claim against a current Board member in his or her official capacity for prospective injunctive relief within fourteen days of this Order.

### Analysis of Plaintiffs' Count Three Claim that Procedural Due Process was Violated When DPS Revoked His Permit in Violation of Conn. Gen. Stat. § 29-32b(b)

Only Goldberg has brought this claim which is alleged in count three of his amended complaint and not Kuck.  Under Conn. Gen. Stat. § 29-32b(b), DPS "may revoke the state permit or temporary permit based on the Commissioner's own investigation or upon the request of any law enforcement agency."  Plaintiffs allege that Goldberg was deprived of procedural due process when DPS revoked his permit "without conducting an investigation to determine if the facts and circumstances warranted revocation."  [Doc.  #67, Goldberg Compl. at ¶ 262].  They also allege that DPS did not receive a request from any law enforcement

agency for revocation of Goldberg's permit.  [*Id.* at ¶88].  In addition, Plaintiffs allege that DPS Defendants deprived Goldberg of due process "when they relied solely on Plaintiff's arrest as cause for revocation of his state permit."  [*Id.* at ¶ 263].  Plaintiffs have sued only the DPS Defendants and Board Defendants Adams and Mazzoccoli in connection with count three.

In particular, Defendants have moved to dismiss count three on the basis that DPS revoked Goldberg's permit based on a request from the GPD. Defendants argue that several allegations in the complaint can be interpreted to suggest that DPS revoked Goldberg's permit based on a request from the GPD. Defendants note that Plaintiffs have alleged that "DPS received a telephone call and a letter from the Glastonbury Police Department that plaintiff's permit and handgun had been seized by the GPD.  GPD is a law enforcement agency, and based on the phone call and letter, DPS revoked the permit."  [Doc. #75, Goldberg Def. Mem. at 25].  Defendants further argue that "[w]hile not clear from the complaint, it may be that the plaintiff is claiming that the letter from GPD to DPS did not include a specific written request to revoke the permit.  In response, the statute does not require the local officers to frame a revocation request in any particular words.  In this case, the local officers arrested the plaintiff, confiscated the firearm and permit and then called the state revocation authority to notify them of these events and sent along the police report.  It is difficult to imagine what else the local officers intended DPS to do."  [*Id.*].

The Court disagrees with the Defendants' reading of Plaintiffs' amended complaint and finds that Plaintiffs plausibly have alleged there was no request

from any law enforcement agency for revocation of Goldberg's permit.  In particular, Plaintiffs alleged that GPD Lieutenant Dennis Woessner forwarded a letter to Defendant DPS Officer Detective Mattson consisting of one-sentence "[e]nclosed is the case we spoke about on the phone.  Thanks for all your help." [Doc. #67, Goldberg Compl. at ¶ 48].   They then alleged that Goldberg received a revocation letter from DPS which "did not reference any investigation by DPS Commissioner Danaher or any request by the GPD for revocation of Goldberg's state permit."  [*Id.* at ¶ 67].  Lastly, Plaintiffs specifically alleged that the GPD "did not request the June 27, 2007, or February 21, 2008, revocations of Goldberg's state permit and temporary state permit, respectively."  [*Id.* at ¶ 88].  Further, these allegations are well-pleaded factual allegations and not conclusory which are entitled to the assumption of truth.  *Iqbal*, 129 S.Ct. at 1950.   In addition, the Court "must draw all reasonable inferences in favor of the Plaintiffs based on these alleged material facts."  *See Dennany v. Knights of Columbus*, No.3:10cv1961, 2011 WL 3490039, at *2 (D. Conn.  August 10, 2011) (quoting *Iqbal*, 129 S. Ct. at 1949-50).  Therefore Plaintiffs have plausibly alleged that DPS did not either conduct an investigation nor did they receive a request from any law enforcement agency prior to revoking Goldberg's permit.   The Court further notes that the issue of whether the GPD did or did not request the revocation of Goldberg's permit is a question ripe for discovery and is more appropriately asserted on a motion for summary judgment or trial.

