UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| KUCK, et al. | : | |
| --- | --- | --- |
| | : | |
| v. | : | CASE NO.:  3:07CV1390(VLB) |
| | : | |
| DANAHER, et al. | : | JUNE 18, 2012 |

**PLAINTIFFS' LOCAL RULE 56(a)2 STATEMENT**

Plaintiffs M. Peter Kuck and James F. Goldberg, hereby submit, pursuant to Local Rule 56(a), a Local Rule 56(a)2 Statement to accompany Plaintiffs' Memorandum of Law in Opposition to the Motion for Summary Judgment filed by the Defendants.

I.   CONTENTS OF STATEMENT

   a.   RESPONSES TO DEFENDANT'S LOCAL RULE 56(a)1 STATEMENT

   b.   DISPUTED ISSUES OF MATERIAL FACT

      EXHIBITS 1- 46 TO LOCAL RULE 56(a)2 STATEMENT

| Ex. 1 | Auditor's Report: Board of Firearms Permit Examiners (FY ending June 30, 2000) |
| --- | --- |
| Ex. 2 | Auditor's Report: Board of Firearms Permit Examiners (FYs ending June 30, 2001 and 2002) |
| Ex. 3 | Auditor's Report: Board of Firearms Permit Examiners (FYs ending June 30, 2003 and 2004) |
| Ex. 4 | Auditor's Report: Board of Firearms Permit Examiners (FYs ending June 30, 2005, 2006, 2007 and 2008) |
| Ex. 5 | Auditor's Report: Board of Firearms Permit Examiners (FYs ending June 30, 2009 and 2010) |
| Ex. 6 | **Memorandum of Decision, Woolard v. Sheridan** |
| Ex. 7 | 04/17/2007 Email from Kuck to Masek |
| Ex. 8 | 04/18/2007 Email from Janeiro to Masek |
| Ex. 9 | 04/26/2007 Letter from Masek to Kuck |
| Ex. 10 | 05/4/2007 Letter from Kuck to Masek |
| Ex. 11 | 05/11/2007 Email from Kuck to Masek |
| Ex. 12 | 05/24/2007 Email from Kuck to Masek |
| Ex. 13 | 05/24/2007 Forwarded 5/24 Kuck email to Masek |

| Ex. 14 | 12/13/2007 FOI response from Janeiro to Kuck |
|---|---|
| Ex. 15 | 05/14/2007 Letter from Adams to Danaher |
| Ex. 16 | 09/14/2007 Letter from Danaher to Adams |
| Ex. 17 | Board of Firearms Permit Examiners email package |
| Ex. 18 | Regulations of Board of Firearms Permit Examiners Sec. 1-5 |
| Ex. 19 | Regulations of Board of Firearms Permit Examiners Sec 1-15 (Westlaw) |
| Ex. 20 | 07/14/2008 Letter from Knapp to Corradino |
| Ex. 21 | 06/25/2007 Letter from Woessner to Mattson encl. police report |
| Ex. 22 | 06/27/2007 Revocation letter from Mattson to Goldberg |
| Ex. 23 | 07/30/2007 Dismissal and order in CT v. Goldberg |
| Ex. 24 | 09/25/2007 Letter from Sweeney to Danaher |
| Ex. 25 | 11/14/2007 Letter from Danaher to Sweeney |
| Ex. 26 | 01/22/2008 Letter from Goldberg to Cetran |
| Ex. 27 | 01/31/2008 Memo from Connolly to Cetran |
| Ex. 28 | Goldberg Temporary State Permit, dated 2/4/2008 |
| Ex. 29 | 02/20/2008 Revocation letter from Karanda to Goldberg |
| Ex. 30 | 02/26/2008 Letter from Cetran to Hale (CPCA) |
| Ex. 31 | 07/29/2008 Witness statements |
| Ex. 32 | 09/8/2008 Letter from Baird to Hall |
| Ex. 33 | Goldberg Temporary State Permit, dated 9/10/2008 |
| Ex. 34 | 12/18/2008 Reinstatement letter from Hall to Mazzoccoli |
| Ex. 35 | 02/22/2012 FOI response from Hatfield to Baird |
| Ex. 36 | Special Licensing and Firearms Unit database records |
| Ex. 37 | Excerpt from Adams deposition |
| Ex. 38 | Excerpt from Knapp deposition |
| Ex. 39 | Excerpt from Citran deposition |

II.     Responses to Defendants' Local Rule 56(a)1 Statement

1. "Pursuant to Conn. Gen Stat §29-28(b), a firearms permit may be issued by the Special Licensing and Firearms Unit ("SLFU") under certain circumstances including if the applicant Is a citizen or legal resident, is not a felon and other specific requirements. Connecticut General Statutes §§ 29.28(b), (f)."

