UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
　　　　　　　　　　　　　　　　　\*
M. PETER KUCK, ET AL.,　　　　　\*
　　　　　　Plaintiffs,　　　　　\*
　　　　　　　　　　　　　　　　　\* CASE NO. 3:07-CV-1390-VLB
V　　　　　　　　　　　　　　　　\*
　　　　　　　　　　　　　　　　　\* FEBRUARY 14, 2012
JOHN A. DANAHER, III, ET AL.,　\*
　　　　　　Defendants.　　　　　\*
　　　　　　　　　　　　　　　　　\*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**COPY**

## DEPOSITION OF T. WILLIAM KNAPP

Taken on behalf of the Plaintiffs in the above-entitled

cause, before Patricia Tyszka, Registered Merit Reporter,

License No. 46, Notary Public, in and for the State of

Connecticut, on Wednesday, February 14, 2012, at 1:22 p.m.,

at the Office of the Attorney General, 55 Elm Street,

Hartford, Connecticut, pursuant to the Rules of Civil

Procedure.

*TYSZKA COURT REPORTING SERVICES*
*189 Old Forge Road*
*West Hartland, Connecticut  06091*
*pat7995@charter.net  Phone/Fax (860)379-7955*

```
 1        A     Yes.

 2        Q     And you understand that that means you're not

 3   being sued individually.

 4        A     Yes.

 5        Q     And do you understand why you've been added to

 6   the lawsuit?

 7        A     Probably because I'm secretary and have some

 8   control over the agenda.

 9        Q     Okay.  Have you had a chance to read the

10   complaint where you're listed as a defendant in your

11   official capacity?

12        A     I haven't read it.  Have I had a chance to?  I

13   don't know.  I don't recall.

14        Q     Okay.

15        A     You know.  I've been sued so many times.  I don't

16   think I've seen it, but -- whatever.

17        Q     Well, let's follow up on that.

18        A     Okay.

19        Q     You currently are secretary of the Board of

20   Firearms Permit Examiners.

21        A     Yes.

22        Q     When were you appointed to the board in general?

23        A     The board in general was March of 2008, I think.

24   Maybe '07.

25        Q     Okay.  So 2007 or 2008.  I think we'll be able to
```

 1   clarify that with some documents --

 2        A    I've got it hanging right next to my computer at

 3   home.  I just didn't realize that would be a question or I

 4   would have known.

 5        Q    Sure.  And then after you became a member of the

 6   board, were you then appointed to a certain position on

 7   the board?

 8        A    Elected to secretary.  Not appointed.

 9        Q    You were elected to be secretary on the board?

10        A    Yes.

11        Q    And so if you became a member of the board let's

12   say back in 2007, you've been a member of the board

13   continuously for about five years now.

14        A    Okay.

15        Q    Now, during the time period the last five years,

16   have you held any other positions on other boards?

17        A    Oh, yeah.

18        Q    Like what?

19        A    On the board of directors of the Connecticut

20   Police Chiefs Association.  I'm on the Conservation

21   Commission in the Town of Wethersfield.  I'm on the

22   Economic Development Commission of the Town of

23   Wethersfield.  There may be a couple others I've

24   forgotten.  You know?  I'm sorry.

25        Q    That's fine.

1      A     At least those others.

2      Q     What occupation have you held primarily during

3  your life, your adult life?

4      A     Police officer for 32 years, the last 15 as chief

5  of police in Wethersfield.  And then I was appointed to

6  the executive director of a state agency known as

7  M.P.T.C. -- that's Michael Paul Thomas Charles -- which

8  the name was converted to -- by my lobbying at the

9  legislature, to P.O.S.T. to reflect its truer mission.

10 And I held that position for Governor O'Neil, Governor

11 Weicker, Governor Rowland.  I don't think I -- I think I

12 retired before Rell.

13     Q     So do you consider yourself retired presently?

14     A     Except for -- oh, another board I was on was the

15 Civil Service Commission in Winsted, Connecticut.  I

16 forget some.

17           Yes.  Is consulting considered not retirement?

18     Q     I think most people would consider consulting an

19 occupation and working.  What kind of consulting do you

20 do?

21     A     I've done consulting for various attorneys and

22 various civil lawsuit cases.

23     Q     Okay.  Now that we have a broad outline of your

24 career, let's go into the different phases of it.  So what

25 was the first police department you served on?

1       A     Wethersfield.  That's the only -- well, no,

2   that's -- okay.  Wethersfield first.

3       Q     Okay.  How many years did you serve on the

4   Wethersfield Police Department?

5       A     Thirty-two.

6       Q     Can you describe in what assignment or rank you

7   started and the ranks and assignments you progressed

8   through and what was your final rank and assignment during

9   those years?

10      A     Okay.  Started as a police officer, rank of

11  patrolman.  Then I became a -- let me see.  That was in

12  1958.  1967 I was promoted from patrolman to lieutenant.

13  Then in 1974, I was promoted from lieutenant to chief.  I

14  was -- so that would make lieutenant, what, seven years.

15  And then in '74, I was chief.  And then I retired from

16  that in '89.  The quick math is I believe that was about

17  15 years as chief of police in Wethersfield.

18      Q     How large was the Wethersfield Police Department

19  when you served as chief for those 15 years?

20      A     Forty-five police officers, and I don't remember

21  how many civilians; I think about 15 or 20, maybe 30.

22  Fifteen full-time civilians and maybe 30 part-time

23  civilians.

24      Q     What was the approximate population of

25  Wethersfield during --

1    is the Connecticut police academy for all the police

2    officers of the state; from Greenwich to Putnam, from

3    Stonington to Torrington.   Motor Vehicle Department.

4    Officers -- the game wardens; they call themselves

5    environmental police now, I guess.   Anybody in the State

6    of Connecticut except the troopers come under P.O.S.T.

7            P.O.S.T. is responsible for setting standards

8    for the employment of police officers in the state and

9    the training of them, both -- and the certification of

10   them and the decertification of them.   Simply -- and the

11   basic training and the -- every three years they have to

12   be re-updated on training.   So P.O.S.T. is responsible

13   for all that.   And the police academy is really more

14   P.O.S.T. than it is the State Police.   The State Police

15   have one dorm, they have one -- two classrooms.   P.O.S.T.

16   has four dorms, nine or 10, 12 classrooms, the range, all

17   that stuff.   And I was responsible for all of that.

18       Q    What qualifications did you have in 1989 that

19   qualified you to take over the position as executive

20   director of P.O.S.T.?

21       A    Well, I'm going to get immodest.

22            **MR. SNOOK:**  Perfectly fine.   That's the

23            job.   You've got to answer the question.

24       A    Okay.   And say that, you know, I was -- I ran --

25   I've run an awful lot of things in the course of my

 1   career.  And the problems that the previous executive

 2   director had there, the people on the council set up a

 3   committee to recommend to the Governor an executive

 4   director and they -- the Governor's office asked me if I

 5   would do it because there was a lot of political publicity

 6   to the previous executive director and they wanted

 7   somebody in the -- I had been in a selection process for a

 8   police chief's position in another police department, so

 9   they knew that I was looking to change positions.  So the

10   Governor's office called and asked me to do it, and I said

11   I would love to do it, so I did it.

12   **BY MS. BAIRD:**

13       Q    Now, you've testified about your career in the

14   Wethersfield Police Department and your service on the

15   training council as a member of the council.  What, if

16   anything, in addition to that are you referring to as

17   having qualified you to be appointed to be the executive

18   director?

