## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **M. PETER KUCK,** | : |
| **PLAINTIFF,** | : |
| | : **CIVIL ACTION NO. 3:07cv1390(VLB)** |
| | : |
| | : |
| **v.** | : **OCTOBER 16, 2012** |
| | : |
| **JOHN A. DANAHER ET AL,** | : |
| **DEFENDANTS.** | : |

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' [DKT. #103] MOTION FOR SUMMARY JUDGMENT

Before the Court is the motion for summary judgment filed on behalf of the Defendants Connecticut State Department of Public Safety officers John A. Danaher III, Alaric Fox, Albert Masek Jr., Barbara Mattson, Thomas Karanda, and Ronald Bastura as well as Defendants Connecticut Board of Permit Examiners officials, Christopher R. Adams, Joseph Corradino, and T. William t.  The Plaintiffs, M. Peter Kuck ("Kuck") and James F. Goldberg ("Goldberg") bring this action individually and on behalf of others similarly situated alleging that they were denied procedural due process in connection with the revocation of a gun permit and the denial of a gun permit renewal and alleging that Goldberg's gun permit was unlawfully seized in violation of the Fourth Amendment.  For the reasons set forth below, Defendants' motion for summary judgment is granted.

### Background and Facts

i.      **Procedural History**

The Court granted Defendants' motion to consolidate two separate actions that were pending before the Court which were *Goldberg v. Danaher et al.*, 3:07-cv-1911 and *Kuck v. Danaher et al.*, 3:07-cv-1390.  The allegations and claims between the two actions were substantially similar, both Goldberg and Kuck had sued the same Defendants and were represented by the same counsel.   Goldberg filed his original complaint on December 12, 2007 which the Court dismissed on July 22, 2008 based on Plaintiff's failure to submit a memorandum in opposition to the motion to dismiss under Local Rule 7(a)(1).  Goldberg appealed the dismissal on November 3, 2001.  On April 30, 2010, the Second Circuit vacated the Court's judgment and remanded the case back to the Court.  On September 3, 2010, Goldberg filed an amended complaint which the Defendants moved to dismiss.

Kuck filed his original complaint on September 17, 2007 which the Court dismissed on July 25, 2008.   Kuck then appealed the dismissal to the Second Circuit.  The Second Circuit vacated and remanded the Court's ruling on the motion to dismiss and held that at the motion to dismiss stage Kuck had plausibly pled that procedural due process was violated when his appeal hearing regarding the denial of his gun permit renewal before the Connecticut Board of Permit Examiners (the "Board") was scheduled eighteen months after the denial. *Kuck v. Danaher*, 600 F.3d 159 (2d Cir. 2010).  On September 3, 2010, Kuck filed an amended complaint, which the Defendants moved to dismiss.

In their amended complaints, Plaintiffs sued the following five Connecticut State Department of Public Safety ("DPS") officers in their individual capacities:

Alaric Fox, Albert Masek, Barbara Mattson, Thomas Karanda, and Ronald Bastura.  Plaintiffs have also sued the Commissioner of DPS James Thomas in his official capacity (collectively referred to as the "DPS Defendants").  In addition, former Connecticut Governor Jodi Rell was sued in her individual and official capacities.  Lastly, Plaintiffs sued two individuals associated with the Board.  They brought suit against the sole employee of the Board, Susan Mazzoccoli, in her individual and official capacities as well as the former chairman, Christopher Adams.

On August 17, 2011, the Court consolidated both actions.  On September 29, 2011, the Court granted in part and denied in part Defendants' motions to dismiss.  *See* [Dkt. #92].  The Court dismissed counts one, four, five and six of the amended complaints.  In addition, the Court dismissed Governor Rell and Susan Mazzoccoli as Defendants in the action.  The Court denied the motion to dismiss Plaintiffs' count two asserting a procedural due process violation in connection with the delay in the time to obtain an appeal of the decision to revoke Goldberg's gun permit and of the decision to deny Kuck's gun permit renewal and held that the count two claims remained extant against Defendant Adams in his individual capacity.  The Court also granted Plaintiffs leave to amend the complaint to name an official capacity defendant who could provide prospective injunctive relief under count two pursuant to the exception to Eleventh Amendment immunity which permits suits against state officials acting in their official capacity that seek prospective injunctive relief.  *See Ex parte Young*, 209 U.S. 123, 155-56 (1908).  The Court also held that count three, asserting a procedural due process

violation in connection with DPS's decision to revoke Goldberg's gun permit remained extant against the DPS Defendants only.  Lastly, the Court held that count seven asserting unlawful seizure of Goldberg's gun permit remained extant against the DPS Defendants in their individual capacities only.

Following the Court's decision on the motions to dismiss, Plaintiffs filed an amended complaint naming Joseph T. Corradino, the current Chairman of the Board, and T. William Knapp, the current secretary of the Board as additional Defendants in their official capacities in accordance with the Court's Order.  *See* [Dkt. #92, Amended Compl.].

ii.     Statutory Framework

In order to obtain a permit to carry a pistol or revolver in Connecticut, a person must apply to a local authority, either the chief of police, warden or selectman, in the jurisdiction in which he resides or maintains a place of business.  Conn. Gen. Stat. §§ 29-28(a)-(b).  No permit may be issued if the applicant falls to meet statutorily imposed suitability qualifications.  Conn. Gen. Stat. § 29-28(b).  The exclusions are and in 2007 were as follows:  (1) the applicant has failed to successfully complete a pistol and revolver safety or training course; (2) the applicant has been convicted of a felony or of certain enumerated misdemeanors;[1] (3) the applicant has been convicted as a delinquent for the

---

[1]  The enumerated misdemeanors are illegal possession of narcotics in violation of Conn. Gen. Stat. § 21a-279(c), criminally negligent homicide in violation of Conn. Gen. Stat. § 53a-58, third degree assault in violation of Conn. Gen. Stat. § 53a-61, assault of an elderly, blind, disabled, pregnant or mentally retarded person in violation of Conn. Gen. Stat. § 53a-61a, second degree threatening in

commission of a serious juvenile offense; (4) the applicant has been discharged from custody within the preceding twenty years after having been found not guilty by reason of mental disease or defect; (5) the applicant has been confined in a hospital for persons with psychiatric disabilities within the preceding twelve months by order of a probate court; (6) the applicant is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical forth against another person; (7) the applicant is subject to a firearms seizure order issue; (8) the applicant is prohibited by federal law from shipping, transporting, possessing or receiving a firearm; (9) the applicant is an illegal alien; and (10) the applicant is less than twenty-one years of age.  Conn. Gen. Stat. § 29-28(b).  In addition, before a temporary permit is issued, the local authority must find that the applicant intends to use the pistol or revolver for a lawful purpose and that the applicant is a "suitable person" to receive such a permit.  *Id.*  The statute does not define the term "suitable."

Within eight weeks after an application for a temporary permit has been made, the local authority must inform the applicant whether the temporary permit has been approved or denied.  Conn. Gen. Stat. § 29-28a(b).  The local authority then sends the application indicating approval or denial to the Commissioner of DPS (the "Commissioner").  *Id.*  If the local authority has denied the application for a temporary state permit, no state permit may be issued.  *Id.*  Within eight

---

violation of Conn. Gen. Stat. § 53a-62, first degree reckless endangerment in violation of Conn. Gen. Stat. § 53a-63, second degree unlawful restraint in violation of Conn. Gen. Stat. § 53a-96, first degree riot in violation of Conn. Gen. Stat. § 53a-175, second degree riot in violation of Conn. Gen. Stat. § 53a-176, inciting to riot in violation of Conn. Gen. Stat. § 53a-178, and second degree stalking in violation of Conn. Gen. Stat. § 53a-181d.

weeks after receiving an application indicating approval of a temporary state permit from the local authority, the Commissioner must inform the applicant in writing whether his application for a state permit has been approved or denied. Conn. Gen. Stat. § 29-28a(b).[2]  When an application is denied, the applicant has the right to appeal the denial to the Board of Firearm Permit Examiners (the "Board").  Conn. Gen. Stat. § 29-32b(b).

State permits to carry a pistol or revolver expire after five years.  Conn. Gen. Stat. § 29-30(c).  Within ninety days before expiration, the issuing authority must send a notice and renewal form to the holder of the permit.  Conn. Gen. Stat. § 29-30(f).  Unless a permit has been revoked or revocation is pending, the permit remains valid for a period of ninety days after the expiration date.  *Id.*  The Commissioner must "investigate each applicant for renewal for a state permit to ensure that such applicant is eligible under state law."  Conn. Gen. Stat. § 29-29(d).

The Commissioner may revoke a state permit or temporary state permit "for cause," and "shall" revoke a permit

> upon conviction of the holder of such permit of a felony or of any misdemeanor specified in subsection (b) of section 29-28 or upon the occurrence of any event which would have disqualified the holder from being issued the state permit or temporary state permit pursuant to subsection (b) of section 29-28.

Conn. Gen. Stat. § 29-32(b).  In addition, the Commissioner "may revoke the state permit or temporary permit based on the Commissioner's own investigation or

---

[2]  If a local authority issued a temporary permit and the Commissioner denies the permit, the temporary permit is immediately revoked.  Conn. Gen. Stat. § 29-28a(b).

upon the request of any law enforcement agency." *Id.*  Any person aggrieved by the revocation of a pistol permit may bring an administrative appeal to the Board. Conn. Gen. Stat. § 29-32b(b).

Conn. Gen. Stat. § 29-32b provides the statutory framework for the appeals process and the Board.  The Connecticut Legislature recently amended Conn. Gen. Stat. §29-32b which became effective July 1, 2011.   Before the statute provided that "[t]here shall be established a Board of Firearms Permit Examiners, within the Department of Public Safety for administrative purposes only." *See* 2011 Conn. Legis. Serv. P.A. 11-48 (H.B. 6651).   Now the statute provides that "[t]here shall be established a Board of Firearms Permit Examiners, within [the] Office of Governmental Accountability established under Section 58 of this act." Conn. Gen. Stat. § 29-32b(a).

The Board is "comprised of seven members appointed by the Governor to serve during his term and until their successors are appointed and qualify.  With the exception of public members, the members shall be appointed from nominees of the Commissioner of Public Safety, the Connecticut State Association of Chiefs of Police, the Commissioner of Environmental Protection, The Connecticut State Rifle and Revolver Association, Inc., and Ye Connecticut Gun Guild, Inc., and each of said organizations shall be entitled to representation on the board. At least one member of the board shall be a lawyer licensed to practice in this state, who shall act as chairman of the board during the hearing of appeals brought under this section." *Id.*  The only powers which the Governor has with respect to the Board is the appointment of Board members.   In addition, the

Board "shall serve without compensation, but its members shall be entitled to reasonable subsistence and travel allowances in the performance of their duties." Conn. Gen. Stat. § 29-32b(g).

The statute further provides that any person aggrieved by any refusal to issue, renew, or the revocation of a permit may within ninety days after receipt of notice and "without prejudice to any other course of action open to such person in law or in equity, appeal to the board.  On such appeal the board shall inquire into and determine the facts, de novo, and unless it finds that such a refusal, limitation or revocation, or such refusal or failure to supply an application, as the case may be, would be for just and proper cause, it shall order such permit or certificate to be issued, renewed or restored, or the limitation removed or modified, as the case may be." Conn. Gen. Stat. § 29-32b(b).