Further, the Defendants have not moved to dismiss this claim on the basis that the alleged violation of statutory procedures rose to the level of a procedural

due process violation.  However the Court is mindful that procedural due process "is flexible and calls for such procedural protections as the particular situation demands" and notes that a failure to follow statutory procedures can rise to the level of a due process violation.  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see also Everett v. City of Tallahassee*, 840 F. Supp. 1528, 1543 (N.D. Fla. 1992) (finding that "the City's placement of the fire station on the Oven Park property without following the statutory procedures for rezoning violates plaintiff's procedural due process").

Defendants once again argue that Plaintiffs cannot maintain this cause of action since Plaintiffs have failed to name a proper Defendant and are protected under the doctrines of sovereign immunity under the Eleventh Amendment as well as qualified and quasi-judicial immunity.

i.   *Analysis of Whether Plaintiff Alleged Sufficient Personal Involvement and Standing of Board Defendants*

Defendants argue that Plaintiffs have not alleged sufficient personal involvement of Defendant former Board Chairman Adams or Defendant Mazzoccoli in connection with Goldberg's count three claim as both Adams and Mazzoccoli played no role whatsoever in DPS's decision to revoke Goldberg's permit in the first place.  The Court agrees that the amended complaint is devoid of any facts that would suggest that Defendants Adams or Mazzoccoli personally contributed to DPS's decision to revoke Goldberg's permit or that they instructed DPS to revoke permits in violation of Conn. Gen. Stat. § 29-32(b).  *See Matagrano v. New York State Dept. of Correctional Services*, No.98CIV428, 1999 WL 675974, at *2 (S.D.N.Y. Aug. 31, 1999) (finding that Plaintiff could not maintain § 1983 claim

since "the complaint fail[ed] to allege any basis upon which [Defendant] Conway could be liable to the plaintiff.  Moreover, plaintiff has elucidated no facts indicating that Conway was involved in anyway with any of the decisions with respect to plaintiff.").  Moreover, the statutory framework provides that the Board is only involved after DPS has revoked the permit and not before: "any person aggrieved by any refusal to issue, renew, or the revocation of a permit may within ninety days after receipt of notice and without prejudice to any other course of action open to such person in law or in equity, appeal to the board." Conn. Gen. Stat. § 29-32b(b).  Accordingly, the Court finds that Plaintiff has failed to allege sufficient personal involvement of the Board Defendants in connection with his count three claim and therefore cannot maintain a § Section 1983 claim against them.

Defendants also characterize this argument in terms of standing and argue that Goldberg's injury is likewise not fairly traceable to the challenged action of the Board Defendants.  F*riends of the Earth v. Laidlaw Environmental Services*, Inc., 528 U.S. 167. 180-81 (2000).  The Court agrees that since the revocation without investigation was occasioned by DPS and not the Board, Goldberg's injury is not fairly traceable to the Board Defendants.  Accordingly, the count three claim against Defendants Adams and Mazzoccoli in their individual capacities is hereby dismissed.

ii.    *Analysis of Defendants Assertion of Sovereign Immunity under the Eleventh Amendment in connection with Plaintiffs' Count Three Claim*

As discussed above, the Eleventh Amendment would bar all claims brought against Defendants in their official capacities for monetary damages and for prospective injunctive as long as the *Ex parte Young* exception did not apply.

Since Plaintiffs have sued DPS Commissioner Thomas in his official capacity only, the claim against Defendant Thomas for monetary damages is barred under the Eleventh Amendment.  To the extent that Plaintiffs are seeking prospective injunctive relief in connection with their count three claim, Plaintiffs could maintain suit against Defendant Thomas in his official capacity under *Ex parte Young*.  Under Section 29-32(b), the Commissioner of DPS is authorized to revoke" the state permit or temporary permit based on the Commissioner's own investigation or upon the request of any law enforcement agency."  Conn. Gen. Stat. § 29-32(b).  It is therefore apparent that Defendant Thomas has a connection to the enforcement of the unconstitutional act and that he had a "particular duty to enforce the statute in question" and a "demonstrated willingness to exercise that duty" as is required under *Ex parte Young*.  209 U.S. at 161.

Plaintiffs have also sued Defendant Mazzoccoli in her official capacity.  The Eleventh Amendment would bar the claims against her in her official capacity for monetary relief as well as for prospective injunctive relief.   As discussed above, Mazzoccoli as the sole employee of the Board had no involvement in DPS's decision to revoke Goldberg's permit in the first place and therefore the exception in *Ex parte Young* would not apply to her as she has no connection to the enforcement of the unconstitutional act.