   **Denied.** The statute speaks for itself.[1]

---

[1] **See Conn. Gen. Stat.** § 29-28(b) "Upon the application of any person having a bona fide residence or place of business within the jurisdiction of any such authority, such chief of police, warden or selectman may issue a temporary state permit to such person to carry a pistol or revolver within the state, provided such

authority shall find that such applicant intends to make no use of any pistol or revolver which such applicant may be permitted to carry under such permit other than a lawful use and that such person is a suitable person to receive such permit. No state or temporary state permit to carry a pistol or revolver shall be issued under this subsection if the applicant (1) has failed to successfully complete a course approved by the Commissioner of Public Safety in the safety and use of pistols and revolvers including, but not limited to, a safety or training course in the use of pistols and revolvers available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Environmental Protection and a safety or training course in the use of pistols or revolvers conducted by an instructor certified by the state or the National Rifle Association, (2) has been convicted of a felony or of a violation of subsection (c) of section 21a-279, section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d, (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120, (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13, (5) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding twelve months by order of a probate court, (6) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person, (7) is subject to a firearms seizure order issued pursuant to subsection (d) of section 29-38c after notice and hearing, (8) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to 18 USC 922(g)(4), (9) is an alien illegally or unlawfully in the United States, or (10) is less than twenty-one years of age. Nothing in this section shall require any person who holds a valid permit to carry a pistol or revolver on October 1, 1994, to participate in any additional training in the safety and use of pistols and revolvers. Upon issuance of a temporary state permit to the applicant, the local authority shall forward the original application to the commissioner. Not later than sixty days after receiving a temporary state permit, an applicant shall appear at a location designated by the commissioner to receive the state permit. Said commissioner may then issue, to any holder of any temporary state permit, a state permit to carry a pistol or revolver within the state. Upon issuance of the state permit, the commissioner shall make available to the permit holder a copy of the law regarding the permit holder's responsibility to report the loss or theft of a firearm and the penalties associated with the failure to comply with such law. Upon issuance of the state permit, the commissioner shall forward a record of such permit to the local authority issuing the temporary state permit. The commissioner shall retain records of all applications, whether approved or denied. The copy of the state permit delivered to the permittee shall be laminated and shall contain a full-face photograph of such permittee. A person holding a state permit issued pursuant to this subsection shall notify the issuing

2.     A handgun permit must be renewed every five years. Connecticut General Statutes §§ 29 .. 30(c).

    <u>**Admit.**</u>

3.     After September 11, 2001, in response to a request from National Instant Background Check System ("NCIS"), SFLU required incoming renewal applications to include proof of citizenship or legal residency. (Decl. of Detective Mattson, 6; Decl. of Detective Karanda, 6)

    <u>**Admit.**</u>

4.     There are in excess of 160,000 valid handgun permits in Connecticut. (Decl. of Detective Mattson, -n 7; Decl. of Detective Karanda, -n 12.)

    <u>**Admit.**</u>

5.     SLFU typically was staffed by a total of two sworn officers at all times relevant to this lawsuit. (Decl. of Detective Mattson ,., 8; Decl. of Detective Karanda, -n 13.)

    <u>**Admit.**</u>

6.     The principle responsibilities of the firearms unit of SLFU is to review handgun permit applications and denials, review incident reports and investigations for potential revocations, train troopers with regard to handgun permit issues and liase with various federal agencies regarding firearms issues. (Decl. of Detective Mattson, '119.)

    <u>**Admit.**</u>

7.     Up to 1000 cases are reviewed by SLFU each year. (Decl. of Detective Mattson, '1110; Decl. of Detective Karanda, ,., 14.)

    <u>**Admit.**</u>

8.     In addition, SLFU is obligated by law to revoke handgun permits when an investigation reveals that a permittee no longer qualifies to have such a permit, for example by reason of having committed a felony or other listed acts. (Dec •• of Detective Mattson, 4[( 11; Decl. of Detective Karanda, 4[( 15.)

---

**authority within two business days of any change of such person's address. The notification shall include the old address and the new address of such person."**

<u>**Admit.**</u>

9. In any given month there may be as many as 50 revocation investigations or requests submitted to the SLFU by local law enforcement agencies. (Decl. of Detective Mattson, 4[( 12.)