19       A    I guess my training and experience and the way I

20   run business -- the way I run operations.  I guess.

21       Q    And during your 15 years as the chief of the

22   Wethersfield Police Department, were there any

23   controversial issues or well-known issues that you had to

24   deal with and you dealt with in an admirable way that you

25   think led to your appointment to executive director of

1    P.O.S.T.?

2    A    I guess.

3    Q    And what were they?

4    A    I don't remember.

5    Q    Okay.

6    A    You know, being chief of police you deal with

7    controversial issues a lot of times:  Officer shootings

8    and political appointees' children involved with rape and,

9    you know, all the political pressures that go on with that

10    kind of stuff.  Had some homicides.  Controversial.

11    Q    Were you part of the Police Chiefs Association

12    while you were --

13    A    Oh, yeah.

14    Q    -- a member of the Wethersfield Police

15    Department?

16    A    Very active in the Chiefs Association.  I was

17    president of Connecticut Police Chiefs Association.  I

18    didn't know you wanted me to go into all that stuff.

19    Q    During what period of time?

20    A    1985, '86 was when I was president of Connecticut

21    Chiefs.  I've been on the board of directors of

22    Connecticut Chiefs almost constantly since 1982 -- that's

23    a guess -- until now.  I go off because in the bylaws

24    there is a stipulation that you can't succeed yourself.

25    So you can't be elected -- nominated or elected

1    consecutively, so I have to get off for a year, but then I

2    get nominated, get elected and get put back on.  And now

3    there's a -- when you retire you become a life member.  A

4    section of the Connecticut Police Chiefs Association is

5    the life members.  The life member group has a president

6    of its own, and I've been elected president of the life

7    member group; but it's called chairman of the life member

8    group, and that automatically puts me back on the board of

9    directors.

10            I don't know what all this has got to do with --

11    well, okay.  It's your -- well, okay.

12        Q    Do you serve as the chairman of the lifetime

13    members of the Connecticut Chiefs Association currently?

14        A    Yes.

15        Q    So that makes you a member of the board of the

16    Connecticut Chiefs --

17        A    Yes.  I'm currently on the board of directors of

18    the Connecticut Chiefs.

19        Q    Does every police chief of a municipality in

20    Connecticut belong to the Connecticut Chiefs Association?

21        A    Every single one.

22        Q    And --

23        A    Sometimes it's a stretch to keep it at 100

24    percent, but we have.  We just went through a period of

25    for about two or three months it was one or two short of

1   you --

2        A    When I was involved in the Police Chiefs

3   Association when I was president, one police chief died

4   suddenly; and that police chief's appointing official had

5   been told by that chief to hold a great deal of respect in

6   me.  So she contacted me and asked me if I would run the

7   selection process for his replacement.  So I did, and

8   that -- and the nature of that led me to start getting a

9   lot of other calls to run police chief selection processes

10  for different towns and municipalities.  So I figured we

11  needed a formal process, so I got ahold of -- I talked to

12  the board of directors.  And I don't remember if I was

13  starting as president or not, but I talked to the board of

14  directors and convinced them to have I believe it was

15  Arthur Andersen come in and do a contract with us to

16  develop a process for selecting police chiefs formally; to

17  offer that as a service to the municipalities.  So then

18  they did, we formed it; and I have been involved in many

19  selections of search committees for municipalities to help

20  them select a police chief.  And now -- I lost count of

21  that a long time ago.

22       Q    When you were with the Wethersfield Police

23  Department prior to becoming chief, were you involved in

24  investigations of crimes?

25       A    Yeah.  I was a lieutenant in charge of the

1      Q    Okay.  But it's your recall that when you became

2  a member of the board, Mr. Corradino was the secretary and

3  he ultimately replaced Chairman Adams as the chairman?

4      A    Yes.

5      Q    And how did you come to be elected to be the

6  secretary to replace Mr. Corradino?

7      A    Mr. Corradino asked me if I would consider being

8  secretary of the board.

9      Q    Did any other members of the board approach you

10  about being the secretary of the board?

11      A    No.  Not to my recollection.

12      Q    And when you say that Mr. Corradino approached

13  you, what did he say to you?

14      A    I don't remember, but it was something like,

15  "Would you consider being the secretary of the board?"

16      Q    And did you know at that time what being the

17  secretary of the board entailed?

18      A    Somewhere between the time I started going to the

19  board meetings and the time I got appointed, I became

20  aware of what the secretary's duties and responsibilities

21  and authority were.  I don't remember when each learning

22  curve impact hit me on what the secretary was, but it was

23  during that time period.  I know that when he asked me to

24  be secretary, I knew pretty much then what the secretary's

25  authority and responsibilities were.

```
 1        Q    Did you discuss with Mr. Corradino how the

 2   relationship between you as secretary and him as chairman

 3   would operate were you to accept the position of

 4   secretary?

 5        A    I had some conditions.

 6        Q    And what were those conditions?

 7        A    I don't remember.  I've got them at home.  If I

 8   would have been forewarned I could have brought them.  But

 9   I don't remember.  I really don't remember.

10        Q    When you say you have them at home, are they

11   written conditions?

12        A    I didn't talk to Joe about them -- yeah, I think

13   I might have.  I drove down to Bridgeport to have a

14   meeting with him.  I said I'll come down and meet with

15   you.  I remember driving to Bridgeport and I remember

16   discussing.  And I always usually write things out.  And I

17   believe I wrote them out.  I know that one of my practices

18   is when I write things out and I want to put a date on

19   them, I put them in an envelope and I mail them to myself

20   to get a postmark on them.  And I make an extra copy so

21   that I don't have to open the envelope, so if it ever

22   becomes an issue I can say here's what's in the envelope

23   and here's proof that I created that document by such and

24   such a date.

25             I don't remember what's in the envelope.  It's
```

```
 1   been, what, five or six or seven years now.
 2       Q    So do you have a stack of these envelopes at your
 3   house?
 4       A    No.  No.  Because, you know, the police chief
 5   once I left in the file or I destroyed them after their
 6   "provable use" I guess is the word to use, what they
 7   portend to prove became moot when I no longer became
 8   chief.  And, and, I know that I have since opened it.
 9       Q    Oh.
10       A    I've just opened it out of curiosity.  So it's
11   sitting on top of my desk right now.  I can picture it
12   sitting there.  But it's opened.  But I can always testify
13   under oath that that is the letter, that's the document.
14   But I don't even remember what it said.
15       Q    Are they handwritten notes?
16       A    Yeah.  Yeah.  I stopped at "memo to file"
17   typewritten stuff when I didn't have a secretary anymore.
18       Q    Well, why in accepting the position of secretary
19   of the board would you feel a need to place conditions on
20   it -- well, let me ask you this.  Is it a practice of
21   yours when you've sat on other boards, prior to accepting
22   membership on the board or a position on the board, to
23   have conditions?
24       A    When I was asked to be president of Connecticut
25   Police Chiefs, I shocked the nominating committee because
```

1   with several other documents when I got on the -- when I

2   was on the board.  I think it was after the first meeting,

3   but it might have been before the first meeting.  I don't

4   remember how much time elapsed between receipt of the

5   letter from the Governor and the first meeting of the

6   board.  I might have gotten those documents before, I

7   might have gotten them right after.  But these were part

8   of those.