The statute also provides that the Board shall schedule a hearing or an appeal within ten days of receipt of the appeal.  It further provides that "[t]he board shall hold hearings at such times and places as it in its discretion reasonably determines to be required, but not less than once every ninety days, and shall give reasonable notice of the time and place of the hearing to the appellant and to the issuing authority.  The board shall have the power to compel attendance at its sessions."  Conn. Gen. Stat. § 29-32b(d).  In addition,

> [a]ll appeals hearings shall be conducted in an informal manner, but otherwise according to the rules of evidence, and all witnesses shall be sworn by the chairman.  The board shall cause a verbatim transcript of the hearing to be kept in such manner as it may determine, and shall furnish such transcript to any party appealing its decision as hereinafter set forth. The statements of witnesses made under oath shall be privileged. Decisions of the board shall be by majority vote and shall be

> communicated in writing to the appellant and to the issuing authority within twenty days after the rendering of the decision.  If any issuing authority neglects or refuses to comply with a decision of the board within ten days after notice of the board's decision has been given to such issuing authority, the board shall apply to the superior court for a writ of mandamus to enforce the board's decision.

Conn. Gen. Stat. § 29-32b(e).  Lastly, any person who has been aggrieved by the decision of the Board may appeal that decision in state superior court.  Conn. Gen. Stat. § 29-32b(f).

The Board maintains an office for conducting its day-to-day business and Conn. Agencies. Regs. § 29-32b-4 provides that "[t]he office shall be staffed by a manager and other personnel as needed.  Such manager shall serve as its executive head for routine administrative and operational matters."

### iii.    Facts

At the outset, the Court notes that both parties have failed to set forth the basic facts of this case in either party's Local Rule 56 statements.   Although Plaintiffs' amended complaint is not verified and therefore not admissible evidence, the Defendants have for the most part admitted to the Plaintiffs' allegations setting forth the basic facts of this case in their answer and relied on those allegations in the amended complaint in their motion for summary judgment.  *See* [Dkt. ##102,103].  Consequently, the Court considers those facts as alleged in the amended complaint, admitted to in Defendant's answer and relied upon by the Defendants in their motion to dismiss to be undisputed. Overall, the facts of this case are relatively straightforward and not in dispute.

DPS employs two full time staff officers in its Special Licensing and Firearms Unit ("SLFU") to process permit applications.  [Dkt. #103, Def. Local Rule 56(a)(1) Statement, ¶5].  The principle responsibilities of the SLFU is to review handgun permit applications and denials, review incident reports and investigations for potential revocations, train troopers with regard to handgun permit issues and liaise with various federal agencies regarding firearms issues. *Id.* at ¶6.  The SLFU reviews up to 1,000 cases each year and there may be as many as 50 revocation investigations or requests submitted to the SLFU by local law enforcement agencies.  *Id.* at ¶¶7,9.  Typically SLFU bases its investigation and decisions to revoke permits solely upon sworn reports submitted by local law enforcement and SLFU may, in its discretion, follow-up by interviewing local officers or reviewing other relevant records or databases.  *Id.* at ¶11.

Goldberg applied in April 2007 for a temporary state permit to carry a pistol or revolver with the local authority which was shortly approved.  [Dkt. #92, Amended Compl., ¶68].  DPS then approved and issued a permit to Goldberg on May 17, 2007.  *Id.* at ¶71.  One month later on June 21, 2007, Goldberg was arrested by the Glastonbury Police Department ("GPD") for breach of the peace in the second degree.  *Id.* at ¶¶72-78.  Goldberg has sued the GPD in a separate action alleging that his Fourth Amendment rights were violated when he was arrested and his property seized.  *See James F. Goldberg v. Town of Glastonbury, et al.*, Docket No. 3:07-cv-01733 (SRU).  Goldberg had entered a Chili's restaurant while wearing his firearm in a holster which was visible.  The manager at Chili's called 911 to report that a man with a firearm had entered the restaurant which

resulted in the Glastonbury Police Officers arriving on the scene and arresting Goldberg for breach of the peace in the second degree.  During the arrest, the GPD seized Goldberg's pistol and his gun permit.  *Id.*; *See also James F. Goldberg v. Town of Glastonbury, et al.*, Docket No. 3:07-cv-01733 (SRU).

On June 27, 2007, Defendant DPS Officer Mattson received a telephone call from Lt. Woessner of the Glastonbury Police Department regarding the arrest of Goldberg.  [Dkt. #103, Def. Ex. 3, Mattson Declaration, ¶16].  Lt. Woessner sent Mattson a copy of the police report detailing Goldberg's arrest.  *Id.*  Mattson attested that she "deemed [the call from Lt. Woessner and receipt of police report] to be a request from local law enforcement to revoke Mr. Goldberg's permit."  *Id.*  Detective Mattson also attested that she "conducted an investigation of the June 21, 2007 incident involving Mr. Goldberg by reviewing the Glastonbury Police Department report as was customarily done by the unit and this investigation resulted in a revocation decision."  *Id.* at ¶20.

Mattson further attested that she did not "direct the Glastonbury Police Department to take Mr. Goldberg's firearms permit" and that she "did not learn that Mr. Goldberg's permit had been taken until after it had occurred."  *Id.* at ¶18. Mattson "only learned of the incident after the arrest had been made and had no contact with Lt. Woessner, or any other officer of the Glastonbury police Department, regarding Mr. Goldberg at any time prior to the arrest."  *Id.* at ¶17.

DPS revoked Goldberg's permit, in a letter dated June 27, 2007, indicating that his permit had been revoked as a result of his involvement of an incident

investigated by the GPD and instructing that he should return the permit to DPS if he still possessed it.  [Dkt. #118, Pl. Ex. 21]. The letter indicated that if he no longer possessed the permit, he should submit a written notarized statement that states that he is aware the permit is revoked, the reason why he was unable to return the permit, and if for any reason, he located the permit he would return it immediately.  *Id.*  The letter further explained that he must submit this statement "even if your permit was confiscated by the State Police or a municipal policy agency.   Any such confiscation must be reported to this office."  *Id.*

On July 30, 2007, Goldberg appeared in state criminal court on the breach of peace charges.  [Dkt. #92, Amended Compl., ¶88].  He moved for dismissal of the case, return of his permit and return of the pistol seized by the GDP.  *Id.*   The state court judge entered a *nolle,* suspending prosecution of the assault charge, and issued an order dated August 6, 2007 granting Goldberg's request for return of his permit from the GPD but indicating that the "Court is *not* ordering the return of the permit if it has been seized by any agency other than the Glastonbury Police Department."  [Dkt. #118, Pl. Ex. 23] (emphasis in the original).

Goldberg timely appealed DPS's decision to revoke his permit.  [Dkt. #92, Amended Compl., ¶93].  Goldberg was scheduled for a hearing before the Board on May 14, 2009 which was twenty-two months after his permit was revoked.  *Id.*

Despite the fact that his appeal before the Board was pending, Goldberg applied for a new temporary state permit on January 29, 2008 with Chief Cetran of the Wethersfield Police Department which was approved on February 4, 2008.  *Id.*

at ¶95.   On February 21, 2008, DPS revoked the temporary permit issued by Chief Cetran. [Dkt. #119, Ex. 29].  DPS indicated that the second permit was also revoked because of Goldberg's involvement in the June 21, 2007 incident with the GPD.  *Id.* The Letter further indicated that "as you know, your state pistol permit was revoked based upon the June 21, 2007 incident and is currently under appeal with the Board of Firearms Permit Examiners."  *Id.*  DPS reinstated Goldberg's permit on September 22, 2008, prior to his scheduled hearing before the Board, stating that a "review of the facts and circumstances of the incident involving your Connecticut Permit to Carry Pistols and Revolvers has been completed. Effective upon your receipt of this notice, your permit is reinstated."  [Dkt. #119 Ex. 32].

In Goldberg's separate lawsuit, another court in the District of Connecticut granted summary judgment in favor of the defendant police officers holding that there was reasonable suspicion to make a terry stop and probable cause to arrest Goldberg for breach of the peace.  See *Goldberg v. Town of Glastonbury, et al.*, Docket No. 3:07-cv-01733 (SRU), Transcript 9/17/2010, p. 43-44.  The Second Circuit then upheld the district court's decision finding there was reasonable suspicion sufficient to support the initial stop of Goldberg and that the defendant officers were entitled to qualified immunity.  *See Goldberg v. Town of Glastonbury, et al.*, docket No. 10-42150CV, slip op. at 3-2 (2d Cir. Dec. 13, 2011).

On March 19, 2007, Kuck submitted an application for renewal of his state gun permit prior to its expiration.  [Dkt. #92, Amended Compl., ¶33].  DPS asked Kuck to submit a birth certificate or United States passport for renewal.  *Id.* at

¶34.  Kuck objected to the request for a birth certificate or passport on the grounds that such submission was not a condition for a state permit renewal under Conn. Gen. Stat. §§¶29-28(b), 29-30.  *Id.* at ¶¶35, 37.   Kuck was informed by DPS that after September 11, 2001, DPS policy required a United States passport or birth certificate as a condition for state permit renewal.  *Id.* at ¶35.  This policy was implemented in response to a request from the National Instant Background Check System that DPS require incoming renewal applications to include proof of citizenship or legal residency.  [Dkt. #103. Def. Local Rule 56(a)(1) Statement, ¶3].

Kuck had originally submitted a birth certificate to DPS as proof of his citizenship when he first applied for his state permit in 1982 and never been asked to provide proof of citizenship when he applied for prior permit renewals. [Dkt. #92, Amended Compl., ¶¶38,39].   Kuck's permit expired on April 16, 2007. *Id.* at ¶46.   Kuck filed a timely appeal to the Board and his hearing was scheduled nearly eighteen months after his state permit had expired on October 9, 2009.  *Id.* at ¶¶55-57, 282.  Prior to the hearing on his appeal, Kuck provided a list of registered voters in the town of West Hartford but the Board did not receive the list into evidence at the hearing.  *Id.* at ¶¶57-60.   Kuck alleges that DPS had verified Kuck's citizenship at the hearing not the Board and his state permit was renewed.  *Id.* at ¶¶61-62.

Plaintiffs allege in their unverified amended complaint that DPS engaged in an unlawful practice and procedure of returning revoked state permits to their owners prior to hearing before the Board thereby concealing unjust and improper revocation decisions from the Board.  *Id.* at ¶¶141-146.  Plaintiffs fail to present

any admissible evidence that DPS made unjust or improper revocation decisions on summary judgment beyond the unverified allegations asserted in the amended complaint.

Kuck served as the Board's secretary from prior to October 2003 until October 11, 2007.  *Id.* at ¶149.  Kuck, in his role as Board secretary, attempted to get the Board to address and focus on the appeals backlog.  *Id.* at ¶151.  Kuck alleges that the Board's sole employee Susan Mazzoccoli and Chairman Adams frustrated his efforts to reduce the backlog of appeals, prevented him from performing his statutorily prescribed duties as secretary and condoned and supported DPS's "unlawful circumvention of the hearing process."  *Id.* at ¶¶151-191.

Kuck routinely clashed and had conflicts with Adams and Mazzoccoli about the Board's approach to the backlog and the proper role of DPS.  Indeed, the vast majority of Plaintiffs' opposition to summary judgment consists of testimony purporting to document the clash between Kuck and Adams including Kuck's allegation that Adams wanted Kuck off the Board.  *See* [Dkt. #116, Pl. Local Rule(a) Statement, Disputed Issues of Material Fact, ¶¶1-33; Dkt. #115, Mem. in Opposition to Summary Judgment, p. 17-39].  Further, many of Plaintiffs' disputed issues of material fact are really assertions that are not "facts" but are rather statements that reflect Kuck's beliefs, opinions, and assumptions.  For example, Plaintiffs assert that Adams "was too busy to be concerned about the Board and believed that Kuck was overly concerned" as well as that "Adams was paranoid about Kuck making Adams look bad even though Adams had no

evidence of any attempt by Kuck to do so."  [Dkt. #116, Pl. Local Rule(a) Statement, Disputed Issues of Material Fact, ¶¶23-24].  It is axiomatic that a party must present facts not legal conclusions, personal belief, or speculation couched as facts to survive summary judgment.  *Morisseau v. DLA Piper*, 532 F.Supp.2d 595, 617 (S.D.N.Y. 2008) (noting that "statements of personal belief and speculation" in a witness declaration are inadmissible); *see generally* 11 *Moore's Federal Practice 3d* at § 56.14[1][d] ("Allegations that proffer legal conclusions ... but are not buttressed with factual support expressed in the affidavit" may not serve as the basis for supporting or opposing a motion for summary judgment).