### iii.    Analysis of Defendants Assertion of Qualified Immunity in connection with Plaintiffs' Count Three Claim

Defendants argue that the DPS Defendants are entitled to qualified immunity in connection with count three since the DPS Defendants "could obviously reasonably rely upon a facially valid arrest report documenting an incident involving a pistol.  No reasonable public official in the DPS defendant's positions would have any reason to believe that the revocation of the newly-minted pistol permit for displaying the weapon at a public restaurant would violate anyone's constitutional rights."  [Doc. #75, Goldberg Def. Mem. at 36].  The Court disagrees with Defendants' analysis as the statutory framework in Conn. Gen. Stat. § 29-32(b) establishes that DPS may only revoke a permit based on its own investigation or upon the request of any law enforcement officer.  Therefore, it was clear that if DPS revoked Goldberg's permit without doing either of these two things as Goldberg claims and the Court accepts as true for purposes of this motion to dismiss, DPS deprived Goldberg of the process to which he was statutorily entitled.

### iv.    Analysis of Defendants Assertion of Quasi-judicial Immunity in connection with Plaintiffs' Count Three claim

Defendants argue that the DPS Defendants are entitled to the protection of quasi-judicial immunity as they were performing prosecutorial functions.    In particular, Defendants argue that DPS acted "in a quasi-prosecutorial capacity and not only investigates the case initially, it presents the case for revocation to the Board in the same manner as a prosecutor in a conventional action."  [*Id.* at 33].  Plaintiffs argue that the conduct at issue in count three "does not concern

the DPS Defendants' appearances before the Board in the capacity of an advocate or attorney" but rather relates to the conduct of processing firearms permits which are investigatory and administrative functions.   [Doc. #84, Goldberg Mem. in Opp. at 24].  The statutory regime provides that DPS make the initial decision based upon its investigation and its discretion to deny or revoke permits which can arguably be viewed as a prosecutorial function.  See Conn. Gen. Stat. §§29-28(b); 29-29(d); 29-32(b).   However, the statute also expressly provides that DPS "may revoke the state permit or temporary permit based on the Commissioner's own investigation or upon the request of any law enforcement agency."  Conn. Gen. Stat. § 29-32(b).  As discussed above in connection with the Board's assertion of quasi-judicial immunity, in light of an express statutory mandate, the Court questions whether it is appropriate to extend quasi-prosecutorial immunity to DPS.  Accordingly, the issue of whether DPS is entitled to quasi-judicial immunity is therefore more appropriately determined on summary judgment after additional briefing.

### Analysis of Plaintiffs' Count Four Claim that Procedural Due Process was Violated When DPS did not Reinstate Goldberg's Permit When his Criminal Charges were Nolled

Goldberg alone has brought this claim which is alleged in count four of his amended complaint and not Kuck.  Plaintiffs allege that on July 30, 2007, Goldberg's criminal charges for breach of the peace in the second degree against him were nolled and therefore all records pertaining to his arrest would be statutorily erased. [Doc. #67, Goldberg Compl. at ¶ 72].   In particular, Goldberg alleges that "despite knowing on July 30, 2007, that it had no disclosable

evidence to present to the Board at the time of hearing, the DPS Defendants did not reinstate Plaintiff's state permit until September 22, 2008 nearly fifteen months after revocation." [*Id.* at ¶ 270]. Further, he alleges that he was deprived of due process when "the DPS Defendants relied on information pertaining to statutorily erased information as grounds for revocation, knowing that such information could not lawfully be disclosed to the Board at the hearing." [*Id.* at ¶ 271]. While it is not clearly alleged in the amended complaint, Goldberg seems to be suggesting that when his criminal charges were nolled the basis for DPS's decision to revoke Goldberg's permits was essentially eliminated and therefore DPS should have automatically or shortly thereafter reinstated his permit upon the entry of the nolle prosequi. It appears that the process Goldberg is alleging that he was denied was reinstatement of his permit by DPS based on the entry of the nolle prosequi. In addition, Plaintiffs have only sued the DPS Defendants in connection with this claim and not the Board Defendants. The Court therefore construes the allegations in count four to be limited to DPS's role in the firearm permitting process.