<u>**Admit.**</u>

10. Local law enforcement agencies often submit only an arrest or incident report when seeking revocation of a State handgun permit. (Decl. of Detective Mattson, " 13; Decl. of Detective Karanda, 4[( 17.)

<u>**Admit.**</u>

11. SLFU may base its investigation and decision solely upon sworn reports' submitted by local law enforcement. (Transcript, Deposition of John Danaher, *12/1/11,* pp. 145 .. 146; Decl. of Detective Mattson, " 14; Decl. of Detective Karanda, "18) SLFU may, in its discretion, follow .. up by interviewing local officers or reviewing other relevant records or databases. (Decl. of Detective Mattson, " 14, 20; Decl. of Detective Karanda, " 18.)

12. SLFU may investigate and conclude that revocation was not warranted and return a permit immediately. The investigation by SLFU is independent of the actions by local police. Even if local officers, for example, choose not to arrest an individual for actions involving a handgun, SLFU may, upon review of the police report, conclude that revocation is proper. (Decl. of Detective Mattson, -n 15; Decl. of Detective Karanda, -n 19.)

<u>**Admit.**</u>

13. On June 27, 2007, Detective Mattson of SLFU received a telephone call from Lt. Woessner of the Glastonbury Police Department ("GPD") informing her that Mr. James Goldberg had been arrested for breach of peace. This was the first time SLFU was notified of Mr. Goldberg's June 21, 2007, arrest. (Decl. of Detective Mattson, -n-n 16-18.)

<u>**Admit.**</u>

14. Detective Mattson did not instruct GPD to seize Mr. Goldberg's firearms permit. (Decl. of Detective Mattson, -n 18.)

<u>**Admit.**</u>

15. The Board of Firearms Permit Examiners ("BFPE" or the "Board") hears and decides appeals related to various firearms permit issues including cases where an applicant for a handgun permit has been denied a permit by local police authorities or the SLFU and cases where an existing firearms permit has been revoked. Through its review of the appeals brought before it, the Board seeks to ensure the protection of the rights of firearms permit holders and the protection of the public from individuals who may not properly hold firearms permits under the laws of the State of Connecticut. (Decl. of Susan Mazzoccoli, , 5.)

    **Admit.**

16. In 1998 the average waiting period for an appeal was 3 months or less and there were only 5 cases scheduled for each meeting. (Decl. of Susan Mazzoccoli,4f( 7.)

    **Admit.**

17. Over time, the delay period increased until by approximately 2003 it was over a year. (Decl. of Susan Mazzoccoli, , 8; Transcript, Deposition of Christopher Adams, *12/20/11,* pp. 40, 143.)

    **Admit.**

18. The Board made repeated efforts to reduce the backlog including scheduling more hearing dates and increasing the number of appeals per hearing to 40 one month and 20 the next. At other times, the docket was rearranged to have only permit denial appeals heard at designated hearings in order to hear more appeals. (Decl. of Susan Mazzoccoli, ttl 9; Transcript, Deposition of Christopher Adams, *1\ 12/20/11,* pp 38, 40-41, 129; Tr. Capt. Masek, *2114112,* pp. 27.28; Decl. Christopher Adams, 118.)

    **Denied.**

19. However, beginning in 2009, the backlog began to drop to the point that, by the end of 2011, the backlog was approximately 7.5 months~ (Decl. of Susan Mazzoccoli, " 11.)

    **Admit.**

20. The most successful method of reducing the backlog was to schedule more meetings and hear more cases. (Decl. of Susan Mazzoccoli, " 12.)

    **Admit.**

21. The Board actively controlled its docket and this was vital in reducing the backlog of appeals. (Decl. Christopher Adams, " 9.)

    **Deny**, to the extent that this occurred only after Adams left the Board. While Adams was the chairman he believed that the Board was incapable of compelling the state police to be more efficient in having cases ready for hearing. (Pl. Ex. 37, Adams Tr. at 88:2-89:5) The backlog decreased when the Governor appointed Corradino to replace Adams because there were 407 cases pending as of August 8, 2008, when the state auditors estimated that it would take "approximately 16 months for these cases to be closed through hearings, withdrawals, or Department of Public Safety settlements." (Pl. Ex. 4 at 3) But the state auditors did notice progress when they drafted the report on June 9, 2009. They noted that "a subcommittee of the Board has been established primarily to address the backlog and to recommend updating the Board regulations." (Pl. Ex. 4 at 7)

22. There were disagreements between Chairman Adams and others with Plaintiff Kuck. (Decl. of Susan Mazzoccoli, 11 15; Transcript, Deposition of Christopher Adams, *12120/11,* pp. 54-55, 69, 94, 101, 149, 170, 187; Decl. Christopher Adams, 11 11.)