9       Q    What is your understanding of the scope of the

10  board's chairman in terms of his duties?

11      A    He conducts the hearings, and he's in charge of

12  the board while the hearings are in progress.

13      Q    And when a hearing is not in progress --

14      A    The rest of it is the secretary's responsibility.

15      Q    I wanted to direct your attention -- and by the

16  way, before I get to that, does the chairman need to be an

17  attorney?

18      A    Yes.  And we just found out it needs to be an

19  attorney authorized to practice law in the State of

20  Connecticut.

21      Q    And how did you find that out?

22      A    Because we got an attorney -- we asked for an

23  attorney to be appointed to the board and we got an

24  attorney, but he's not licensed to practice in the State

25  of Connecticut.

1      Q      So this attorney who was just appointed to the

2    board who is not licensed in practice in Connecticut

3    cannot serve as the chairman?

4      A      He can't serve as the chairman or conduct any

5    hearings.  We've had -- before this attorney we had

6    another one, who I don't know that he served it.  I don't

7    know if you take over and conduct hearings, if that makes

8    you the chairman.  When the chairman isn't there, if

9    you're a member of the board who is an attorney licensed

10   to practice in Connecticut and you conduct the hearings,

11   if that makes you the chairman or not, I don't know.

12            But anyway, for a while we had two attorneys.

13   And as secretary -- we're here to talk about I think the

14   backlog.  In an attempt to reduce the backlog, one of the

15   things I did was say, hey, we've got two attorneys.  I

16   talked to the two of them about instead of each of you

17   attending the scheduled meetings, how about you take

18   turns and let me get you a quorum and we have more

19   hearings.

20            They went along with that, and that's why when

21   that public member attorney -- don't forget, there's two

22   spots on the board that are public members.  That second

23   attorney was a public member.  I wanted and the board

24   wanted, because they voted, to ask the Governor to

25   appoint a lawyer to the board to replace the one that had

1   been.  And when the board voted it, obviously it was too

2   late because it was a matter of a couple of days later

3   that we got the attorney.  So the fact that the board

4   only voted -- we voted to ask for an attorney and we --

5   and frankly, I don't believe we would have thought --

6   because I composed a motion, I think.  I don't believe we

7   would have thought to say "an attorney licensed to

8   practice in the State of Connecticut."  But it didn't

9   make any difference anyway, because obviously the

10  attorney that was appointed was already in the process.

11  But I had been lobbying a woman in the Governor's

12  appointments office to say, please, please fill that seat

13  and please fill it with a lawyer.

14       Q     And who was that woman?

15       A     If you told me the name I could confirm it.

16       Q     Right.

17       A     I may or may not have it scribbled on a piece of

18  scrap paper at home, but since the vacancy's been filled I

19  probably threw that away.  But it's whoever runs the

20  appointments office for the Governor.  Or at least runs

21  the appointments office for Boards and Commissions, I

22  believe was her title.

23       Q     When did you first become aware of this backlog

24  issue at the Board of Firearms?

25       A     Before I got on it.  And at the first -- at my

1  first meeting when I got sworn in.

2      Q    And before you were appointed --

3      A    I think it was in a case that you were involved

4  in was how -- it was the epitome of becoming aware of it.

5      Q    Well, but let's go back to before you became a

6  member of the board, how did you become aware of it?

7      A    Because I was attending meetings.  Because I know

8  Mr. Peruta.  I know about the Goldberg case.  I knew

9  about -- I think probably the Goldberg case was my first

10  awareness of the backlog, but it might have been before

11  that.  I'm not sure.

12      Q    And how would a case make you aware of the

13  backlog?

14      A    How long before it's scheduled to be heard.

15      Q    And what's your recall of the number of months

16  that it took --

17      A    I believe at that time that I got on the board,

18  that the first case was the Goldberg request for an

19  expedited hearing.  I believe it was over 20 months, maybe

20  24.  That may or may not be accurate because it's just

21  word of mouth.

22      Q    Did you look into after you became a member of

23  the board, what efforts had been made previously to

24  decrease the backlog and whether those efforts had been

25  successful or not?

1      A      I didn't look into it, but I was present at

2  meetings where the subject came up, which gave me a

3  realization that it had been -- attempts had been made to

4  address it prior to my getting on the board and prior to

5  my going to be a public observer.

6      Q      Do you know who had made those attempts?

7      A      I believe -- I believe it was the board at the

8  request of Mr. Kuck.

9              **(Brief discussion held off the record.)**

10     A      I just wanted to -- I believe I attended a couple

11  of informational meetings with a couple of retired State

12  Police people.

13  **BY MS. BAIRD:**

14     Q      Right.  A couple of informational meetings?

15     A      Yeah.  I think the backlog was beginning to hit

16  the media in the Goldberg case, and that was before I got

17  on the board.  So the backlog was becoming publicly known.

18  Memory is coming back to me.  And I know -- from my

19  position as executive director I know the wife of a guy

20  that used to work in the Firearms Unit, and I remember

21  attending a bull session at somebody's house where he was

22  present with a retired trooper who also worked there, and

23  they were talking about how they used to do things.

24  That's as good as I can do.

25     Q      Okay.  And is one of those individuals Michael

1    Q    Was Susan Mazzoccoli surprised when you called

2  her and said that?

3    A    No.  Well, I shouldn't say "no" because I don't

4  remember.  And as a matter of fact, I don't believe that

5  those -- they had photocopies; I didn't go up there and

6  look at them.  I called her and I said make photocopies of

7  the next 60 cases; 60 being a guess.  Make photocopies of

8  the next 60 files.  Knowing fully well that if they got

9  through those 60 in four days, I could call up and say

10  photocopy the next 60.

11    Q    And were --

12    A    In other words, I had reached the agreement.  She

13  didn't have any problem with it.  As a matter of fact,

14  somewhere along the line I said, "I'm assuming the State

15  Police revoke a lot more permits than appeal."  Some

16  people that get their permits revoked got to know they're

17  not going nowhere on appeal.  I'm just guessing at that.

18  But, "Do you notify the State Police when somebody

19  appeals?"  She said yes.  I said, "Whatever happens to

20  that?"  She said, "As far as I know, they ignore them."

21  She never got a feedback on any of -- call up on a

22  question.

23        See, because after they file an appeal -- all

24  they got to do to file an appeal, they can scribble out

25  an appeal on an envelope or a piece of toilet paper and

1    send it in.  And we send out a questionnaire to the

2    appellant saying fill out this questionnaire.  The

3    filling out of that questionnaire is, in an awful lot of

4    cases, the appellant's side of the case; and that's quite

5    frequently the only place where the appellant gets an

6    opportunity to say what their side of the case is.