The Auditors of Public Accounts for the State of Connecticut conducted statutorily mandated audits of the Board and issued five reports covering the fiscal years June 2000 to 2010 which are germane to the matter before this court.[3] *See* 23 Conn. Gen. Stat. §2-89.  The Plaintiffs rely upon the audit report to demonstrate that the Board was derelict in performing its duties.  See [Dkt. #116, Pl. Opp. to Summary Judgment, p. 13-17].  The first report dated July 9, 2001 covered fiscal year ended June 30, 2000.  [Dkt. #118, Pl. Ex. 1].  The report indicated that during 1999-2000 fiscal year, "272 appeals were processed of which 163 appeals were scheduled for hearings.  Of that number 95 cases were heard by the Board and the remainder were either resolved or cancelled prior to the scheduled hearing date.  The Board heard 86 cases during the 1998-1999

---

[3] Curiously, Defendants indicate that they "do not necessarily accept the numbers of appeals filed and decisions rendered as calculated by the Auditors" but do not dispute that Plaintiffs have accurately cited the reports.  [Dkt. #121, Def. Reply Mem. p. 4 n.1].  However since Defendants have failed to proffer their own statistics as to the numbers of appeals filed and decisions rendered, the Court deems the statistics in the audit reports to be undisputed.

fiscal year."  *Id.* at p. 3.  The report recommended that the Board should take steps to improve its members' attendance at permit hearings.  *Id.* at p. 7.

The second report dated May 29, 2003 covered fiscal years ended June 30, 2001 and 2002.   The report indicated that for "fiscal year ended June 30, 2001, there were 187 requests for appeals of which 103 were scheduled for hearings. During the fiscal year ended June 30, 2002, there were 314 appeals of which 109 were scheduled for hearings."   [Dkt. #118, Pl. Ex. 2, p. 3].  "The number of appeals actually heard and decided upon the Board for the fiscal years ended June 30, 2001 and 2002, were 51 and 39, respectively."  *Id.*  The report indicated that the "increase in the number of appeals in fiscal year ended June 30, 2002, resulted from a number of factors including an increase in permit requests following the destruction of the World Trade Center and a higher frequency of permit denials from the local authorities."  *Id.*   Further, the report noted that "[a]s of January 22, 2003…the hearing date was being scheduled fourteen months after an appellant filed a completed appeal with the Board.  This compares unfavorably to the approximately three month backlog between requests for appeals and the scheduled hearing dates noted in our prior audit.   The actual delay between the appellant's appeal and the scheduled hearing is somewhat shorter as a result of cancellations and dispositions."  *Id.*

The 2001-2002 report expressed concerns about the length of the delay and recommended that steps be taken to reduce the backlog by establishing a standard for the Board and adjusting the scheduled hearing dates and number of cases heard.  *Id.* at 4.   In the report, the Board formally responded to the

Auditor's concerns noting that the "Board recognizes the cause for the time lag between the request for appeal and the hearing date and is attempting to reduce it by: [1] Sending a roster of appellants, a month in advance of a hearing scheduled, to the Department of Public Safety.  The purpose is to have DPS review the appellants present status and possibly reinstate or issue a pistol permit.  As a result, the Board would replace the new vacancy with appellants waiting and decrease the backlog; [2] Increasing the number of appeals heard at a meeting; [and 3] meeting with Board members and the Department of public safety to discuss a schedule to increase the number of meetings held per year." *Id.* at 5.

The 2001-2002 report also recommended that the Board take "steps to improve its members' attendance at hearings.  Further, the Board should establish and enforce standards for a quorum and majority vote for its meetings and for the minimum attendance requirements of its members."  *Id.* at 5.  The Board formally responded to this concern noting that the "Board has and will continue to take steps to improve its members' attendance at hearings.  The Board Chairman has informed members of the importance of attendance at meetings, and the need for quorum for a majority vote.  Members were also notified that meetings would be cancelled if a quorum was not met.  The Board regulations do not provide the required minimum attendance of its members who are volunteers appointed by the Governor.  Only the Governor is allowed to appoint or replace members to the Board.  The Board Chairman with the support of the Commissioner of the Department of Public Safety notified the Governor

regarding the DPS member's failure to attend more than 3 meetings in 3 years. The Commissioner of the DPS has recommended a new member to the Governor. The Governor has yet to reappoint a Board member.  In addition Board members are notified of hearings by: [1] An annual calendar of hearing dates and location is provided to each member; [2] A location is reserved a year in advance at the Department of Public Safety, Middletown, CT to provide convenient access to all members, [3] A memo with the hearing date and time is sent two weeks in advance of each hearing, [4] a follow up phone call confirming attendance is made at least two days in advance of hearing."  *Id.* at 6.

The third report dated November 21, 2005 covered fiscal years ended June 30, 2003 and 2004.   [Dkt. #118, Pl. Ex. 3].  The report indicated that that for fiscal year 2003, 299 requests for appeals were received, 89 cases were resolved or cancelled before the hearing, and 61 appeals were heard.  *Id.* at 3.  For fiscal year 2004, 300 requests for appeals were received, 96 cases were resolved or cancelled before the hearing, and 70 appeals were heard.  *Id.*  The report noted that the level of requests for appeals has been constant since June 30, 2002, in which year appeals rose approximately 60 percent, resulting from a number of "factors including an increase in permit requests following the destruction of the World Trade Center and a higher frequency of permit denials from the local authorities."  *Id.* The report further acknowledged that "[a]lthough all appeals are scheduled for hearing, not all are heard.  For example, the Board requires appellants to submit a follow-up questionnaire before their appeal can be heard, but approximately 30 percent of appellants never submit the form.  Also, the

majority of appeals are either resolved or cancelled by the Department of Public Safety before the scheduled hearing date." *Id.*  Lastly, the Auditors reported that there were approximately 290 cases pending at May 12, 2005 and that they estimated it would take approximately 14 months for those cases to be closed through hearings, withdrawals, or Department of Public Safety settlements.  *Id.*  It was further indicated that the backlog reached a high of approximately 20 months during the audit period but that beginning in November 2004, "the Board began reducing the backlog by asking the DPS to review additional cases.  The backlog during May 2005 was approximately 14 months."  *Id.* at 4.   The Auditors recommended that the Board continue to improve the timeliness of its hearings and improve member attendance.  *Id.* at 5-6.

The Board formally responded to these concerns in the 2003-2004 report disagreeing with the Auditor's estimate that there was a present backlog of 14 months.  *Id.* at 5.  The Board responded that the Auditor's 14 month estimate relied on statistics from past years" and did not "accurately incorporate new procedures implemented that have reduced that number to 7.6 months."  *Id.*  The Board further responded that it did "not have the capacity to call cases in a vacuum.  It relies on appellants to complete their applications and for State agencies, other than the Board, to do background checks prior to a case being made available for hearing.  Presently, the Board has 230 cases that are ready for a hearing.  As a result of hard work by the unpaid Board, the Department of Public Safety has agreed to do 60 background checks every two months for the Board, up substantially from years past.  All 60 cases have been cleared in each

two-month cycle since its adoption.  For simplicity, if we average 30 cases cleared per month and divide that by 230 it comes out to approximately 7.6 months."  *Id.*

The fourth report dated June 9, 2009 covered fiscal years ended June 30, 2005 through 2008.  [Dkt. #118, Pl. Ex. 4].  For fiscal year 2005, there were 296 total requests for appeals, 177 were resolved or cancelled prior to a hearing and 88 appeals were heard.  *Id.* at 3.  For fiscal year 2006, there were 330 total requests for appeals, 196 were resolved or cancelled prior to a hearing and 85 appeals were heard.  *Id.*  For fiscal year 2007, there were 337 total requests for appeals, 175 were resolved or cancelled prior to a hearing and 74 appeals were heard.  *Id.*  For fiscal year 2008, there were 318 total requests for appeals, 145 were resolved or cancelled prior to a hearing and 80 appeals were heard.  *Id.*  The Auditors once again note that not all appeals which are scheduled are heard pointing out that approximately 31% of the appellants fail to submit the required follow up questionnaire before their appeal can be heard.  *Id.*  The Auditors also noted that the "majority of appeals are either resolved or cancelled by the Department of Public Safety before the scheduled hearing date."  *Id.*  The Auditors indicated that there were 407 cases pending at August 8, 2008 and estimated that it would take 16 months for the cases to be closed through hearings, withdrawals, or Department of Public Safety settlements.  *Id.*  The Auditors further noted that between 2005 and 2008, 1,281 cases were opened by the Board, 1,052 cases were settled and of the 327 cases that went through a hearing process, the Board settled 242 cases while DPS settled 55 cases.  *Id.* at 4.

In addition, 32 cases were barred by state statute and/or appellants did not respond or attend their hearings while in 229 cases the appellants had not completed the required questionnaire to be ready for a hearing. *Id.*

In the 2005-2008 report, the Auditors recommended that the Board better ensure timely hearings by increasing the frequency of its hearings or by increasing the number of appeals scheduled at each hearing. *Id.* at 5.   The Board formally responded that on July 19, 2008, at the recommendation of the Board's subcommittee, the Board decided to increase the annual number of meetings from twelve to sixteen to reduce the backlog." *Id.*  The Board anticipated scheduling the 4 additional meetings, adding one additional meeting in each of the months of October, January, April and July. *Id.*

The 2005-2008 audit report also indicated that the Board had improved its member's attendance between July 2005 and June 2007 with average attendance now at 74% but encouraged the Board to further improve attendance. *Id.* at 5-6. The Board formally responded to this recommendation noting that as of March 12, 2009, the Board increased attendance to 76% while increasing the number of meetings from twelve to sixteen per year and established a quorum of 4 members and has not had to cancel a meeting due to a lack of quorum." *Id.* at 6.   The Board also indicated that a subcommittee of the Board will address the issue of minimum standards for attendance noting that Board members are volunteers and serve without compensation. *Id.*

The last report dated August 10, 2011 covered fiscal years ended June 30, 2009 and 2010.  [Dkt. #118, Pl. Ex. 5].  For fiscal year 2009, there were 361 total requests for appeals, 202 were resolved or cancelled prior to a hearing and 149 appeals were heard.  *Id.* at 3.  For fiscal year 2010, there were 325 total requests for appeals, 281 were resolved or cancelled prior to a hearing and 137 appeals were heard.  *Id.* at 3.  The 2009-2010 report indicated that the increased number of hearings (16 in 2009 and 18 in 2010) resulted in a decrease in the case backlog from 407 in August 2007 to 284 as of June 30, 2010.  *Id.*  "Over that same period, the estimated number of months needed to clear the backlog decreased from approximately 16 months to 10.5 months."  *Id.*   The Board formally responded in the audit report that it had "not only met its goal but further reduced the backlog or wait time for a hearing from 18 months to 9 months" and that the Board "will continue to be cognizant of the backlog and with the cooperation of the Department of Public Safety to continue to review cases that can be resolved prior to the hearing, thereby reducing the backlog further."  *Id.* at 5.  The report further indicated that the attendance rate had continued to improve to 84 percent from an average of 74 percent in the prior audited period.  *Id.* at 7.  Defendants assert that by the end of 2011, the backlog is now approximately 7.5 months. [Dkt. #103, Def. Local Rule 56(a)(1) Statement, ¶19].