The Defendants argue that the claim should be dismissed on the basis that the "[plaintiff filed an appeal of his permit revocation. The Board defendants cannot rescind the revocation until the Board as a whole hears the merits. The DPS defendants are under no obligation to restore the permit, and are entitled to have Board hear the appeal and adjudicate the issues." [Doc. # 75, Goldberg Def. Mem. at 26]. The Court agrees with Defendants that Plaintiffs have failed to state that Goldberg was deprived of due process. Under Conn. Gen. Stat. § 29-32b the

only way to appeal a decision to revoke a permit is through appeal to the Board and not DPS.  The statutory framework laid out in Conn. Gen. Stat. § 29-32 and § 29-32b authorizes DPS to revoke a permit based on certain criteria as enumerated in the statute.  All revocation decisions made by DPS are then subject to an appeal before the Board.   The statutory framework does not include a reinstatement process through application to DPS and therefore Goldberg is not statutorily entitled to the process that he claims he was denied.

Moreover, Plaintiffs throughout their amended complaints have repeatedly complained that DPS revoked permits "without evidence or basis in law" and then reinstated these permits ultra vires just prior to the scheduled appeal to the Board.  *See* [Doc. # 67, Goldberg Compl. at ¶¶ 123, 139, 258].   It is contradictorily to on the one hand condemn DPS's repeated ultra vires practice of reinstating permits outside of the statutory scheme thereby depriving individuals of the appeals process before the Board and then on the other hand claim that due process was also denied when DPS did not commit the allegedly ultra vires act to reinstate Goldberg's own permit prior to the appeals process before the Board. Accordingly, the Court finds that Plaintiffs have failed to state that Goldberg was denied procedural due process in connection with his claims in count four and therefore Defendants' motion to dismiss count four is granted.

Since the Court has granted Defendants' motion to dismiss count four on substantive grounds, the Court need not address Defendants' arguments that the claim should also be dismissed based on the state's sovereign immunity under

72

the Eleventh Amendment or based on the Defendants assertion of qualified or
quasi-judicial immunity.

### Analysis of Plaintiffs' Count Five Claim that They Were Denied Substantive Due Process

Goldberg and Kuck have brought nearly identical claims alleging they were
denied substantive due process.  Goldberg's claim is alleged in count five of his
amended complaint whereas Kuck's claim is alleged in in count three of his
amended complaint.  They allege that the DPS Defendants imposition of arbitrary
barriers to "gun possession in contravention of representative legislation" in
combination with the "unreasonable wait period" for an appeal denied them of
substantive due process.   [Doc. # 67, Goldberg Compl. at ¶¶ 274, 275].   Plaintiffs
have sued all of the Defendants in connection with count five.

"For state action to be to be taken in violation of the requirements of
substantive due process, the denial must have occurred under circumstances
warranting the labels 'arbitrary' and 'outrageous.'" *Natale v. Town of Ridgefield*,
170 F.3d 258, 262 (2d Cir. 1999).   Here nothing in the amended complaints
"shocks the conscience" or suggests a "gross abuse of governmental authority."
*See Rochin v. California*, 342 U.S. 165, 172 (1952), *overruled on other grounds by
Mapp v. Ohio*, 367 U.S. 643 (1961).

First, the the Second Circuit has already addressed Kuck's substantive due
process claim and held that "DPS's alleged misconduct was not so 'egregious,
outrageous, or shocking to the contemporary conscience" that it violated
substantive due process.'"   *Kuck*, 600 F. 3d at 167.  The Second Circuit reasoned
that "[w]hether authorized or not, the fact that state officials required Kuck to

produce proof of citizenship or legal residency in connection with his permit
renewal application is hardly outrageous or shocking.  Even more, substantive
due process does not entitle federal courts to examine every alleged violation of
state law, especially ones that, while perhaps vexatious, are more routine than
egregious.  That is especially so because, under Connecticut law, Kuck and other
class members have recourse to state forums to challenge the merits of DPS
decisions."  *Id.* (citing Conn. Gen. Stat. § 29-32b(b), (f)).

The Second Circuit's reasoning in *Kuck* is also applicable to Goldberg's
substantive due process claim.   The fact that state officials revoked Goldberg's
gun permit based on his arrest for breach of the peace in the second degree is
likewise hardly outrageous or shocking.   In addition, as the Second Circuit
pointed out Goldberg and other class members do have recourse to state forums
to challenge the merits of DPS's decision to revoke a permit.   Accordingly, the
Court grants Defendants' motion to dismiss Plaintiffs' count five claim.