    **Deny.** Adams was paranoid about Kuck making Adams look bad even though Adams had no evidence of any attempt by Kuck to do so. (Pl. Ex. 37, Adams Tr. at 132:19-133:6) Adams can refer to no instances or examples. (Pl. Ex. 37, Adams Tr. at 133:7-15)

23. At no point did any member of the Board deliberately delay or otherwise improperly or intentionally interfere with any appeal. (Decl. of Susan Mazzoccoli, 1111 13, 16; Decl. Christopher Adams, 1111 10, 12.)

    **Deny.** Kuck Affidavit with references to emails preventing Kuck from performing his function as Board secretary.

24. Defendant Adams' last hearing was June 12, 2008. (Decl. Christopher Adams, 11 4.)

    **Admit.**

III. Plaintiff's Disputed Issues of Material Fact

1. The cause of the increase in the time period between a request for hearing and the date of hearing from three months on or about July 1, 2000, to fourteen months as of January 23, 2003, as threefold: (a) An increase in requests for permits after September 11, 2001; (b) an increase in denials of temporary state permits at the local issuing authority level; and (c) the Board's failure to

   **increase the number of hearing dates or the number of appeals heard at each hearing to meet the escalating demand.  (Pl. Ex. 2 at 4)**

2. **Adams ignored the recommendation of the state auditors that the Board "establish a standard that provides for a reasonable time period between the receipt of the appellant's request for an appeal and the scheduled hearing, and should adjust its scheduled hearing dates and numbers of cases heard to meet that standard."  (Pl. Ex. 2 at 4)  (Pl. Ex. 3 at 4)  (Pl. Ex. 37, Adams Tr. at 166:19-167:5)**

3. **Adams ignored the state auditors caution that the "length of the delay between the receipt of a request for an appeal and the hearing of the appeal, may be considered a denial of the appellant's right to a timely hearing."  (Pl. Ex. 2 at 4) (PL. Ex. 3 at 4)**

4. **The backlog decreased when the Governor appointed Corradino to replace Adams because there were 407 cases pending as of August 8, 2008, when the state auditors estimated that it would take "approximately 16 months for these cases to be closed through hearings, withdrawals, or Department of Public Safety settlements."  (Pl. Ex. 4 at 3)  But the state auditors did notice progress when they drafted the report on June 9, 2009.  They noted that "a subcommittee of the Board has been established primarily to address the backlog and to recommend updating the Board regulations."  (Pl. Ex. 4 at 7)**

5. **The backlog decreased after Adams left  the Board, as "[o]n July 10, 2008, at the recommendation of the Board's subcommittee, … decided to increase the annual number of meetings from twelve to sixteen to reduce the backlog"  (Pl. Ex. 4 at 5)**

6. **Adams departure from the Board resulted in a decrease in the backlog because after Corradino replaced Adams in August 2008 as Board chairman, the "frequency of Board hearings increased from 11 in the four prior fiscal years to 16 hearings in fiscal year 2009 and 18 hearings in fiscal year 2010. The more frequent meetings over the audited period resulted in a decrease in the case backlog from 407 in August, 2008 to 284 as of June 30, 2010.  Over that same time period, the estimated number of months needed to clear the backlog decreased from approximately 16 month to 10.5 months."  (Pl. Ex 5 at 3)**

7. **The Board only met monthly while Adams was chairman.  (Pl. Ex. 37, Adams Tr. at 18:18-20)**

8. **Adams delegated the responsibilities of the Board secretary to Mazzoccoli who did not have the authority to schedule additional meetings aas did the secretary to reduce the backlog.  (Pl. Ex. 37, Adams Tr. at 17:23-18:13) (Pl. Ex. 37, Adams Tr. at 202:1-205:12)**

9.  The one most vocal about the backlog was Peter Kuck. (Pl. Ex. 37, Adams Tr. at 38:16-19)

10. Adams knew there was a backup and that it was a civil rights violation. (Pl. Ex. 37, Adams Tr. at 38:20-39:5)

11. Kuck discussed having more meetings as did other Board members while Adams was chairman but Adams was not available for more meetings. (Pl. Ex. 37, Adams Tr. at 166:19-167:5