7           That is in essence what happened when I turned

8    all those files over to Hall and Hatfield and they

9    started reading what the appellant had to say.  They

10   said, you know, we're not going to win that case, so

11   let's just give them back the permit.  And that's what

12   happened.  And if you go over our past minutes and

13   agendas, you can see that.  You can see we go from four

14   or five cases or three or four cases settled, to 10, 15

15   cases every month settled once Hall and Hatfield and I

16   started that process.

17        Q     A couple of paragraphs back you mentioned --

18        A     Can I ask just a question?

19        Q     Yes.

20        A     Can I get a drink of water?

21        Q     Oh, yes.

22              **MR. KUCK:**  Why don't we take a little

23              break.

24              **(A recess was taken at 2:41 p.m.)**

25              **(The proceedings resumed at 2:47 p.m.)**

1   Q    How many times did this occur where you would

2   send over a number of files to Sergeant Hall and Trooper

3   Hatfield?  Was it a regular --

4   A    It was so many cases I don't recall how many

5   times.  I would say it wasn't more than two or three.  It

6   resulted in a lot of cases being resolved, but it was --

7   the batches were big.  But I don't recall -- I don't think

8   it was more than two or three, but it might have been.  I

9   didn't keep track.

10  Q    Well, why did that process stop?

11  A    Hall got transferred and so did Hatfield.  Hall

12  got transferred to narcotics and Hatfield got transferred

13  to the commissioner's office.

14  Q    And who took their place?

15  A    Who took their place?

16  Q    Yes.

17  A    A whole succession of lawyers.  I'll just give

18  you a little side note.  At the last meeting -- not this

19  last one, the one before that where now Major Fox -- oh,

20  come to think of it, Fox took their place.

21  Q    And did this relationship that you had with

22  Sergeant Hall and Trooper Hatfield of forwarding files to

23  the Firearms Unit continue with Major Fox?

24  A    Not quite.

25  Q    Was it discussed with him whether he would be

```
 1    amenable to --

 2        A    No.

 3        Q    -- continuing that relationship?

 4        A    No.

 5        Q    Nobody even asked him?

 6        A    I don't have the familial relationship with then

 7    Lieutenant, then Captain, now Major Fox.

 8        Q    Well, did you attempt to develop a relationship

 9    with him so that --

10        A    No.  No.

11        Q    -- the files could continue to be reviewed?

12        A    No.

13        Q    So did it go back to the way it was when you

14    became secretary, where Susan Mazzoccoli would just pick

15    out the next 20 in line and send them over?

16        A    I can only guess yes.

17        Q    Why can you only guess?

18        A    Because I wasn't saying make photocopies of a

19    whole bunch of files and send them over there.  By then I

20    was off on a different tangent.  I was off on the more

21    meetings, the four more meetings a year, and then setting

22    up even more meetings by working out the deal with the two

23    attorneys on the board, Finnerty and Corradino, to split.

24    So it became a focus of having more hearings to address

25    the backlog.
```

1    BY MS. BAIRD:

2        Q    Okay.  So we're going to be referring to 29-32b-3

3    and dash-7.  So dash-3 refers to the overall duties of the

4    secretary.  Correct?

5        A    It makes the secretary responsible for the

6    secretarial duties defined in b-5 through b-15.

7        Q    Okay.

8        A    Then you want me to go to 7?

9        Q    Yes.

10       A    Okay.

11       Q    No. 7 talks about that the secretary has the

12   authority to make a thorough review of the facts and

13   inquire into appeals brought to the board.  Correct?

14       A    Yes.

15       Q    And how did you interpret the scope of your

16   authority with regard to dash-7 of the regulations?

17       A    What it says.

18       Q    Okay.  Did you interpret that to mean that you

19   had access to the files that the Board of Firearms Permit

20   Examiners had and were maintained by Susan Mazzoccoli?

21       A    Of course.

22       Q    Did you interpret that to mean that you could go

23   look at those files any time you wanted?

24       A    Yes.

25       Q    And did you interpret that to mean that you had a

```
 1   the March hearing date, maybe a little -- yeah.  I'm sure
 2   those have either already gone out or are in the process
 3   of going out.  She looks at the next, I'm going to guess,
 4   20 cases and she sends out notices to both:  "Time to get
 5   everything that you want to introduce into evidence here."
 6   And the State Police respond with everything.  The
 7   appellants, you know, they're not always candidates for
 8   doctorate degrees.  The letter also says bring nine
 9   copies.  Sometimes they don't send anything, sometimes
10   they bring nine copies, sometimes they don't bring
11   anything.  But the State Police send everything in.  At
12   that time.  Not back when the appellant -- not back when
13   the revokee or the denialee appeals.  I don't know if
14   Susan still notifies them that an appeal's come in.  I
15   know at one time she did, but she said they -- I believe
16   she said they've since stopped sending them because we
17   don't pay any attention to them.  But that's just hearsay.
18   But could I have?  I know I could have had access to that
19   any time I asked for it after I made the deal with
20   Hatfield and Hall.  I believe I probably could have before
21   that, but it might have been a fight.  And it might be a
22   fight now, I don't know, because I haven't exercised it.
23        Q    Let me direct your attention to another section
24   in the regulations, 29-32b-11.  It talks about scheduling
25   hearings.  Is that a regulation that you've reviewed
```

1   during your time as secretary?

2       A    (Reviewing.)  Yes.  I'm just -- you know, you

3   read it, you recognize it, you don't look at it again for

4   five years and I'm just realizing, oh, that's right.  I

5   forgot I had that.

6       Q    Well, that gives you pretty broad authority,

7   doesn't it --

8       A    Yeah.

9       Q    -- as secretary?

10      A    I've exercised it pretty well.  Without realizing

11  that -- I've always assumed that the secretary is in

12  charge of everything; therefore, I can do what I want.

13  Now I see that, I know, I guess I can't.  And I see

14  it's -- I've always considered -- I've always understood

15  that as soon as the chairman calls the meeting to order

16  it's no longer the secretary, now it's the chairman until

17  the meeting's adjourned.  And it's confirmed there --

18  reviewing -- may request the board to postpone and

19  reschedule the hearing -- at the secretary's discretion --

20  yeah, I do that routinely.  And I'm a hardbutt about it.

21  Get the proper phraseology there, right?  Okay.

22      Q    Okay.  So in looking at 29-32b-11 which you've

23  just had a chance to review, do you agree that according

24  to this regulation that the board could postpone, recess

25  or reschedule hearings at the discretion of you as the

1    secretary?

2        A    Yes.

3        Q    Okay.  And do you have any guidelines or

4    parameters that you know of with regard to how you

5    exercise that discretion?

6        A    Yeah.

7        Q    And what are those?

8        A    Case by case would give me documents.  I don't

9    grant continuances or anything else unless there is a

10   legitimate reason and there's documents to support the

11   legitimate reason.