For ease of comprehension the Court displays in the chart below the audit report data which the court recited in narrative form above:

| Year | Requests for Appeals | Appeals Scheduled | Resolved or cancelled prior to hearing | Appeals Heard | Estimated Length of Backlog* |
|------|------|------|------|------|------|
| 2000 | 272 | 163 | 68 | 95 | |
| 2001 | 187 | 103 | Not reported | 51 | 3 months |
| 2002 | 314 | 109 | Not reported | 39 | 14 months |
| 2003 | 299 | Not reported | 89 | 61 | |
| 2004 | 300 | Not reported | 96 | 70 | 14 months with a high of 20 months at end of period |
| 2005 | 296 | Not reported | 177 | 88 | |
| 2006 | 330 | Not reported | 196 | 85 | |
| 2007 | 337 | Not reported | 175 | 74 | |
| 2008 | 318 | Not reported | 145 | 80 | 16 months at the end of period |
| 2009 | 361 | Not reported | 202 | 149 | |
| 2010 | 325 | Not reported | 281 | 137 | 10.5 months at the end of period |

*Backlog means the time between the date on which an appeal was filed and the date on which a hearing on the appeal is scheduled to be conducted.

[Dkt. #118, Pl. Exs.1-5]. This data does not reveal for every year the number of scheduled appeals barred by state statute nor do they reveal those appeals scheduled but to which the appellant did not respond or at which the appellant did not appear. Accordingly, the data does not reveal the number of appeals carried over from one fiscal year to the next.

Adams served as Board Chairman from 2005 to June 2008 when he was replaced by Joseph T. Corradino. [Dkt. #118, Pl. Ex. 4]. In fall of 2007, T. William Knapp replaced Kuck as Board secretary. Plaintiffs assert that once Kuck was replaced by Knapp, Knapp, unlike Kuck, had control over the agenda and that Knapp was able to adopt some of the changes to reduce the backlog that Kuck

had long been advocating.  [Dkt. #116, Pl. Local Rule 56(a)(2) Disputed Issues of Material Fact, ¶¶29-38].

DPS has asserted that its two SLFU officers "repeatedly made efforts to cull cases from the backlog of cases on appeal that could properly be resolved prior to a hearing."  [Dkt. #103, Def. Ex. 3, Mattson Decl, ¶8]. DPS Officer Mattson further attested that "[m]any appeals are settled or otherwise disposed of without a decision by the Board of Firearms Permit Examiners for various reasons including the fact that an appellant may move, choose not to continue their appeal, or because a statutory disqualifier such as a protective order or restraining order may lapse."  *Id.* at ¶10.   Defendant DPS Officer Albert Masek testified that DPS attempted to "triage the cases" and "would look at some of the cases where maybe the Court had already said that the person's eligible again. [For example], a nolle may have finished."  [Dkt. #103, Def. Ex. 8, Masek Dep., p. 30].

Although Kuck and Adams clearly disagreed on how best to approach the backlog and Kuck sincerely believed that Adams "sabotaged" his efforts to address the backlog, Adams was aware of the backlog during his tenure as Chairman and made efforts to reduce it.  Adams sent DPS Commissioner John Danaher a letter dated May 14, 2007 regarding the backlog seeking advice and assistance in reducing the backlog.  [Dkt. #118, Pl. Ex. 15].   In the letter, Adams wrote that the "backlog of cases to be heard by the Board of Firearms Permit Examiners is a substantial concern to the members of the Board.  In their annual report, the Auditors of Public Accounts cited this backlog as a concern for the

second year in the row.  At that time, the wait for a hearing date was 14 months.
Today this backlog stands at 304 cases with an estimated wait for a hearing at 16
months.  The Board would greatly appreciate the assistance of the Department of
Public Safety in devising strategies to reduce this backlog in the interest of due
process.  We appreciate the hard work the members of the Connecticut State
Police assigned to the Special Licensing Firearms Unit perform with the narrow
constraints imposed by staffing and budget limitations." *Id.*  Adams further wrote
that "[o]ne strategy we are contemplating is providing the Unit more advance
notice of our hearing docket so they can clear out the uncontested matters and
focus on the cases that will require more work on their part.  Presently, we
provide about one month of advance notice of hearings.  We are considering
setting our calendar ninety days in advance to provide the Unit more lead-time.
We are interested in the Department's response to that idea, and also any other
ideas that the Department might have to expedite the appeals process." *Id.*
Lastly, Adams suggested that the Board resolve appeals "on the papers" without
a hearing for those cases where a permit was denied for failure to present two
forms of identification as the Board was unaware of any statute, law, or regulation
requiring two forms of identification.  *Id.*

Danaher responded to Adams in a letter dated September 14, 2007
indicating that DPS was also "concerned about the backlog" but did not
anticipate that the Board's suggestion of setting its calendar 90 days in advance
would have a "significant effect on the backlog."  [Dkt. #118, Pl. Ex. 16].  In
addition, Danaher declined to provide Adams with an opinion on the legality of

the requirement of two forms of identification suggesting that Adams reach out to solicit the advice of the Office of the Attorney General.  *Id.*  Danaher expressed "hope that Detective Karanda's participation at the Board's July 12, 2007 Special Meeting on this topic assisted the Board in understanding the complexity of addressing the backlog" and indicated that DPS would "continue to remain open to suggestions for improving the process."  *Id.*

Adams further testified that the "Board had been expressing a concern with the backlog and it was a concern that I shared, and we decided as a board to contact the commissioner to ask if there was anything that we could do or that they could do to try and address the backlog…I think all of the board members were concerned at varying levels.  Certainly the one that was most vocal about the backlog was Peter Kuck."  [Dkt. #119, Pl. Ex. 27, Adams Dep., p. 38].  Adams testified that he wrote to Danaher because the Board was "grasping at straws, trying to figure out if there was any place where we could become more efficient, if the department in processing their cases could become more efficient.  I had no way of knowing how they could become more efficient; that was really their issue. But we wanted to bring it to their attention that it was a concern of outs, so that if there were any opportunities to either streamline the process, or, you know, make it more efficient so that the backlog could be reduced, then that's something we would be interested in working with the department to do."  *Id.* at 40-41.

Adams also testified that he met with Danaher to "see if there was any other creative solutions that we could come up with to address the backlog."  *Id.* at 51.  Kuck was not included in this meeting with Danaher as Adams felt that

27

Kuck's presence would not be helpful due to the "mutual animosity" that existed between Kuck and DPS.  *Id.* at 52-54.

Adams testified that he agreed that one contributory factor in the backlog was that the Board only met once a month.  *Id.* at 142.  He also testified that other factors that contributed to the backlog included the Cheshire murders and the election of President Obama which resulted in increases in the number of permit applications and correspondingly requests for appeals.  *Id.* at 143.  Adams also attested that Kuck had wanted to schedule two meetings a month and that "was a controversial thing among our board.   He was clearly advocating the position that we should have more meetings.   I knew that I couldn't attend more meetings, but I did poll the board on a number of occasions during our discussions after hearings that we would have as a board, whether there was interest by any of the other board members to have more meetings, and there wasn't.   Being a volunteer board, people thought they were already spending a lot of time at these hearings.  And for him to go and all of sudden have there be two meetings notwithstanding that board sentiment, I thought was improper."  *Id.* at 166-67.

In addition, Adams met with SLFU officers Mattson and Karanda regarding the backlog and agreed to implement a system of reviewing cases alternating 40 cases every other month and 20 the other month which helped to reduce the backlog.  [Dkt. #118, Pl. Ex. 17, 6/15/2007 email]; see also [Dkt. #103, Def. Ex. 8, Masek Dep., p. 27-28] ("they were in the process of reviewing 20 cases one month, 40 cases a month, and 20 a month").

Knapp who replaced Kuck as Board secretary testified that the Board had asked the Governor to appoint another attorney to the Board to facilitate hearings.  [Dkt. #119, Pl. Ex. 38, Knapp Dep., 41-43].  Under the statute, at least one member of the Board has to be an attorney and "shall act as chairman during the hearing of appeals."   See Conn. Gen. Stat. § 29-32b(a).  Knapp explained that if there were more than one attorney on the Board, if the chairman wasn't present, the Board could still preside over appeals with the other attorney-member acting as chairman at the hearing.   Therefore during Adams' tenure, the Board would have only been able to conduct hearings if he was able to attend as he was the sole attorney appointed to the Board.

<u>Legal Standard</u>

 Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd*

*Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

<u>Analysis</u>

i.      Procedural due process claim in connection with backlog of appeals

Kuck and Goldberg argue they were deprived of due process when they were required to wait 18 and 22 months, respectively, for a hearing before the Board to contest DPS's decisions to deny Kuck's permit renewal and revoke Goldberg's permit after his arrest.  Defendants argue that there is no cause of action for a procedural due process violation under the facts of this case where the Board

was faced with significant increases in the number of Connecticut citizens seeking to own a handgun after September 11, 2001, the July 23, 2007 high profile Cheshire home invasion and murders and the November 2008 presidential election of Barack Obama after which the Board made several attempts with DPS to change procedures and with the Governor to change the composition of the Board in an effort to reduce the backlog, both of which were ultimately successful in reducing the time from the filing to the resolution of appeals nearly fifty percent from its high of 20 months in 2004 to its low of 10.5 months in 2010.  [Dkt. #103, Def. Summary Judgment Mem. p. 21-26].

Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990) (emphasis in original).  Due Process is a "flexible concept" that "varies with the particular situation." *Id.* at 127.  Consequently, the Court must consider "two distinct issues: 1) whether plaintiffs possess a liberty or property interest protected by the Due Process Clause, and, if so, 2) whether existing state procedures are constitutionally adequate."  *Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005).  To assess whether the existing state procedures are constitutionally adequate, the

Court applies the three-factor test articulated in *Mathews v. Eldridge* which requires the Court to balance the following "Matthews Factors":

> (1) the private interest at stake, (2) the risk of an erroneous deprivation of that interest through the procedures used and the probative value (if any) of alternative procedures, (3) the government's interest, including the possible burdens of alternative procedures.

*O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005).

The Second Circuit explained in its prior decision in the instant matter that "[b]roadly speaking, a delay amounts to a due process violation only where it renders the prescribed procedures meaningless in relation to the private interest at stake.  The mere assertion that state remedies are lengthy will not render state remedies inadequate under the Due Process Clause unless they are inadequate to the point that they are meaningless or nonexistent."  *Kuck v. Danaher*, 600 F.3d 159, 163 (2d Cir. 2010) (internal quotation marks, citation, and alterations omitted); *see also, Kraebel v. New York City Dept. of Housing Preservation and Dev.*, 959 F.2d 395, 405 (2d Cir 1992) ("'[I]mplicit in the conferral of an entitlement is a further entitlement to receive the element within a reasonable time' … [D]elay in processing can become so unreasonable as to deny due process.") (quoting *Schroeder v. City of Chicago*, 927 F.2d 957, 960 (7th Cir. 1991)).

Although there is "no bright-line rule…for determining when a delay is so burdensome as to become unconstitutional," the Second Circuit has nonetheless indicated that "determining the moment at which state procedures become so untimely that they become meaningless is a matter of context, driven by the *Mathews* factors."  *Kraebel*, 959 F.2d at 405; *Kuck*, 600 F.3d at 163.  Consequently,

"deprivations may not be indefinite, particularly where delay cannot be attributed to any clear state interest or the risk of erroneous deprivation is significant." *Id.* at 164.