Since the Court has granted Defendants' motion to dismiss count five on
substantive grounds, the Court need not address Defendants' arguments that the
claim should also be dismissed based on the state's sovereign immunity under
the Eleventh Amendment or based on the Defendants assertion of qualified or
quasi-judicial immunity.

### Analysis of Plaintiffs' Count Six Claim for First Amendment Retaliation

Only Goldberg has brought this claim which is alleged in count six of his
amended complaint and not Kuck.  Goldberg alleges that he was "deprived of his
state permit in retaliation for the interviews rendered to the media concerning his
arrest" when DPS revoked and then refused to reinstate his permit after the entry

of the nolle prosequi on his criminal charges. [Doc. #67, Goldberg Compl. at ¶¶ 285- 287].   Goldberg alleges that he spoke with the media after his criminal charges were nolled on July 30, 2007.  [*Id.* at ¶285].   Goldberg has sued all of the Defendants in connection with count six.  In order to state a retaliation claim, a private citizen must show that: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right."  *Curley v. Village of Suffern*, 268 F. 3d 65, 73 (2d Cir. 2001).   The Second Circuit addressed a similar First Amendment retaliation claim that was raised by Kuck in his original complaint and held that Kuck had not adequately alleged that his speech caused any adverse action by DPS.  *Kuck*, 600 F.3d at 168 (*citing Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Gill v. Pidlypchak*, 389 F.3d 379, 382-84 (2d Cir. 2004) (requiring an adverse action by defendants and a causal connection between the adverse action and the protected speech)).

Goldberg like Kuck has adequately alleged that he engaged in protected speech, however he has not pleaded facts that suggest that the Defendants' adverse actions were motivated by the exercise of his First Amendment rights. As Defendants point out, Goldberg's alleged protected speech occurred after the initial decision to revoke his permit was made and therefore based on Goldberg's pleadings the decision to revoke his permit could not have been made in retaliation.   In addition, as discussed above, Goldberg was not statutorily entitled to have his permit reinstated by DPS in the first place when his nolle prosequi

was entered in his criminal case and therefore could not have suffered any adverse action by the Defendants when they did not reinstate his permit or give his permit back after the nolle.  Even assuming arguendo that DPS's failure to reinstate his permit was an adverse action, Goldberg has not alleged any facts demonstrating that such action was motivated by retaliation.  For example, Goldberg has not alleged that the DPS defendants who refused to return his permit were even aware of his protected speech.  *Pavone v. Puglisi*, 353 Fed. Appx. 622, 625 (2d Cir. 2009) ("Although causal connection between adverse action and protected speech may be indirectly established by showing that protected activity was followed closely in time by adverse action, a plaintiff must still allege that defendants were aware of the protected activity.") (internal citation omitted).  Moreover, Goldberg like Kuck has not alleged that his speech was actually chilled as a result of DPS's conduct.  *Kuck*, 600 F.3d at 168 (*citing Williams v. Town of Greenburgh*, 535 F.3d 71, 76, 78 (2d Cir. 2008); *Curley*, 268 F. 3d at 73)).   Accordingly, Defendants' motion to dismiss Plaintiffs' count six claims is hereby granted.

Since the Court has granted Defendants' motion to dismiss count six on substantive grounds, the Court need not address Defendants arguments that the claim should also be dismissed based on the state's sovereign immunity under the Eleventh Amendment or based on the Defendants' assertion of qualified or quasi-judicial immunity.

<u>**Analysis of Plaintiffs' Count Seven Claim for Illegal Seizure of Goldberg's Property in violation of the Fourth and Fourteenth Amendments**</u>

Only Goldberg has brought this claim which is alleged in count seven of his amended complaint and not Kuck.  Goldberg alleges that "by means of the unlawful receipt of Plaintiff's valid state permit between June 21, 2007 and June 27, 2007, the DPS Defendants conspired with Glastonbury Police Department to commit the criminal act of larceny and condoned the GPD seizure of property that the GPD had not right to take or withhold from Plaintiff" and violated Goldberg's right to be free of unreasonable and unlawful seizures of property in violation of the Fourth and Fourteenth Amendments.  [Doc. #67, Goldberg Compl. at ¶¶ 293-294].   In addition, Goldberg alleges that GPD illegally took and withheld Goldberg's gun permit in violation of the Fourth Amendment and that the "DPS Defendants maintain a practice and procedure of receiving from municipal police agencies unlawfully taken and withheld state permits."  [*Id.* at ¶¶ 304-307]. Plaintiffs have sued only the DPS Defendants in connection with count seven.