12. Adams met with Danaher, Fox, Mazzoccoli and others about the backlog but Kuck was excluded from that meeting even though he was the Board secretary and the member of the Board most concerned about the backlog. (Pl. Ex. 37, Adams Tr. at 159:18-25)

13. Adams believed that Kuck should not have been Board secretary because he was outspoken about the backlog. (Pl. Ex. 37, Adams Tr. at 69:5-19)

14. Adams refused to allow Kuck to perform his job as Board secretary under any circumstances. (Pl. Ex. 37, Adams Tr. at 70:18-71:24)

15. Mazzoccoli performed the role of the Board secretary to a degree (Pl. Ex. 37, Adams Tr. at 72:7-23)[2] but lacked the authority of a Board member so if Kuck did not perform the secretarial duties then no one performed them. (Pl. Ex. 37, Adams Tr. at 72:7-23)

---

[2] Q: Okay. What were your specific concerns about Mr. Kuck and what he might do if he continued to be secretary because of his outspokenness or what you've 21···described as his bias? A: Yeah; I don't know that I had any specific -- anything specific in mind. Just again an overall impression and atmosphere that was created by his presence. Q: And while Mr. Kuck was secretary, did you have those concerns while he was secretary as well? A: Oh, yes. Q: And did that affect your decisions about what role Peter Kuck should play as secretary? A: I think that's fair. Q: Okay. And were you more comfortable when Peter Kuck was secretary, leaving the administrative functions to Sue Mazzoccoli? A: Well, I think the short answer is yes. The longer answer is that the -- the functioning of the board having always been a certain way from before I was there to up to that time, I saw that functioning devolving during the time that I was there and I -- my impression was that if anybody was going to have an increased role or ·increased responsibility as secretary or take on more responsibility as secretary, it ought to be someone that's more even-handed. Q: And while Peter Kuck was secretary, you saw that more even-handed person as Sue Mazzoccoli? A: I didn't really have an impression of -- or had formed an impression of even-handedness. That hadn't really become apparent until later on. That, frankly, in my view, anybody would be more even-handed than Peter.

16. Adams and Mazzoccoli excluded Kuck, the Board secretary, from the case scheduling process. (Pl. Ex. 37, Adams Tr. at 93:22-94:2)

17. Adams and Mazzoccoli, at Adams' direction, prevented Kuck from looking at the cases. (Pl. Ex. 37, Adams Tr. at 94:3-19)

18. As Kuck exerted more pressure to decrease the backlog, Adams and Mazzoccoli grew more concerned with scheduling but continued to exclude Kuck from scheduling the appeals even though Kuck was the driving force behind the greater attention paid to the backlog. (Pl. Ex. 37, Adams Tr. at 99:22-100:9)

19. Adams allowed Kuck to rely on the Board regulations provided by Mazzoccoli (Pl. Ex. 18, Regulations §§ 1-5) even though Adams, as an attorney, was aware that the entirety of the Board regulations consisted of section 1-15 and that the missing regulations applied to the functions of the Board secretary. (Pl. Ex. 37, Adams Tr. at 105:25-106:18)

20. Adams encouraged Mazzoccoli to denigrate and disrespect Kuck. (Pl. Ex. 37, Adams Tr. at 113:7-114:5)

21. Adams did not do anything to assist Kuck. (Pl. Ex. 37, Adams Tr. at 115:23-116:2)

22. Adams made fun of Kuck. Kuck never did the same to Adams. (Pl. Ex. 37, Adams Tr. at 125:21-126:15)

23. Adams was too busy to be concerned about the Board and believed that Kuck was overly concerned. (Pl. Ex. 37, Adams Tr. at 127:14-128:4)

24. Adams was paranoid about Kuck making Adams look bad even though Adams had no evidence of any attempt by Kuck to do so. (Pl. Ex. 37, Adams Tr. at 132:19-133:6)

25. Adams wished things to continue as they had and not only opposed Kuck but acted in bad faith against Kuck by sabotaging Kuck, making fun of Kuck, attempting to have Kuck removed and replaced as Board secretary, and preventing Kuck from performing his functions because Adams believed that Kuck was passionate and would question the state police. (Pl. Ex. 37, Adams Tr. at 133:16-134:3)

26. Adams attributed the backlog to the Cheshire home invasion and the election of President Barak Obama but the auditors' reports (Pl. Exs. 1-5) do not show an increase post-July 2007 and President Obama was not elected until four months after Adams left the Board. (Pl. Ex. 37, Adams Tr. at 142:17-143:21)