12       Q    Do you take this regulation to mean that you have

13   the authority to schedule cases out of order?  In other

14   words --

15       A    Yes.

16       Q    -- out of order --

17       A    Yes.

18       Q    -- that the next in line isn't necessarily the

19   next case to be heard?

20       A    Yes.

21       Q    And do you have any parameters or guidelines that

22   you go by in determining when you would exercise that

23   discretion?

24       A    I've only exercised it once.  So I'm going to say

25   it's case by case, but only if I see something that

1   made a death contract on the victim.   Second defendant was

2   coming up for -- or the third defendant was coming up for

3   trial or sentencing.

4           Anyway, the appellant had gotten afraid for his

5   life, had gotten a pistol permit, was going to court to

6   testify.   Brought the gun with him, realized he couldn't

7   get into court with the gun, locked the gun in the glove

8   compartment.   While he was in court the gun was stolen

9   out of the glove compartment.   And because the gun was

10  stolen out of the glove compartment his permit was

11  revoked.   Man was in fear of his life.   He had an

12  obviously documented death threat against him and they

13  revoked his permit.   So I thought that one's really got

14  to go to the front of the line.

15      Q    And how often would you review files out of

16  curiosity?   And when you say review files, do you mean the

17  files that the board keeps?

18      A    Yeah.

19      Q    How often would you do that?

20      A    Occasionally when I just say, "You know what?

21  I'm going to go see if I can't find some other methodology

22  or system to get rid of a bunch of cases."   For example,

23  I've already told Susan that I'm planning on having a

24  couple of denial-only days because denial hearings seem to

25  go faster than revocation hearings.   So I told her to put

```
 1    aside all the denial cases we have coming up.

 2              Oh, and another time I -- another time I did

 3    that I went -- I didn't go over them -- yes, I did.

 4    Asked her to go get all of the ones who had been denied

 5    because they -- because in filling out the application

 6    they had checked that they hadn't been arrested when, in

 7    fact, they had.  I said accumulate the next -- all of

 8    them and schedule a meeting for me at Wethersfield P.D.

 9    in the public room because I want to meet with all those

10    appellants.  So I reviewed all of those cases to see that

11    they fit the criteria that I had set for Susan.  I met

12    all those appellants and I made a deal with them.

13         Q    You mentioned a case called Spinelli.  Did you

14    mention Spinelli or did you say "54 days"?

15         A    I said 54 -- I didn't remember the name of the

16    case until you just said it.  I remember it's a New York

17    case involves some woman whose livelihood depended on it,

18    and 54 days was too long to wait for a hearing.

19         Q    What effect did that have on you in your

20    consideration of appeals coming before the board?

21         A    We changed the letters going out to people who

22    had been revoked or denied to say if this is directly

23    affecting your ability to make a livelihood, please

24    indicate so right away so I can move it to the front of

25    the line.
```

1    Q    And then if a person so indicated, how far ahead

2    to the line would they be moved?

3    A    The next hearing.  Next hearing date that Susan

4    can comply with the statute, get the notice out, give

5    everybody 10 days, that kind of stuff.

6    Q    Okay.  When you became a member of the board --

7    A    Continue that answer just for a second?

8    Q    Yes.

9    A    But it has to be documented.  Okay.

10   Q    The fact that it affects their work?

11   A    Either an offer of a job conditioned on, or in a

12   revocation case you're terminated, you can have your job

13   back if you get your permit back or something like that.

14        Go ahead.

15   Q    In the denial cases when you first became a

16   member of the board, were the municipalities pursuing

17   those cases on their own in front of the board or was the

18   State Police --

19   A    State Police were representing them.

20   Q    What led to that change?

21   A    Well, I'm not over there, but I believe a

22   hardbutt -- that's a terminology -- indication on my part

23   that there is a section in the statutes that says the

24   State Police cannot -- if a local chief denies a permit,

25   the State Police can't issue it.  In other words, they

1    a power of the local chiefs.  There's a couple of local

2    chiefs in the audience that are my friends, but also are

3    the legislative representatives that negotiated that

4    sentence into the new system.  And they completely

5    supported me and said that's what we want.

6            Now, how much my being a hardbutt about that led

7    to them making a decision that's really not our function

8    to do that, I don't know.

9        Q    You mentioned that when a municipal issuing

10   authority denies a temporary state permit, that the State

11   Police don't have any authority to override that.

12   Correct?

13       A    Correct.  Yes.  That's right in the statute.

14       Q    Okay.  Do you know if when a municipality asks

15   the State Police to revoke a permit whether the same

16   principle applies, that the State Police cannot reinstate

17   it without the permission of the local authority?

18       A    I'm not sure I understand the phraseology of that

19   question.

20       Q    I'll ask it again then because we want to make

21   the record clear.

22       A    Okay.

23       Q    If a municipality asks the State Police to revoke

24   a state permit and the State Police do, do the State

25   Police then have to receive the permission of the --

```
 1      A    No.

 2      Q    -- municipality to reinstate it?

 3      A    Clearly not.

 4      Q    Have you ever heard of the principle where if a

 5  criminal case is nolled, that a person is not eligible for

 6  reinstatement for the 13 months during the period when it

 7  eventually becomes dismissed?

 8      A    Have I ever heard of that as a policy?

 9      Q    Yes.

10      A    I'm unaware of such a policy.

11      Q    Okay.  Is it a law?

12      A    Not that I'm aware of.  In fact, the shortening

13  of the waiting period for hearings is resulting in more

14  cases coming up before the board that are in the nolle

15  pending period, and appellants are asking me to continue

16  and lawyers are asking me to continue, and I'm saying no.

17      Q    Well, is there --

18      A    And we have issued permits --

19           MR. SNOOK:  Oh, you can issue -- so it's

20           not that you --

21           THE WITNESS:  Correct.

22  BY MS. BAIRD:

23      Q    That was going to be my next question.  Well,

24  does it automatically mean if a person is still in that

25  13-month nolle period that the board couldn't vote to
```

1   meetings with appellants, just denials, to make a deal

2   with them.

3       Q    Wait a second.  How did that work?

4       A    Get back to the question before.  The secretary's

5   got a lot of power, okay?  I said to Susan get me the

6   next, I don't remember the number, 20, 25 cases where

7   people had been denied because they checked that they'd

8   never been arrested when they, in fact, had.  I want to

9   meet with them.

10          I met with them.  I said, you know, some of you

11  have got to wait -- I don't know what it was at the time,

12  let's say it was 15, 16 months.  Some of you got to wait

13  16 months for a hearing.  I'll make you a deal.  Go out

14  and apply for -- reapply for a permit with a new

15  application, check the answer correctly, go in and

16  explain why you checked "no" the first time; and if you

17  get denied again, I'll move you to the head of the line.