The Second Circuit has further emphasized that courts should assess whether the delays are "egregious and without any rational justification." *Kraebel*, 959 F.2d at 405. In making this assessment, courts should "bear[] in mind the deference appropriately accorded by courts to executive agencies regarding practicalities encountered by those agencies in administering legislative programs" and "engage in a factual inquiry to determine whether the burdens and delays imposed … were reasonable." *Id.* at 406. Courts may consider a variety of factors, such as the level of difficulty in making the determination, the amount of work required, the amount of decision-making discretion, the need for and availability of administrative appellate review, the necessity for paperwork and supporting documentation required, the amount of time required to process similar claims as well as "any other factors that may bear on whether 'due process' is provided." *Id.*

Further underscoring this Court's due process analysis is the truism that "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 895 (1961). Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972).

Lastly, the Second Circuit has also "acknowledged that administrative determinations may require a non-trivial amount of time to complete, especially where caseloads are heavy" and that "'[r]egrettably, delay is a natural concomitant of our administrative bureaucracy.'" *Kuck*, 600 F.3d at 163 (quoting *Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir. 1989)).  Non-trivial delays may therefore be tolerated under the due process clause in clear cases of routine administrative delay or overburdened bureaucracy.   *See Isaacs*, 865 F.2d at 477 (holding that "neither the six-month delay created by the additional fair hearing, nor the estimated total of 19 months from claim initiation to completion of ALJ review are remarkable in the Medicare, Social Security and employment benefits systems" where "delay is a natural concomitant of our administrative bureaucracy") (colleting cases).

In coming to its conclusion that Kuck has plausibly stated that the delay in obtaining a hearing before the Board violated due process to survive a motion to dismiss, the Second Circuit relied on two prior cases which held that delays in post-deprivation hearings resulted in a procedural due process violations.  The first case the Second Circuit relied upon was *Spinelli v. City of New York*, 579 F.3d 160 (2d Cir. 2009) in which the Court of Appeals concluded that a "gun shop owner's due process rights were violated when New York City suspended her license without a prompt post-deprivation hearing." *Kuck*, 600 F.3d at 164.   In *Spinelli*, the City did not provide licensees with notice or an opportunity for a formal hearing until after the police investigation was completed which could take months or years.   *Spinelli*, 579 F3d at 171.  The Second Circuit concluded that

"although due process may tolerate some period of delay between a deprivation of property and a hearing, there is no justification for indeterminately delaying a hearing for a person in Spinelli's circumstances while the investigation runs its course" and therefore "the City's blanket policy of only providing a hearing after the investigation is completed cannot be squared with due process."  *Id.* at 173.

 The second case was *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) in which the Second Circuit considered "New York City's civil forfeiture procedures for vehicles involved in alleged crimes such as driving while intoxicated.  Under city policy, the city would seize vehicles immediately after an arrest, but forfeiture hearings awaited the completion of the underlying criminal proceedings. This practice frequently meant that owners were deprived of their vehicles for a year or more before they had any opportunity to challenge the seizure.  [The Second Circuit] concluded that this interval was simply too long in light of the private interests at stake." *Kuck*, 600 F.3d at 164.  Therefore, forfeiture hearings which often occurred more than a year after a vehicle's seizure pending the completion of the underlying criminal proceedings did not represent a meaningful opportunity to be heard at a meaningful time.  *Krimstock*, 306 F.3d at 43.  The Second Circuit explicitly noted that these two prior decisions informed its application of the *Mathews* factors in Kuck's case at the motion to dismiss stage. *Kuck*, 600 F.3d at 164.

   1.  Private interest at stake

Here, the parties do not dispute that the Plaintiffs possess a liberty interest, created by the Connecticut Constitution, in the right to carry a firearm.  Instead, the parties dispute whether the time required to schedule and resolve appeals before the Board violated due process.  The Second Circuit considered this very issue in this case and held that Kuck possessed a liberty interest created by the Connecticut Constitution in the right to carry a firearm.  *Kuck*, 600 F.3d at 163, 165 (citing Conn. Const. art. I, § 15; *Benjamin v. Bailey*, 234 Conn. 455, 662 (1995)).  The Second Circuit acknowledged that "[u]nlike in *Spinelli*, however, this interest is not directly tied to Kuck's economic livelihood, and thus lacks some of the same urgency identified by our opinion in that case and others" but that the "interest here remains substantial, protected as it is by the Connecticut Constitution and decisions of that state's highest court."  *Id.* at 164.

The Second Circuit further concluded that although the right to carry a firearm "is clearly subject to state regulation-including licensing provisions such as those here-these procedures must comport with due process" and therefore "as a result, permit renewal applicants are entitled to basic due process protections, including a meaningful opportunity to be heard after a denial or revocation."  *Id.* at 164-65.  Although the "deprivation of a firearm permit may not represent the same day-to-day hardship occasioned by the seizure of a vehicle used for daily transportation, as in *Krimstock,* 306 F.3d at 44-46, or interference with a business-person's livelihood, as in *Spinelli,* 579 F.3d at 174-76," the "Connecticut Constitution establishes a clear liberty interest in a permit to carry a firearm-an interest that is highly valued by many of the state's citizens."  *Id.* at

165.  Therefore as the Second Circuit has already concluded, Plaintiffs' private interest at stake here "[t]hough not overwhelming or absolute" remains significant.  *Id.*

    2.  Risk of erroneous deprivation

Next, the Court will consider the "risk of an erroneous deprivation" under "the procedures used" by the Board, along with "the probable value, if any, of additional or substitute procedural safeguards." *Mathews,* 424 U.S. at 335.  The Second Circuit in *Kuck* emphasized that the analysis of this factor at the motion to dismiss stage required "a close analysis of Kuck's complaint" and concluded based on Kuck's allegations that there was a significant risk of erroneous deprivation.  600 F.3d at 165-66.  Their conclusion was predicated on Kuck's allegation that "DPS frequently denies permit applications for bogus or frivolous reasons, thereby subjecting qualified applicants to a lengthy appeals process, only to grant the permit months or years later, just before the appeal hearing" as well as figures which Kuck offered "suggesting that the number of appeals 'resolved' without a hearing is indeed far greater than those actually heard by the Board." *Id.*

The Second Circuit highlighted that Kuck had alleged that in 2006-2007, 249 appeals were resolved while only 40 appeals came before the board for a hearing which was "consistent with his allegation that many permits are granted or reinstated shortly before the Board is due to hear the applicant's appeal."  The

Second Circuit relied on the following figures which were alleged in Kuck's complaint:

| Fiscal Year | Appeals Resolved | Appeals Heard |
|---|---|---|
| 2006-07 | 249 | 40 |
| 2005-06 | 281 | 72 |
| 2004-05 | 265 | 76 |
| 2003-04 | 166 | 52 |
| 2002-03 | 150 | 43 |
| 2001-02 | 109 | 39 |

*Id.* at 166 n.4.

Based on these figures and in the absence of refutation, the Second Circuit held that "[a]t the motion to dismiss stage, we credit the inference that this large disparity represents a significant number of unfounded permit decisions by DPS." *Id.* at 166. Accordingly, the Second Circuit found that "[b]ecause this practice appears to have affected a significant number of applicants, and the delay is considerable, the second Mathews factor weighs in favor of Kuck at this stage of the proceedings." *Id.*

On summary judgment, this second factor requires an analysis of whether evidence has been introduced to establish a material issue of fact as to whether there were a significant number of unfounded permit decisions by DPS as alleged in the complaint. *See Fox v. Poole*, No.06CV148, 2008 WL 3540619, at *5 (W.D.N.Y. Aug. 12, 2008) ("On a motion for summary judgment, however, the

issue is not the sufficiency of the pleadings rather whether evidence has been introduced by the opponent to establish a material issue of fact for the claims alleged in the pleadings to defeat a summary judgment motion."); *Dicara v. Connecticut Educ. Dept.*, No.3:08cv627(PCD), 2008 WL 5083622, at *4 (D. Conn. Nov. 26, 2008) ("'Summary judgment is designed to pierce the pleadings' and evaluate the sufficiency of the evidence to support the claims therein.") (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997)).

Here, the evidence in the record fails to substantiate the Plaintiffs' allegations that there was a significant risk of erroneous deprivation.  The only evidence that Plaintiffs introduce relevant to this second factor are the reports by the Auditors of Public Accounts.  The statistics from the audit reports significantly differ from the statistics that Kuck had previously provided in his complaint and relied upon by the Second Circuit.[4]   The statistics that Kuck had provided in his complaint significantly overstated the amount of appeals which were resolved or cancelled prior to a hearing as well as understated the amount of appeals actually heard by the Board.   Despite the fact that Plaintiffs overstated the amount of appeals resolved or cancelled prior to a hearing in their complaint, the audit reports do indicate, as Kuck had alleged, that a significant amount of more appeals are resolved or cancelled prior to a hearing then are heard. Although these statistics are relevant, the Supreme Court cautioned in *Mathews*

---

[4] The Court notes that the Connecticut State Auditors of Public Account's reports are available online to the public.  See http://cga.ct.gov/apa/Reports2.htm#A (last visited 10/2/2012).  When Kuck filed his original complaint in this matter, the reports for fiscal years 2000-2004 were available.  When Kuck's appeal was heard by the Second Circuit, the reports for fiscal years 2005 – 2008 were available.

*v. Eldridge that* "[b]are statistics rarely provide a satisfactory measure of the fairness of a decisionmaking process."  424 U.S. at 346.   Indeed, these statistics alone are suspect as they do not take into account the reasons for the resolution or cancellation of the appeal prior to hearing and therefore cannot truly be a proxy for the arbitrariness of DPS's decision-making.

Moreover, Defendants have submitted evidence explaining that a significant portion of the resolution or cancellation of appeals by DPS prior to the Board's hearing is entirely unrelated to DPS's original revocation or denial decisions.  First, the Auditors of Public Accounts noted that not all appeals that are scheduled are heard and found that this was in part explained by the fact that 30-31% of appellants failed to submit a follow-up questionnaire which was required before their appeal could be heard by the Board.  [Dkt. #118, Pl. Exs. 3 and 4].  DPS further explained that "[m]any appeals are settled or disposed of without a decision by the Board for various reasons included the fact that an appellant may move, choose not to continue their appeal, or because a statutory disqualifier such as a protective order or restraining order may lapse."   [Dkt. #103, Def. Ex. 3, Mattson Decl, ¶10.  Further, DPS may upon review prior to the hearing take into consideration whether a *nolle* of criminal charges which mandated revocation of the permit had been entered by the court, thereby warranting reinstatement of the permit prior to the hearing.  [Dkt. #103, Def. Ex. 8, Masek Dep., p. 30].  DPS has explained that they are reinstating permits prior to a formal hearing before the Board not because their initial decision was erroneous as Plaintiffs allege but rather as a result of a subsequent event or changed

circumstances which warrant reinstatement at that later time.  This evidence further reveals that the bare statistics from the audit reports do not provide a satisfactory measure of the fairness of DPS's decision-making process.

Plaintiffs have failed to offer any direct or other circumstantial evidence that DPS denied or revoked permits for bogus or frivolous reasons.  In the absence of any evidence demonstrating the arbitrariness of DPS's decision-making, the Court, on summary judgment, cannot credit the inference that the large disparity between cases resolved / cancelled and heard represents a significant number of unfounded permit decisions by DPS as was the case at the motion to dismiss stage in light of the evidence offered by the Defendants which undermine the conclusions drawn by the Plaintiffs.