Defendants move to dismiss count seven on the basis that Plaintiffs have failed to demonstrate standing and in particular that Goldberg's injury is not fairly traceable to the challenged actions of the DPS Defendants as "there are absolutely no factual allegations to support a claim that [] the DPS defendants had any role in the Glastonbury Police Department's decision [to seize Goldberg's permit] whatsoever.  These defendants simply had absolutely nothing to do with the underlying action."  [Doc. #75, Goldberg Def. Mem. at 30].

Plaintiffs have alleged that "GPD Lieutenant Dennis Woessner forwarded a letter to [DPS Defendant] Detective Mattson dated June 25, 2007, consisting of one sentence in its body: 'Enclosed is the case we spoke about on the phone.

Thanks for all your help." [Doc. #67 at ¶ 48]. They have therefore alleged that at least one DPS Defendant spoke with the GPD regarding the seizure of Goldberg's permit and drawing all inferences from these allegations in the light most favorable to the Plaintiffs, the Court concludes that Plaintiffs have plausibly alleged that DPS did have a role in the GPD's decision to seize Goldberg's permit. Plaintiffs have therefore alleged that his injury was fairly traceable to the DPS Defendants' conduct.

In order to prove a conspiracy claim under § 1983, a plaintiff must demonstrate: "(1) an agreement an agreement between two or more state actors or a state actor and a private party[;] (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Bussey v. Phillips*, 419 F.Supp.2d 569, 586 (S.D.N.Y. 2006). To succeed in a § 1983 conspiracy claim, "a plaintiff must prove not only a conspiracy, but *an actual deprivation* of a constitutional right." *Martinez v. Golding*, 499 F.Supp.2d 561, 570 (S.D.N.Y. 2007) (emphasis in the original). Whether discovery will bear out Plaintiffs' claim of conspiracy is a matter for summary judgment or trial and the Court notes that if there was probable cause to arrest Goldberg and seize his permit such a conclusion would likely be fatal to a § 1983 conspiracy claim. *See Id.* (finding that since there was probable cause to arrest and prosecute plaintiff, plaintiff's claim for conspiracy to violate his constitutional right must be dismissed).

Defendants argue that they are entitled to qualified immunity in connection with count seven on the basis that "there is no reason for any of the defendants

[to] believe that they were violating plaintiff's constitutional rights because none of them played any role in the confiscation." [Doc. #75, Goldberg Def. Mem. at 36]. However as discussed above, Plaintiffs have plausibly alleged that at least one DPS Defendant spoke with GPD and therefore DPS might have played a role in the GPD's decision to seize Goldberg's permit. Accordingly, Defendants have not demonstrated on the motion to dismiss that they are entitled to qualified immunity in connection with Plaintiffs' count seven claim.

Lastly, the Court notes that the Eleventh Amendment would bar Plaintiffs' count seven claim against Defendant DPS Commissioner Thomas as Plaintiffs have sued Thomas in his official capacity.

<u>Conclusion</u>

Based upon the above reasoning, the Defendants' [Doc. #70] and [Doc. #86] motions to dismiss are GRANTED IN PART and DENIED IN PART. Plaintiffs' counts one, four, five and six claims are hereby dismissed. The following claims survive the motion to dismiss. Plaintiff's count two claim remains extant against Defendant Adams in his individual capacity only and the Court grants Plaintiffs leave to amend their complaint within fourteen days of this Order to name an official capacity defendant who could provide prospective injunctive relief under count two. Plaintiffs' count three claim remains extant against the DPS Defendants only and Plaintiffs' count seven claim remains extant against the DPS Defendants sued in their individual capacities only. All other Defendants are hereby dismissed from the action.

IT IS SO ORDERED.

_____/s/_____

**Hon. Vanessa L. Bryant**

**United States District Judge**

**Dated at Hartford, Connecticut: September 29, 2011**