27. Kuck attempted to fulfill the role of the Board secretary and assert the control needed decrease the backlog.  Adams prevented him from doing so and the continuation of the backlog was the result. (Pl. Ex. 37, Adams Tr. at 150:15-24)

28. Adams wanted Kuck off the Board (Pl. Ex. 37, Adams Tr. at 155:24-156:4) but had no evidence that any action by Kuck would warrant seeking Kuck's removal. (Pl. Ex. 37, Adams Tr. at 163:24-164:1)

29. Knapp had concerns about the state police and the use by the state police of the delay period between the filing of an appeal and the hearing on the appeal to manipulate and punish appellants causing injustice to innocent, honest people.  (Pl. Ex. 20, Notes)

30. Knapp, as the Board secretary, has control over the agenda. (Pl. Ex. 38, Knapp Tr. at 5:5 to 5:8)

31. The chairman only conducts the hearings and when the hearings are not in session the responsibilities for the board are the secretary's. (Pl. Ex. 38, Knapp Tr. at 41:9 to 41:14)

32. In preventing Kuck from performing his role as secretary and in delegating the authority to Mazzoccoli, Adams was acting outside the hearing process and outside the scope of his duties as chairman so he does not have absolute immunity for those acts. (Pl. Ex. 38, Knapp Tr. at 41:9 to 41:14)

33. Kuck had tried to do some things about backlog before Knapp became secretary. (Pl. Ex. 38, Knapp Tr. at 44:22 to 45:8)

34. Knapp set up a system that provided the state police with appellant's side of the issue so that cases could be resolved and permits returned in cases where the state police knew they would not prevail at a hearing.  This replaced the former, ineffective system where appeals would be sent in and stagnate until immediately before the hearing when the state police would finally look at the appeals and, often, reinstate permits on their own. (Pl. Ex. 38, Knapp Tr. at 55:13 to 56:16)

35. Regulation 29-32b-7 gives the Board secretary authority to look at appeals Board filed and review them. (Pl. Ex. 38, Knapp Tr. at 59:19 to 59:25)

36. The secretary has complete discretion over scheduling which Adams denied Kuck. (Pl. Ex. 38, Knapp Tr. at 70:22 to 71:15)

37. Knapp became aware that there had been limitations placed on the previous Board secretary's authority. (Pl. Ex. 38, Knapp Tr. at 98:22 to 99:6)

38. Defendants Knapp and Fox admit that it has been the practice of the DPS/DESPP to revoke certain pistol permits from permit holders without conducting any independent investigation at all. (Pl. Ex. 38, Knapp Tr. 82:11-83:3)(Pl. Ex. 40, 3/14/12 Deposition Transcript of Alaric Fox ("Fox Tr.") 74:12-18)

39. The Special Licensing and Firearms Unit (SLFU) does not even speak with pistol permit holders prior to revoking permits. (Pl. Ex. 38, Knapp Tr. 87:2-88:3)

40. The statute requiring the Board to meet once every 90 days is inadequate. (Pl. Ex. 38, Knapp Tr. at 100:7 to 100:21)

41. If Mazzoccoli had not shown Knapp the files and had denied him access, Knapp could not have performed his duties as secretary. (Pl. Ex. 38, Knapp Tr. at 99:7 to 99:24)

42. There is no regulation or law that compels the Board to hold its hearings in accordance with the process due appellants deprived of a liberty interest under the state and federal constitutions. (Pl. Ex. 38, Knapp Tr. at 126:24 to 128:4)

43. The state police Defendants condone and participate in the unlawful seizure off state permits by admitting in their revocation that the permits may have been seized by municipal law enforcement agencies. (Pl. Ex. 22, Revocation Letter)

                **PLAINTIFFS**
                M. PETER KUCK, individually and on behalf of others similarly situated

      BY:    /s/ Rachel M. Baird
                Rachel M. Baird (ct12131)
                Law Office of Rachel M. Baird
                379 Prospect Street
                Torrington CT 06790-5238
                Tel: (860) 626-9991
                Fax: (860) 626-9992
                Email: rbaird@rachelbairdlaw.com

**CERTIFICATION OF SERVICE**

I HEREBY CERTIFY THAT on June 18, 2012, a copy of the foregoing Rule 56(a)2 Statement was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Rachel M. Baird
Rachel M. Baird
Commissioner of the Superior Court