18          Made that deal with a bunch of them because when

19  we sit on these -- some of these police chiefs things,

20  police chiefs take the position because that's signing --

21  that's a false statement under oath that they've never

22  been arrested; that that's grounds for denial right

23  there.  And I take the position that it's not.  I mean,

24  you know, we've had people that checked it they've never

25  been arrested, but they've got three convictions.

```
 1    Candidates -- like I said, my favorite phrase is they're
 2    not all candidates for a doctoral in anything.  You know?
 3    And sometimes they check it because they think because a
 4    lawyer told them -- (gesturing) -- that it would be off
 5    the record if they paid a $600 fine to the Red Cross or
 6    something, that they could check that.  And the question
 7    itself says if your case -- I don't have it in front of
 8    me, but it said if your case has been erased, dismissed
 9    or something like that, you can answer no.
10         Q    And that authority that you have to meet with
11    these individuals who have been denied, does that arise --
12         A    I don't know if that's an authority, but I'm --
13    I'm just a person now.
14              Anyway, go ahead.  But I exercised it.  If it
15    isn't, it is.
16         Q    In your interpretation --
17         A    I'll take it.
18         Q    -- after reading --
19         A    I have the authority to move them to the front of
20    the line.  How's that?
21         Q    In your interpretation in reading 29-32b-7 where
22    it gives the secretary the right to make a thorough
23    inquiry of the facts of the appeal --
24         A    Yeah.
25         Q    -- do you interpret that to include in making a
```

1   thorough inquiry speaking to --

2       A    Yeah.

3       Q    -- appellants about --

4       A    Yeah.

5       Q    -- the facts of their case?

6       A    Yeah.  Yeah.

7       Q    Are you aware of what kind of investigation the

8   Firearms Unit conducts prior to the determining that a

9   permit should be revoked?

10      A    No.

11      Q    In being on the board for five years and hearing

12  cases, have you had opportunity to make any observations

13  about what kinds of investigation the Firearms Unit

14  conducts prior to revoking?

15      A    My mind's scanning five years' worth of cases.  I

16  think in an occasional case, the kind of investigation

17  that they don't conduct, I think there are some where they

18  do.  But the some where they do is probably, emphasis on

19  "probably," cases involving State Police where it's within

20  their own case report kind of thing.  I don't think that

21  in municipal cases they do that kind of detailed

22  investigation.  I think that I've seen that when they are

23  preparing a case to go before the board, that's when they

24  get ahold of the P.D. and say send us the case report.  I

25  don't think they get it in advance.  I'm saying "think"

1    rather than "know" because I believe that the date line on

2    the top of the faxes that are in our packet is within the

3    previous 10 or 15 days rather than 19 months ago.

4        Q    Do you interpret the statutory responsibility of

5    the State Police as investigating prior to revocations?

6        A    Do I believe that's their authority?

7        Q    Do you understand statutes to obligate the State

8    Police to make an investigation prior to revoking

9    someone's permit?

10       A    Again, from memory only, I think so.

11       Q    And do you think they do that in all cases?

12       A    Depending on what you call "investigation," no.

13       Q    Well, that's what I'm going to ask you because

14   that's one reason we got into some of your qualifications

15   earlier today, to make a matter of record your expertise

16   and your achievements --

17       A    Oh.

18       Q    -- and all the things you've done.

19       A    Oh.  I see the corner that we just got painted

20   into.

21              MR. SNOOK:  Go right ahead.

22   BY MS. BAIRD:

23       Q    So I do want to ask you how police define

24   "investigations."  What is an investigation?

25       A    An investigation is looking into things to gather

1    all the facts and circumstances that you can by

2    interviewing everybody and viewing the physical evidence

3    and gathering witnesses and statements and stuff like

4    that.

5         Q    So if I'm a police officer in one department --

6         A    Yeah.

7         Q    -- and I do an investigation and make a report,

8    and I give it to you and you read the report --

9         A    Yeah.

10        Q    -- have you also conducted an investigation?

11        A    If every question that I would have under those

12   circumstances are answered in that report, yes.  But if

13   that report gives me saying "I wonder about this" or, "you

14   know, there's something that's not in here," then that's

15   an investigation, but it's not complete.

16        Q    And so --

17        A    That's what cold cases are made out of.

18        Q    Old cases?

19        A    Cold cases.

20        Q    Okay.  So when you would give some of these

21   files, the 50 or so -- and I know that was an

22   approximation that you mentioned to Sergeant Hall and

23   Trooper Hatfield --

24        A    Yeah.

25        Q    -- and they looked into it, what was your

1    impression of what they were doing with those 50 files?

2         A    I believe that was the first time they saw the

3    appellant's side of the story, which probably raised

4    questions in their mind:  Either clearly the appellant's

5    side of the story wins and we want to get that permit back

6    to him or her as fast as possible even if we have to

7    hand-deliver it within the hour, or something that they

8    ought to get ahold of the handler of the original

9    investigation that caused the revocation in the first

10   place and ask whatever questions came up from listening or

11   reading the appellant's side of the story; whatever

12   question popped into their mind as investigators, to get

13   ahold of them and say what's the answer to these questions

14   that I got?  Because I'm not a lawyer -- don't forget,

15   those are both lawyers -- I got to present the case to the

16   Firearms board.  What's your answers to this?  Is this or

17   that witness still around?  Is there anybody who can

18   testify to -- I want the answer to this question.  You got

19   somebody there that can testify to it?

20         In other words, reviewing the appellant's side,

21   making it so clear that, like I said, get it back to them

22   within the hour, or raises questions so I got to get back

23   to whomever caused the revocation in the first place and

24   say, you know, what's your response to this?

25         Did I answer the question?  I'm so long-winded I

1    lost track of the question.   Sorry.   Running off the

2    pages for her.   Right?

3        Q    When you were a detective with the Wethersfield

4    Police Department and then ultimately became the

5    lieutenant of the detective unit --

6        A    Yeah.

7        Q    -- and I guess when you were a patrol officer

8    investigating cases as well, did you attempt to talk to

9    individuals who had been accused of engaging in a criminal

10   offense?

11       A    Of course.

12       Q    Was that part of your investigation?

13       A    Of course.

14       Q    Did sometimes people not talk to you?

15       A    Yeah.

16       Q    But sometimes they did?

17       A    Lot of times.

18       Q    And, in fact, when you wanted to talk to people

19   accused of a crime, you would tell them "if you talk to me

20   it could be used against you."   Right?

21       A    Not early in my career.   That changed.

22       Q    Oh.   Oh.   With *Miranda*?

23       A    Early in my career that changed.   Yeah.   Don't

24   forget, when I became a police officer the Bill of Rights

25   didn't apply to me.   It was only in federal.   Now I've

1   dated myself, haven't I?  That all started with *Knapp*

2   *versus Ohio*, not *Miranda*.  But yes.

3       Q     Okay.  But later in your career or, you know,

4   near the beginning of your career you did start to advise

5   people that if they spoke to you it could be used against

6   them?

7       A     No.  Not before *Miranda*.  Why would you tell

8   people that if they talked to you it could be used against

9   them?

10      Q     Well, that's what I mean, though.  Later in your

11  career --

12      A     Oh, later.  Later in the career.

13      Q     -- about then, right?

14      A     After *Miranda*.  After *Miranda*.

15      Q     Yes.

16      A     Of course.  We all carried the little blue card

17  around in our pocket.