This conclusion is only underscored by an examination of DPS's decisions to deny Kuck's permit renewal and revoke Goldberg's permit.  Although Kuck certainly believes that there is no state law, federal law, or other regulation which requires proof of citizenship for a permit renewal, a reasonable juror would not conclude that DPS's decision to implement a policy requiring such identification in response to a request by the National Instant Background Check System after the September 11, 2001 attacks was arbitrary or unreasonable.  Moreover, this policy is consistent with the statutory requirement that illegal aliens are not permitted to obtain permits.  *See* Conn. Gen. Stat. § 29-28(b).  Although Kuck did provide proof of citizenship when he applied for his original permit, it is not clear from the statutory scheme that requesting such identification upon renewal would be prohibited.  Considering the statutory scheme and the increased

emphasis on security post 9/11, a reasonable juror would not conclude that DPS's decision to deny Kuck's permit renewal pursuant to the policy they adopted post 9/11 was arbitrary or unreasonable.   As the Second Circuit sagely commented "[w]hile this requirement appears eminently reasonable to us, it is not our province here to resolve the specific issue of state law on which Kuck based his appeal to the Board." *Kuck*, 600 F.3d at 165.   Regardless of whether or not state law does or does not require the resubmission of proof of citizenship on a permit renewal, DPS's decision to deny Kuck's permit renewal was clearly not arbitrary or unfounded.

Likewise, a reasonable juror would not conclude that DPS's decision to revoke Goldberg's permit after his arrest for breach of the peace involving his firearm was arbitrary or unreasonable.   It is not surprising that DPS made the determination that an individual arrested for breach of the peace was a not suitable person to hold a permit pursuant Conn. Gen. Stat. § 29-28a(b).   As thoroughly discussed in this Court's prior decisions on the plaintiffs' respective motions to dismiss, although the term "suitable" is not statutorily defined, Connecticut courts have made clear that the purpose of imposing a suitability requirement is to ensure that persons who potentially would pose a danger to the public if entrusted with a handgun do not receive a permit.  [Dkt. #91, Mem. of Decision, p. 21-24].   A reasonable juror would not conclude that it was unreasonable or arbitrary for DPS to conclude that Goldberg potentially posed a danger to the public if entrusted with handgun on the basis of his arrest.

In addition, the statutory scheme itself circumscribes DPS's discretion to deny or revoke a firearm permits and thus reduces the risk of erroneous deprivation.  As this Court discussed in its prior decision, DPS does not exercise unbridled discretion to deny or revoke a person's firearm permit.  There are ten statutory exclusions which automatically disqualify an applicant for holding or retaining a firearms permit.   Conn. Gen. Stat. § 29-28(b).  In addition, the suitability requirement is itself cabined by the enumerated factors for determination of an applicant's qualifications and the principle established by Connecticut courts that the purpose of imposing a suitability requirement is to ensure that persons who potentially would pose a danger to the public if entrusted with a handgun do not receive a permit.  [Dkt. #91, Mem. of Decision, p. 21-24].

Lastly, the risk of erroneous deprivation is further reduced in this case where DPS employs two trained police officers in its SLFU to review and process permit applications, renewals and revocations.  The Second Circuit concluded in *Krimstock* that the risk of erroneous seizure and retention of a vehicle was "reduced in the case of a DWI owner-arrestee, because a trained police officer's assessment of the owner-driver's state of intoxication can typically be expected to be accurate."  306 F.3d at 62-63.   This same logic applies to the instant case. A trained police officer's assessment of a permit application, renewal, or revocation can typically be expected to be accurate particularly in light of the statutory scheme.  As noted above, Plaintiffs fail to offer any evidence, besides

the subjective and conclusory allegations in the complaint devoid of factual corroboration, suggesting otherwise.

Even viewing these facts in the light most favorable to Plaintiffs, a reasonable juror would not conclude that DPS was making unfounded permit decisions that it purposefully hid from the Board's review as Plaintiffs alleged.  In sum, the statistics in the audit reports alone do not demonstrate that DPS was making arbitrary or unreasonable permit decisions.  Further, Defendants have presented evidence indicating that the disparity between cases resolved / cancelled and heard was largely a function of factors entirely unrelated to the DPS's original permit decisions such as the lapse of a statutory disqualifier or the failure of the appellant to pursue their appeal.  Lastly, the risk of erroneous deprivation is reduced by the statutory scheme which circumscribes the discretion DPS has to deny or revoke permits and by the fact that DPS employs two trained police officers whose decisions can be expected for the most part to be accurate.  Plaintiffs have therefore failed to establish a material issue of fact as to DPS's decision-making.  Because the risk of erroneous deprivation occasioned by DPS's permit decisions is a reduced one, the second *Mathews* factor weighs in favor of Defendants.

As the Second Circuit concluded although this "prong generally requires that we also consider the probable value of alternative procedures," the Court need not explore this in depth as "it is clear that reducing the time to obtain an appeal hearing would considerably diminish the impact of any erroneous denials."  *Kuck*, 600 F.3d at 166n.6

### 3. Government interest at stake

The third Mathews factor examines "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews,* 424 U.S. at 335.  As the Second Circuit already concluded "Connecticut clearly has a strong and compelling interest in ensuring that firearm permits are not issued to those 'lacking the essential character or temperament necessary to be entrusted with a weapon.'" *Kuck*, 600 F.3d at 166 (quoting *Dwyer v. Farrell*, 193 Conn. 7 (1984)). At the motion to dismiss stage, the Second Circuit expressed concern over whether this interest in public safety could "explain why it requires up to twenty months to address appeals" and found the state's account that the prolonged wait is simply a function of the Board's caseload and backlog "far from overwhelming." *Id.*  This conclusion was premised on the pleadings which the Second Circuit emphasized contained no indication "that this time is required to gather evidence, perform additional investigation, or formally consider the appeal" and instead suggested that "the appeal sits gathering dust for nearly all of the interim period, awaiting the scheduled hearing date." *Id.*  In coming to his conclusion, the Second Circuit was required to accept as true Plaintiffs' allegations that "the Board held only 40 appeals hearings in the fiscal year 2006-07 –or less than four appeals per month." *Id.* at 166-67.  Thus the Second Circuit concluded that "the pleadings themselves do not support a clear case of routine administrative delay or overburdened bureaucracy" and "[w]hile we are often solicitous of governmental interests, particularly those related to the public's

safety, we cannot accept, at least without additional factual support, the months-long delay that Connecticut attempts to justify in this case." *Id.* at 167.

On summary judgment, the third Mathews factor requires the Court to assess whether the delay imposed by the Board was "egregious and without any rational justification" in light of the evidence in the record as well as the burdens that additional procedures aimed at reducing the backlog would entail such as increasing the number of times the Board met or the number of cases the Board heard at one sitting. Defendants essentially argue that the delay was indeed the product of routine administrative delay or overburdened bureaucracy. This Court agrees that the evidence amply shows that appeals do not sit gathering dust but instead that the Board was inundated with increasing requests for appeals, the Board was aware and concerned by this increase and made efforts to reduce the backlog.

As noted above, the statistics from the audit reports significantly differ from the figures that the Plaintiffs offered in their complaint which the Second Circuit relied upon in its decision. The audit reports reveal that far fewer appeals were resolved or cancelled prior to a hearing and that significantly more appeals were heard by the Board than was alleged. This is particularly true for fiscal year 2006-07 where Plaintiffs had alleged that 249 appeals were resolved while only 40 appeals were heard by the Board; whereas the audit report indicated that 175 appeals were resolved or cancelled prior to hearing and 74 appeals were heard by the Board. Therefore in 2006-07, the Board actually heard almost twice as many appeals as the Plaintiffs alleged. Based on the complaint's allegations, the

average number of appeals heard annually between 2001 and 2007 was approximately 54 while the actual average number of appeals heard annually was approximately 70 based on the audit reports. During Adam's tenure as Chairman from 2005 to 2008, the Board heard an average of 82 appeals annually.   The Second Circuit's concern that appeals sit gathering dust based on Plaintiffs' allegation that the Board only heard 40 appeals in 2006-07 is belied by the audit reports which reveal that the Board on average was actually hearing almost twice as many appeals than were alleged.

The audit reports further substantiate Defendant's claim that the Board was faced with unexpected and significant increases in requests for appeals after fiscal year end 2002.  In 2002, the number of requests for appeals increased from 187 the year prior to 314 which represented a 60% increase.  The Auditors of Public Accounts concluded that this increase resulted from a number of "factors including an increase in permit requests following the destruction of the World Trade Center and a higher frequency of permit denials from the local authorities." [Dkt. #118, Pl. Ex. 3].  Between 2003 and 2005, the number of requests for appeals remained steady at approximately 300 requests per year.   In fiscal year ended 2006, the number of appeals increased again from 296 the year prior to 330 which represented an approximately 11% increase.  The number of requests for appeals remained somewhat steady through fiscal year ended 2010 except for an increase in fiscal year ended 2009 where the Board received an unprecedented high of 361 requests for appeals, an approximately 10% increase from 2006 and 20% increase from 2003-2005 levels.   The audit reports indicate that as the Board received

higher numbers of requests for appeals, the so-called backlog, or time between the date an appeal was filed and a hearing was held, increased from 3 months in 2001 to a high of 16 months in 2008.   *See* [Dkt. #118, Pl. Exs.1-5].  The number of appeals declined from a high in fiscal year ended 2009 of 361 to 325 in fiscal year ended 2010, representing a decline of approximately 10%.   During that same period the backlog declined more than commensurately from 16 to 10.5 months, a decline of approximately 34%.  In view of these significant increases in requests for appeals in 2002, 2006, and  2009, coupled with its decline in 2010, it appears that the appeal's backlog was a function of routine administrative delay or overburdened bureaucracy which comports with due process.

Bolstering this conclusion is the Supreme Court's mandate that due process is not a technical conception but instead flexible calling for procedural protections which reflect the time, place and circumstances of a particular situation.  Crucial to determining what due process demands in this situation is an understanding of the nature, function, and resources of the Board.  The Board is comprised of seven members appointed by the Governor from prescribed constituencies.  Conn. Gen. Stat. § 29-32b(a).  One member must be an attorney who must act as chairman to preside over appeal hearings.  *Id.*  The members are all volunteers and serve without compensation.  Conn. Gen. Stat. § 29-32b(g). The Board maintains an office for its day-to-day business and is staffed by a single employee who oversees routine administrative and operational matters. Conn. Agencies. Regs. § 29-32b-4.  Neither the Chairman nor any other member

of the Board can terminate another member from the Board who serve at the Governor's favor.

Further, the statutory scheme implements an appeals procedure that demands a significant amount of work and preparation on behalf of the Board as well as appellants.  Although the appeal hearings are to be conducted in an informal manner, they shall be conducted in accordance with the rules of evidence and witnesses are to be sworn by the Chairman.  Conn. Gen. Stat. § 29-32b(e).  The Board is required to maintain a verbatim transcript of the hearing, the statements of witness made under oath are privileged, and the Decisions of the Board are to be made by majority vote and shall be communicated in writing to the appellant and to the issuing authority within twenty days after the rendering of the decision.  *Id.*   During a hearing, the Board is therefore required to consider sworn testimony and other evidence and then draft a written decision to be disseminated afterward.

As all courts are well aware, presiding over a hearing where evidence is to be weighed, considered and deliberated as well as drafting a decision requires substantial preparation, work and time.  In view of the fact that the Board is composed of volunteer members and not an agency staffed with full time employees like a court or administrative law judges in conjunction with the time-consuming nature of the appeals procedures mandated by statute, requiring the Board to significantly increase the number of meetings held or appeals heard in a meeting would undoubtedly result in more burden to what appears to be an already overburdened bureaucracy.  An examination of the statutory scheme, the

49

nature of the Board and its process as well as the increasing demands for appeal hearings illustrates that the Board's administrative determinations do require a non-trivial amount of time especially in light of the increasingly heavy caseload confronting the Board.  In light of these facts and circumstances, a reasonable juror would not conclude that the delay was egregious and without any rational justification.