18      Q     Right.

19      A     And then we began to find out that that little

20  blue card doesn't really apply to as many cases as

21  everybody -- as TV makes everybody think it does.

22      Q     In sitting as secretary of the board during the

23  past five years, have you been able to determine based on

24  testimony and what's been presented to you during appeal

25  hearings, whether the State Police as a matter of course

1  talked to appellants prior to determining that their

2  permits should be revoked?

3      A    No, they don't.

4      Q    Do you know Detective Mattson?

5      A    Yes.

6      Q    When did you first become aware or meet or know

7  about Detective Mattson?

8      A    My first contact that I -- I believe there was

9  one before the one that sticks in my memory.

10     Q    Okay.  Well, so it doesn't sound like you knew

11 her when you were on the Wethersfield Police Department.

12     A    No.  No.

13     Q    And when you were executive director of P.O.S.T.

14 did you know her?

15     A    I think I might have -- I might have either

16 talked to her or been talked to about her by a lieutenant

17 colonel.  I had attempted to do something legitimate and

18 had given it to the lieutenant colonel that I was friendly

19 with, and he gave it back to me and said Detective Mattson

20 has taken care of it.  So I don't believe I talked to her

21 on that occasion.  I just assumed that Detective Mattson

22 had taken care of it.

23     Q    Okay.  And at that time you knew her or were you

24 aware --

25     A    I knew of her.

1            of the actual counts in the particular

2            complaint.  But if you want to see the document

3            I have no problem.

4   BY MS. BAIRD:

5       Q    Okay.  In the course of your testimony today,

6   it's been a couple of hours since we talked about that

7   trip to Bridgeport to see Mr. Corradino, have you recalled

8   whether any of the conditions that you discussed with

9   Mr. Corradino were related to the authority that you would

10  exercise if you accepted the appointment to be secretary?

11      A    That would be my nature.  I don't recall it

12  specifically, but that would be my nature.  As I've said,

13  in just about every appointment I've ever accepted I've

14  always put the conditions that I not be interfered with.

15      Q    Did you have any reason to believe that prior to

16  your appointment as secretary or prior to your appointment

17  to the board there had been interference with the

18  secretary's duties?

19      A    Do I know of them of my own knowledge?

20      Q    I'll ask you that first.

21      A    No.

22      Q    No.  Did you hear anything that gave you concern

23  that if you became secretary your authority could be

24  infringed upon?

25      A    I remember becoming aware of the fact that there

1   was allegations floating around other legal issues that I

2   became familiar with either by reading F.O.I. documents or

3   minutes of board meetings or whatever, that there had

4   previously been limitations on the secretary's -- oh,

5   yeah.  Yes.  Attempts to, because the power was always

6   there.  But there were -- yes.  Yeah.

7          Q     How would it have affected the exercise of your

8   authority as secretary if Susan Mazzoccoli had not

9   provided you the opportunity to review the files of the

10  board or look at the files of the board?

11         A     How would that have affected me?

12         Q     Yes.

13         A     I would have been teed off and would not have

14  accepted that.

15         Q     Would it have affected your ability to perform

16  your duties as secretary for the board if you didn't have

17  access to the files?

18         A     It would depend how access was denied.  I would

19  go there, physically present myself and say I want to see

20  them.  And if access was denied, then we'd go from there.

21         Q     And if access were denied and you weren't able to

22  see the files, would that have affected your ability to

23  carry out your duties as secretary?

24         A     Of course.  Yes.

25         Q     What is your assessment of the progress towards

1  decreasing the backlog that have been made in the past

2  five years?

3       A    What's my assessment of it?

4       Q    Yes.

5       A    I think we've made significant prog -- I know

6  we've made significant progress.

7       Q    Does the board have a goal with regard to the

8  time in which it ultimately hopes that hearings will be

9  held from the time an appellant files an appeal to the

10  time of the actual hearing?  Is there a goal that the

11  board has --

12       A    I don't know that the board has ever formally

13  voted or even mentioned a time period to be a goal.  I

14  look at the statute and I laugh at it, but I suppose you

15  can say that's a goal set by the legislature that the

16  board be required to meet at least once every 90 days.

17       Q    Why do you laugh at that?

18       A    Because of the backlog.  And, you know, meeting

19  once every 90 days implies that you don't have that much

20  business so you got to meet at least once whether you have

21  any business or not.

22       Q    Do you think there was a time when there weren't

23  as many applications for permits?  I mean do you think

24  that has ebbed and flowed over the years?

25       A    Applications for permits or --

BY MS. BAIRD:

Q   Well, let me ask it this way.  What conducts or statements have you had access to or been told about that have led you to believe there was any philosophical difference between Detective Mattson and Michael Beal?

A   Okay.  Mike Beal both told me and also gave me a copy of a letter he wrote to the commissioner stating how he conducted that office when he was in it.  And Detective Mattson said to me, quote, I can't believe such a highly placed law enforcement official as you believes anybody but cops and military should possess guns.

Q   Detective Mattson said that to you?

A   Yes.

Q   When did she say that?

A   I'm guessing in that phone -- well, I only had that one phone conversation with her.  So that's my now recollection of that phone -- I remember that statement specifically because that was very shocking to me.

Q   I'm looking for the document -- I'm looking for the actual exhibit.  This is not an exhibit, so I need to find the exhibit.

I found it.  It's Exhibit No. 12.  Have you seen Exhibit 12 before?

A   Without reading every single word, but with reading the opening sentence on the first sentence in the

1      Q     What in addition to the measures that have

2    already been taken over the past five years that you've

3    described for us today, what in addition to those measures

4    could the board take from today into the future to further

5    decrease the backlog?

6      A     Another suggestion that Joe Corradino just made

7    to me within the last -- just to make sure I capture the

8    time frame, I'm going to say 45 days, a suggestion that I

9    consider, because we're beginning to have a shortening of

10   the waiting period.  As I said, it's bringing people who

11   would just as soon their cases didn't come up for three

12   years; people who have restraining and/or protective

13   orders still in existence.  Joe suggested to me that I

14   move them right up to the front of the line so we quickly

15   call them up to the front of the board and say, "We're

16   sorry, the board can't give you any relief because the

17   statutes prohibit it."  He made the suggestion.  I said I

18   would consider it.

19         I don't know that I've arrived at my own

20   conclusion whether that's fair or not to them, so I

21   haven't decided that one yet.  Right now they come up in

22   the order that the board -- that the case is ready to

23   come up.  I let them progress and when it's their turn,

24   they come up.  If the protective or restraining order is

25   still in effect, then that's what they get told:  You can

1   to be done would be done to make sure those hearings were

2   held?

3        A    I'm under the impression in America if the court

4   orders, it gets done.  I don't know that --

5        Q    But the state has an interest in not returning

6   permits to people who shouldn't have them.  Correct?

7        A    Oh, yeah.  Very definitely we have had cases

8   where you get a unanimous "no" and the state doesn't have

9   to present much of a case.  The burden of proof is on

10  them.  This last hearing gave us one example where clearly

11  the state didn't have to present much of a case at all.