As the Ninth Circuit acknowledged, when considering whether administrative delay violates due process, "[t]here is no talismanic number of years or months, after which due process is automatically violated." *Coe v. Thurman,* 922 F.2d 528, 531 (9th Cir.1990).  The length of the appeals backlog will always be a moving target which the Board, within its means, should exercise diligence to address in order to comport with the demands of due process.  The Second Circuit in *Kuck* was clearly concerned that the Board had adopted a dilatory attitude towards the backlog on the basis of the complaint's allegations which suggested that Board was meeting infrequently and just letting appeals sit "gathering dust."

In contrast, the factual record demonstrates that the Board was not dilatory but instead concerned and exercising diligence to address the backlog despite Kuck's sincere beliefs to the contrary.  It is undisputed that the Board was meeting far more frequently than the 90 days mandated by statute.  *See* Conn. Gen. Stat. § 29-32b(d).  During Adam's tenure as Chairman from 2005-2008, the Board was meeting monthly which is three times more frequently than contemplated by the statutory scheme.  Chairman Adams reached out to DPS

Commissioner Danaher in a letter dated May 14, 2007, proposing several suggestions to increase the number of appeals that could be resolved or cancelled prior to hearing.  *See* [Dkt. #118, Pl. Ex. 15].

The Board took affirmative steps to reduce the time between the appeal and the hearing.  Adams, the Board chairperson,  also met with Danaher in person to discuss the backlog.  [Dkt. #119, Pl. Ex. 27, Adams Dep., p. 51-54].   The Board held a special meeting on July 12, 2007 to brainstorm ideas for addressing the backlog with DPS Officer Karanda in attendance.  [Dkt. #118, Pl. Ex. 16].  Adams also met with SLFU Officers Mattson and Karanda and agreed to implement of system of reviewing more cases on an alternating basis.  As a result of this meeting, DPS began reviewing 40 cases every other month and twenty the month in between in an effort to increase the number of cases cancelled or resolved as a result of a change in circumstances or subsequent event which would facilitate the more-timely scheduling of appeals which were ripe for Board review.  [Dkt. #118, Pl. Ex. 17, 6/15/2007 email]; *see also* [Dkt. #103, Def. Ex. 8, Masek Dep., p. 27-28].  Further the Board had successfully improved its members' attendance at hearings between July 2005 and June 2007.  [Dkt. #118, Pl. Ex. 4, p.5-6].

The Board also reached out to the Governor seeking the appointment of another attorney as a member to increase the capacity of the Board to hear more appeals.  [Dkt. #119, Pl. Ex. 38, Knapp Dep., p. 41-43].  The statutory scheme requires that an attorney act as chairman and preside over the hearings.  *See* Conn. Gen. Stat. § 29-32b(a).  Consequently, the Board was constrained by the

fact that there was only one attorney appointed to the Board and therefore hearings could only be scheduled when that member was available.   Lastly, the Board on several occasions considered whether to increase the frequency of their meetings.   Kuck had strongly advocated that the Board meet twice a month. Although Adams felt that he could not attend more meetings himself, he did poll the Board on a number of occasions whether there was any interest to have more meetings.   On those occasions, the other members of the Board did not express any interest in increasing the number of meetings.   Adams explained that "[b]eing a volunteer board, people thought they were already spending a lot of time at these hearings."   [Dkt. #119, Pl. Ex. 27, Adams Dep., p. 166-67].   Ultimately, the Board in 2008 did decide to schedule four additional meetings per year.

On these undisputed facts, a reasonable juror would not conclude that the Board displayed a dilatory attitude towards the backlog and let the increasing backlog of appeals sit around gathering dust.   While Kuck sincerely believed that the Board needed to exercise more diligence to reduce the backlog to comport with due process, was frustrated when the Board did not consider or adopt his recommendations, and felt belittled and singled out by certain members of the Board and its staff employee, these beliefs and facts are not dispositive to this Court's analysis as to whether due process was violated.   Here, the undisputed facts depict a system staffed by volunteer officials inundated with increasing numbers of requests for time-consuming appeals.   In light of these facts and the limited resources of the volunteer Board, a delay of 14 to 16 months as reported by the state Auditors was not unreasonable administrative delay.

The Seventh Circuit in *Wright v. Califano*, 587 F.2d 345 (7th Cir. 1978) persuasively held that delays are not unreasonable under the due process clause where they are system-wide, impact all applicants equally and where the government has made "good faith efforts ... to cope with the delay problem under severe resource constraints."  587 F.2d at 353-54.  In *Wright*, the Seventh Circuit examined whether the lengthy delays prevalent in the social security system violated the mandates of the Social Security Act and Administrative Procedure Act which provides for hearings within a reasonable time.  The Seventh Circuit explained that the "reasonableness of the delays in terms of the legislatively imposed 'reasonable dispatch' duty must be judged in the light of the resources that Congress has supplied to the agency for the exercise of its functions, as well as the impact of the delays on the applicants' interests.  Since administrative efficiency is not a subject particularly suited to judicial evaluation, the courts should be reluctant to intervene in the administrative adjudication process, absent clear congressional guidelines or a threat to a constitutional interest."  *Id.* The Seventh Circuit also indicated that delays might be unreasonable where there was evidence of "bad faith, a dilatory attitude, or a lack of evenhandedness on the part of the agency." *Id.* at 353.  The Seventh Circuit ultimately concluded that the delays were not constitutionally unreasonable since the Social Security Administration had made good faith efforts to cope "with the delay problem under severe resource constraints and the prospect of future progress in the reduction of processing times" and there were no allegations of bad faith, a dilatory attitude, or a lack of evenhandedness.   *Id.* at 354-54.

As was the case in *Wright*, the factual record demonstrates that the Board made good faith efforts to cope with their delay problem under resource constraints occasioned by the significant increases in appeal requests and an all-volunteer board which had the prospect of future progress in reducing the delay. Indeed, these very efforts did successfully decrease the delay from 16 months in 2008 to 10.5 months in 2010.  Further, there is no evidence that the Board displayed bad faith, a dilatory attitude or a lack of evenhandedness in addressing its backlog despite Kuck's beliefs and allegations to the contrary.  This Court likewise concludes that the delays at issue were not constitutionally unreasonable as the Board made a good faith effort to address the backlog as opposed to letting the increasing requests for appeals accumulate and gather dust.

Although the Third Circuit in *Kelly v. R.R. Retirement Bd.*, 625 F.2d 486 (3d Cir. 1980) rejected a similar argument that a delay of three years and nine months from the filing of an application for a disabled child's annuity until issuance of a final agency decision was justifiable under the due process clause as a result of a backlog of cases and limited resources, the instant case is distinguishable.  *Id.* at 490-91.  In *Kelly*, the Third Circuit found this argument unpersuasive because "[w]hatever its internal problems the Board has the power to implement regulations that would accelerate the agency review process" and that a delay of four years was "totally out of phase with the requirements of fairness."  *Id.*  In the instant case, the Board was somewhat constrained to adopt regulations which would accelerate review by virtue of the fact that it was a volunteer board whose

members were appointed by the Governor.   Moreover, the delay at issue here is far shorter than the four years at issue in *Kelly* especially when considered in comparison to delays of 19 month up to three years that have been held constitutional in the Medicare, Social Security, and employment benefits systems.  *See Isaacs*, 865 F.2d at 477.

In view of the statutory scheme which requires a substantial amount of work and deliberation on behalf of Board members in processing appeals, the increasing number of requests for appeals, and the nature and resources available to a board composed solely of volunteer members, a reasonable juror would conclude that the backlog was attributable to routine administrative delay, an overburdened bureaucracy and indicative of a reasonable delay.  A balancing of the Mathews factors confirms that the Board's existing procedures are constitutionally adequate.  While the Plaintiffs do possess a liberty interest that is significant, this interest is not overwhelming or absolute and the risk of erroneous deprivation is a reduced one.  It is also clear that the government has a significant interest in public safety and that additional procedures aimed at reducing the backlog would impose substantial burdens on an already overburdened volunteer organization.  The record developed on summary judgment demonstrates that the Board's backlog reflects the well-accepted truism that "[r]egrettably, delay is a natural concomitant of our administrative bureaucracy."  *Isaacs*, 865 at 477.

The Court commends the Board's good faith efforts to cope with the backlog, including its recent decision to meet four additional times a year, that

have successfully reduced the delay to obtain a hearing before the Board.   The Court encourages the Board to continue in these efforts as due process obliges the government to strive to ensure the promptness and reasonableness of its remedies.   As the Second Circuit indicated the delay in processing appeals would have likely been constitutionally unreasonable if the Board had, as alleged, taken a dilatory approach and let requests for appeals accumulate gathering dust. The Court therefore grants summary judgment in favor of Defendants on Plaintiff's claims that due process was violated by the appeals backlog.

### a.  *Qualified Immunity*

Defendant Adams argues that he is entitled to qualified immunity from Plaintiffs' procedural due process claims.  When reviewing a claim of qualified immunity, a court must consider "whether the facts that the plaintiff has alleged (See Fed. R. Civ. P. 12 (b)(b)(6), (c)) or shown (see Rule 50, 56) make out a violation of a constitutional [or statutory] right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Although previously the Supreme Court prescribed a mandatory two-step analysis, considering first the constitutional violation prong and then the clearly established prong, the Court has since recognized that this rigid procedure "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case," as "[t]here are cases in which it is plain that a constitutional right is not established but far from obvious whether in fact there is a constitutional right." *Pearson*, 555 U.S. at 236-

37. Thus, the Supreme Court has provided district courts with the discretion to decide the order in which the two prongs of the qualified immunity analysis are applied.  *Id.* at 243.

Qualified immunity "protects government officials from liability where the officials' conduct was not in violation of a 'clearly established' constitutional right." *Sudler v. City of New York*, 11-1198-cv (L), 11-1216-cv (con), 689 F.3d 159, 174 (2d Cir. 2012). "If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Id.* (quoting *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)). "Qualified immunity thus shields government officials from liability when they make 'reasonable mistakes' about the legality of their actions, and 'applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal citations omitted) (quoting *Pearson*, 555 U.S. at 231).

Adams argue that at the time it was not clearly established that an 18-20 month delay in the scheduling of appeals before the Board was a violation of procedural due process as the caselaw that the Second Circuit relied upon in its decision in *Kuck* would not lead an objectively reasonable public official to believe his conduct was in violation of a plaintiff's federal rights.  In this Court's decision on the motions to dismiss, the Court held that at the motion to dismiss stage that the Second Circuit's decision in *Krimstock* taken together with the statutory regime which mandates that the Board hold hearings not less than once

every ninety days provided the Board with sufficient notice that the delay and alleged conduct of the Board's in failing to schedule and promptly hear appeals violated gun permit holders constitutional right to procedural due process.  See [Dkt. #91, p. 54-55].

Although this Court has concluded on summary judgment that the backlog did not violate due process, it is clear from the factual record that Adams would be entitled to the protections of qualified immunity even if the Court had found a constitutional violation.  The Court's prior decision that Adams would not be protected by qualified immunity at the motion to dismiss stage was largely premised on the Complaint's allegations which suggested that the Board was meeting less than statutorily required and as the Second Circuit characterized just allowing appeals to sit gathering dust.  As discussed above, the factual record developed on summary judgment confirms that the Board was not dilatory but instead diligently acting to address the backlog.  During Adam's tenure as Chairman on the Board, the Board was meeting monthly which was three times more frequently than statutorily required.  Adams personally made a good faith effort to cope with the delay by meeting several times with DPS and implementing a system of alternating increased DPS review to facilitate the more timely-scheduling of appeals which were ripe for Board review.