12  The appellant sitting there made the state's case.

13       Q    So as secretary of the board and a member of the

14  board, if there were a requirement that hearings be held

15  in a certain period of time, such as 30 days, or the

16  permits were reinstated, do you think you'd get a lot of

17  support so that those hearings could be held in 30 days?

18       A    I am totally unaware of what the words "consent

19  decree" mean, but I think I know what they mean.  I mean

20  the legislature and the Governor would have to agree to

21  put the personnel in place to carry that out.  Yes.

22       Q    What did you just say?  I didn't hear you.

23       A    The legislature and the Governor --

24       Q    Right.

25       A    -- would have to agree to put the personnel and

```
 1        A    Yeah.

 2        Q    It says the length of the delay between the

 3   receipt of a request for an appeal and the related hearing

 4   or negotiated DPS settlement may be considered a denial of

 5   the appellant's right to a timely hearing.

 6             Is that a factor that the board has taken into

 7   consideration in trying to address the backlog, to try to

 8   provide people a timely hearing on their appeals?

 9        A    Is that -- yeah, I think that's what we're all

10   concerned about.

11        Q    Okay.  Well, what is the reason why the backlog

12   is an issue and why there has been an effort to decrease

13   the backlog?

14        A    Well, because of the reasons you just said.

15   Waiting two years is ridiculous.  Waiting three months is

16   probably not ridiculous.  It's probably good.  I don't

17   know that some time between three months and 24, from

18   ridiculous to acceptable, that four is unacceptable.  You

19   know, court cases go on how long?  But certainly, let

20   me -- you know, a pistol permit -- for the record, a

21   pistol permit, a lot of people, an incredible amount of

22   people believe that a pistol permit is a credential that

23   is a plus for their character.  Even if they are not

24   interested in owning or carrying a gun, they like having a

25   pistol permit.  And I've seen people testify to that and
```

1    I've read their body language and their face, and I know

2    they mean it.  And therefore, denying it and allowing that

3    denial to go on for a long period of time just isn't

4    right.

5         Q     And then going on on Page 4, we had just read the

6    effect and then there is a cause.  And under the "cause"

7    section --

8         A     There is a clause?

9         Q     Cause.

10        A     Oh, I'm sorry.  I was looking in there.  Okay.

11        Q     It begins with:  The frequency of board hearings

12   increased from 11 in the four prior fiscal years to 16

13   hearings in fiscal year 2009, and 18 hearings in fiscal

14   year 2010.

15        A     Somebody took notice.

16        Q     Okay.  And then it says:  The more frequent

17   meetings over the audited period resulted in a decrease in

18   the case backlog.

19              Do you agree with that, that the more frequent

20   meetings resulted in a decrease in the backlog?

21        A     Of course.  How could it not?

22        Q     And then I'm going to skip to the last paragraph

23   on Page 4 where it begins with:  While this is a marked

24   improvement over the prior audit period, additional effort

25   will be required by the board to reduce the backlog.

1     A     Oh, there's an acknowledgment of the

2   10.5-month -- oh, that's right, that was in the backlog.

3   All right.

4           (Reviewing.)

5     Q     And do you agree that to further reduce the

6   backlog the board will have to make additional efforts in

7   addition to what it's already made?

8     A     Yeah.  Or -- you know, this is a reference to

9   2010.

10    Q     Right.  And so there have been additional

11  efforts --

12    A     My answer to that question goes back to as of

13  June 30th, 2010.  Do I think that now the additional

14  effort that we're making will succeed in getting it down

15  there?  I don't know.  I have to think -- now I don't have

16  a second lawyer.  I have to think about -- you know.

17    Q     At some point do you agree that you maximize what

18  you can do with the resources that you have?

19    A     Yeah, but I don't know what maximization result

20  is because we haven't maximized yet.  So what will the

21  result be, I don't know.  Hopefully I'd like to see it

22  three months, but do I believe it?  No.  But do I believe

23  five?  Well, we're already at eight.

24    Q     It sounds to me that you have a very good and

25  positive opinion of the individuals who serve as members

```
 1    of the board; is that correct?
 2         A    Yes.
 3         Q    That they contribute their time on a voluntary
 4    basis.
 5         A    Most certainly.
 6         Q    Okay.  And --
 7         A    Do I agree with them?  Not all the time.
 8         Q    Could you foresee the possibility that if there
 9    were other individuals appointed to the board, maybe they
10    wouldn't be as diligent; they would just hold hearings
11    once every 90 days as required by statute?
12         A    I mean, that's so hypothetical how can I answer
13    it?
14         Q    But is there anything that is requiring the board
15    to make the efforts that its making --
16         A    No.  No.
17         Q    If the board wanted to, they could start just
18    meeting once every 90 days and be completely within the
19    law.  Right?
20         A    And ignore the backlog.
21         Q    Right.
22         A    Yeah.
23         Q    So the only thing that is decreasing the backlog
24    is the individual decisions of the board members to
25    attempt to do that.
```

1    A    Yes.

2    Q    But there's nothing under the law requiring them

3    to do that.

4    A    No.

5         MS. BAIRD:   Okay.   That's it.   I'm done.

6         Thank you.

7

8                    **CROSS-EXAMINATION**

9

10   **BY MR. SNOOK:**

11   Q    Police officers, in your 32 years of experience,

12   are permitted to rely on the sworn reports of other

13   officers?

14   A    Yes.

15   Q    If a police officer receives a sworn officer's

16   report that contains enough information that that officer

17   believes that they have sufficient facts to make a

18   determination, that is acceptable police practice in your

19   experience?

20   A    Yes.   But let me ask you to slow down.

21   Q    Oh.   Thank you.   Okay.

22        What was the time period, if you can recall,

23   when you were working with Sergeant Hall and Trooper

24   Hatfield for that special arrangement you described

25   earlier?

1

2                              CERTIFICATE

3

4    STATE OF CONNECTICUT    )
                             )  SS:  West Hartland, Connecticut
5    COUNTY OF HARTFORD      )

6    I, Patricia Tyszka, a Notary Public duly commissioned and
     qualified in and for the County of Hartford, State of
7    Connecticut, do hereby certify that pursuant to notice
     there came before me on the 14th day of February 2012, at
8    1:22 p.m., the following named person, to wit:  T. WILLIAM
     KNAPP, who was by me duly sworn to testify to the truth and
9    nothing but the truth of his knowledge touching and
     concerning the matters in controversy in this cause; and
10   that he was thereupon carefully examined upon his oath and
     his testimony reduced to writing under my direction; that
11   the deposition is a true record of the testimony given by
     the witness; that the deposition may be signed before a
12   Notary Public.

13   I further certify that I am neither attorney nor counsel
     for, nor related to, nor employed by any of the parties to
14   the action in which this deposition is taken, and further
     that I am not a relative or employee of any attorney or
15   counsel employed by the parties hereto or financially
     interested in the action.

16
     In witness whereof, I have hereunto set my hand and affixed
17   my notarial seal this _____ day of _____, 2012.

18

19                              _____
                                Patricia Tyszka, LSR, RMR
20                              Notary Public
                                License No. 46
21
                                My Commission Expires
22                              May 31, 2015

23

24

25