Since under Adam's tenure, the Board was meeting far more frequently than the statutory mandate, it was objectively reasonable for Adams to believe that his conduct did not violate appellant's due process rights, especially in the face of unprecedented and unpredictable case load increases.  The Second

Circuit has explained that "[e]ven if compliance with the state's own regulations is insufficient to meet the requirements of due process, adherence to such regulations may be pertinent in considering whether a reasonable official would have known his actions violated the Constitution."  *Green v. Bauvi*, 46 F.3d 189, 195 (2d Cir. 1995).  Where, as here, the Board was far exceeding the requirements of state law, a reasonable official would not have known that his actions violated the Constitution.

Further, the Second Circuit's decision in *Krimstock* alone would not have put a reasonable official on notice that the delay at issue violated due process. Plaintiffs cite no Supreme Court decision clearly establishing a right to an earlier hearing.  As the Second Circuit acknowledged the deprivation of a firearms permit does not occasion the same day-to-day hardship occasioned by the seizure of a vehicle used for daily transportation.  *Kuck*, 600 F.3d at 165.  Further the cause of the delay in *Krimstock* was the completion of underlying criminal proceedings as opposed to routine administrative delay or overburdened bureaucracy as was the case in the instant matter.  In *Krimstock* at issue was the City's wholesale failure to provide owners of seized motor vehicles an opportunity to challenge the seizure of their vehicles after the deprivation of their property and thus prior the completion of the underlying criminal proceedings. *Krimstock,* 306 F.3d at 43.  In *Krimstock*, the owners of the seized vehicles were forced to wait until after the underlying criminal proceedings completed upon which the City decided to either pursue a civil forfeiture suit or not.  *Id.*  In the instant case, the state did not fail to provide permit holders an opportunity to

challenge the decision to deny or revoke their permits after the deprivation of the permit as was the case in *Krimstock*. Instead, at issue was whether the Board was processing the requests for appeals in a timely manner which comported with due process. The key considerations in the instant matter are administrative delay and overburdened bureaucracy which were simply not at issue in *Krimstock*. While *Krimstock* does clearly establish that a deprivation of a significant interest "may not be indefinite, particularly where delay cannot be attributed to any clear state interest or the risk of erroneous deprivation is significant," the factual record indicates that this was not the case in the instant matter. *Kuck*, 600 F.3d at 164. A reasonable official would not be on notice from *Krimstock* that the backlog of appeals which resulted from routine administrative delay and overburdened bureaucracy despite good faith efforts to address the delay violated due process.

In sum, an objectively reasonable official would not believe that his conduct violated due process where the official conducted far more meetings than required by state law and made concerted efforts to reduce the delay of 14 to 16 months while constrained by resources and an increasing caseload. Consequently, Chairman Adams would be protected by qualified immunity assuming arguendo that the delay did violate due process.

Since this Court has found that Adams is protected by qualified immunity, it need not address Defendants' alternative argument that Adams is also protected by quasi-judicial immunity. "A court should find absolute immunity only in circumstances where the official can demonstrate that absolute, rather

than qualified, immunity is required by public policy." *Krebs v. New York State Div. of Parole*, No.9:08-cv-255, 2009 WL 2567779, at *6 (N.D.N.Y. Aug. 17, 2009) (*citing Scotto v. Almenas*, 143 F.3d 105, 110 (2d Cir. 1998)).  Here the Defendants make no argument that quasi-judicial immunity is required by public policy and therefore the Court declines to consider whether it applies in light of the appropriateness of qualified immunity.

> ii.  Procedural due process claim in connection with DPS's revocation of Goldberg's Gun Permit

Under Conn. Gen. Stat. § 29-32b(b), DPS "may revoke the state permit or temporary permit based on the Commissioner's own investigation or upon the request of any law enforcement agency." *Id.*  Plaintiffs argue that Goldberg was deprived of procedural due process when DPS revoked his permit without conducting an investigation to determine if the facts and circumstances warranted revocation nor did they receive a request for revocation from any law enforcement agency.  At the motion to dismiss stage, this Court found that Plaintiffs had plausibly stated a due process violation as due process "is flexible and calls for such procedural protections as the particular situation demands" and acknowledged that a failure to follow statutory procedures can rise to the level of a due process violation.

On summary judgment, this Court need not address whether the alleged failure to follow statutory procedures rose to the level of a due process violation as Plaintiffs fail to create a material issue of fact as to whether DPS violated Conn. Gen. Stat. § 29-32b(b).  At the outset, the Court notes that Plaintiffs have failed to include any statement of disputed or undisputed fact, nor have they

submitted any other evidence, tending to show that DPS failed to conduct an investigation or that it did not receive a request to revoke from a law enforcement agency in their Local Rule 56(a)(2) statement of disputed issues of material fact. See [Dkt. #116, Pl. Local Rule 56(a)(2) statement].  In contrast, Defendants have presented evidence indicating that DPS complied with Conn. Gen. Stat. § 29-32b(b).

DPS Officer Mattson has attested in a declaration that she received a phone call from the Glastonbury Police Department regarding Goldberg's arrest which she interpreted as a request to revoke Goldberg's permit.  [Dkt. #103, Ex. 3, Mattson Declaration, ¶16].  Mattson was then sent by the Glastonbury Police the incident report regarding the arrest.  *Id.* at ¶20.  Mattson attested that she conducted an investigation by reviewing the incident report as was customarily done by the unit and agreed that Goldberg's permit should be revoked.  *Id.*  A reasonable juror would not conclude that Mattson had failed to investigate where she has declared that she reviewed the incident report prior to revoking Goldberg's permit.  A reasonable juror would also conclude that when the Glastonbury Police Department called Mattson and sent her the incident report along with Goldberg's seized permit they were requesting that DPS revoke Goldberg's permit.

Plaintiffs have also failed to establish a material issue of fact as to DPS's failure to comply with Conn. Gen. Stat. § 29-32b(b) in connection with Goldberg's second permit revocation.   Goldberg applied for and received a second permit despite the fact that his first permit had been revoke and his appeal was pending.

DPS then revoked Goldberg's second permit.  DPS indicated in its letter to Goldberg that this second revocation was based on both Goldberg's involvement in the June 21, 2007 incident which culminated in his arrest and the fact that his prior permit had already been revoked on that same basis and currently under appeal. [Dkt. #119, Pl. Ex. 29].  A reasonable juror would conclude that DPS conducted an investigation prior to revoking Goldberg's second permit by virtue of the fact that their second revocation was based on their prior revocation which was under appeal.   Goldberg was clearing trying to circumvent the permitting and appeals process altogether.  It was imminently reasonable for DPS to revoke his second permit on the basis that they had previously revoked his first permit and that decision was under appeal to the Board.  If DPS allowed permit holders to simply reapply while their appeals were pending that would render the appeal process before the Board entirely moot.  Goldberg also appears to take issue with the fact that when DPS revoked his second permit his charges had been *nolled* and therefore all records of his arrest were to be statutorily erased.  Goldberg reasons based on his *nolle* that DPS should not have relied on his arrest to revoke his second permit.  However it is clear that DPS did not just rely on the facts of his arrest to revoke his second permit but were relying on the fact that his first permit had been prior revoked and under appeal.   Even viewing the facts in the light most favorable to Plaintiffs, a reasonable juror would not conclude that DPS violated Conn. Gen. Stat. § 29-32b(b) when they revoked Goldberg's second permit.

Assuming arguendo that DPS did violate due process by failing to comply with Conn. Gen. Stat. § 29-32b(b), the DPS Defendants would likely be entitled to qualified immunity as an objectively reasonable officer would not believe that his conduct in revoking Goldberg's first permit after reviewing the incident report and his second permit on the basis that his first permit was revoked pending appeal violated Conn. Gen. Stat. § 29-32b(b) or a permit holder's due process rights.   The Court notes that the Defendants argue in the alternative that the doctrine articulated in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984) applies to bar Plaintiffs' claim.  However, because the Court has found that there are no issues of material fact in dispute as to DPS's failure to comply with state law, the Court need not address this alternative argument.  The Court therefore grants summary judgment in favor of Defendants on Plaintiff's due process claim in connection with the revocation of Goldberg's permits.

### iii.   Fourth Amendment claim for unlawful seizure of Goldberg's gun permit

The Plaintiffs argue that "by means of the unlawful receipt of Plaintiff's valid state permit between June 21, 2007 and June 27, 2007, the DPS Defendants conspired with the Glastonbury Police Department to commit the criminal act of larceny and condoned the GPD seizure of property that the GPD had no right to take or withhold from Plaintiff" and violated Goldberg's right to be free of unreasonable and unlawful seizures of property in violation of the Fourth and Fourteenth Amendments.  [Doc. #92, Amended Compl., ¶¶ 295-297].  Defendants argue that there is no evidence that DPS conspired with the GPD to unlawfully

seize Goldberg's permits.   This Court agrees that Plaintiffs have failed to establish a material issue of fact as to the existence of a conspiracy to unlawfully seize Goldberg's permit.

In order to prove a conspiracy claim under § 1983, a plaintiff must demonstrate: "(1) an agreement an agreement between two or more state actors or a state actor and a private party[;] (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Bussey v. Phillips*, 419 F.Supp.2d 569, 586 (S.D.N.Y. 2006). To succeed in a § 1983 conspiracy claim, "a plaintiff must prove not only a conspiracy, but *an actual deprivation* of a constitutional right." *Martinez v. Golding*, 499 F.Supp.2d 561, 570 (S.D.N.Y. 2007) (emphasis in the original).

Here, Plaintiffs have failed to introduce any evidence that there was an agreement between DPS and GDP to deprive Goldberg of his permit.   Indeed, Plaintiffs have admitted that DPS Officer Mattson did not instruct GPD to seize Mr. Goldberg's permit. [Dkt. #116, Pl. Local Rule 56(a)(2) statement, ¶14].  Mattson has attested that she did not "direct the Glastonbury Police Department to take Mr. Goldberg's firearms permit" and that she "did not learn that Mr. Goldberg's permit had been taken until after it had occurred." [Dkt. #103, Ex. 3, Mattson Declaration, ¶18].  Mattson "only learned of the incident after the arrest had been made and had no contact with Lt. Woessner, or any other officer of the Glastonbury police Department, regarding Mr. Goldberg at any time prior to the arrest." *Id.* at ¶17.   Considering that DPS was not aware that Goldberg's permit had been seized by the GPD and never had any contact with any officer in the

GPD regarding Goldberg prior to his arrest, a reasonable juror could not conclude that DPS conspired with GPD to seize Goldberg's permit and commit larceny in the record in this case.

Further, another court in this district has held that the GPD did not violate Goldberg's Fourth Amendment rights and that his arrest was supported by probable cause.  See *Goldberg v. Town of Glastonbury, et al.*, Docket No. 3:07-cv-01733 (SRU), Transcript 9/17/2010, p. 43-44.  This decision was subsequently affirmed by the Second Circuit. *See Goldberg v. Town of Glastonbury, et al.*, docket No. 10-42150CV, slip op. at 3-2 (2d Cir. Dec. 13, 2011).   As a result, the Plaintiffs cannot demonstrate that Goldberg's Fourth Amendment rights were violated to prove a conspiracy claim against DPS under Section 1983.  The Court therefore grants summary judgment in favor of Defendants on Plaintiff's Fourth Amendment claim.

<u>Conclusion</u>

Based upon the above reasoning, the Defendants' [Dkt. #103] motion for summary judgment is GRANTED.  The Clerk is directed to enter judgment in favor of Defendants and close the case.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: October 16, 2012